## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cr-00404** |
| | ) | **Hon. James E. Boasberg** |
| **ISREAL JAMES EASTERDAY,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MOTION FOR REVOCATION OF DETENTION ORDER

Isreal James Easterday, by counsel and pursuant to 18 U.S.C. § 3145(b), respectfully moves the Court to revoke the Southern District of Florida's Order on Detention in this case. Because pretrial release to the custody of a suitable third party custodian along with other appropriate conditions described below would be sufficient to reasonably assure Mr. Easterday's appearance at future proceedings and protect the safety of the community, the Bail Reform Act ("BRA") requires his release.

Mr. Easterday is a 21 year old man with no prior criminal convictions. His mother, Marian Easterday, is Amish, and raised Mr. Easterday and his siblings according to the tenants of that faith. Until he was approximately 12 years old, Mr. Easterday's family traveled by horse and buggy, and went to a nearby town only two or three times a year. His family home was not connected to an electrical grid and used water from a well. He wore simple clothes with a hat and suspenders, and was home-schooled until he was 15 years old, when he began working full time on his family's farm. He served as the family's primary cow-milker from the age of around 5 until he left home at age 18 ½.

His principal employment since then has been farming, working with his uncle constructing houses, and building a modest two-room home on a small plot of land in Bonnieville, Kentucky, which he received from his father. Mr. Easterday's fiancé, Hannah Fredericks, moved in with him approximately two years ago. Mr. Easterday also enjoys a tremendous amount of familial support from his immediate family, all of whom reside at that same property or nearby in Kentucky. Mr. Easterday is also deeply committed to his faith, and had planned on participating in missionary work to distribute free bibles in the Bahamas when he learned of the outstanding arrest warrant while he was in Miami, Florida.

Although counsel has not yet received discovery, the criminal complaint makes no suggestion that Mr. Easterday is affiliated with any group such as the Proud Boys or the Oathkeepers, or that he advocated violence, or that he has espoused anti-democratic views. Mr. Easterday proffers pursuant to 18 U.S.C. § 3142(f) that he has no political affiliation, is not a member of any militia group, and does not know anyone affiliated with such groups.

Nor is there any evidence that in two years since January 6, 2021, Mr. Easterday has engaged in any conduct designed to undermine American democracy. On the contrary, after January 6, 2021, Mr. Easterday returned to his quiet life in Kentucky. For the past two years, he has resided with Ms. Fredericks and his family, and lived a modest life. At no point after January 6 did he glorify what happened on that date, or otherwise espouse violence.

When Mr. Easterday became aware that there was a warrant for his arrest, he immediately contacted the FBI and voluntarily turned himself in to authorities in Miami, Florida (where he sailed his boat and was preparing his travel arrangements for the missionary work). In

sum, Mr. Easterday is a very young man from an extraordinarily sheltered background who should not be detained pending the resolution of this case.

"The most informed decisions [about conditions of release] will almost always be made in the charging district," *United States v. Dominguez*, 783 F.2d 702, 705 (7th Cir.1986), and this observation is particularly apt given the unique nature of cases arising from the events on January 6, 2021, and the precedent developed in this jurisdiction with respect to the application of the BRA in this context. *See United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021). It is thus appropriate that this Court engage in *de novo* review with respect to a detention order issued by a Magistrate Judge in an arresting district that is far less familiar with this type of case and this jurisdiction's law. For these reasons and those that follow, Mr. Easterday respectfully requests that the Court vacate the Southern District of Florida Magistrate Judge's Order of Detention and release Mr. Easterday to the custody of a third party custodian, Ms. Fredericks, under pretrial supervision.

## I.      PROCEDURAL BACKGROUND.

On December 2, 2022, a criminal complaint was filed against Mr. Easterday and a warrant for his arrest was issued on the same date. Once Mr. Easterday became aware of the arrest warrant, he immediately contacted the FBI and turned himself in to the authorities six days later on December 8, 2022. He has been in custody since that date –approximately one month – and is currently detained at the Northern Neck Regional Jail. On December 9, 2022, Mr. Easterday had his initial appearance in the Southern District of Florida, and the court set a detention hearing for December 13, 2022. On that date, the court entered an order requiring that Mr. Easterday be detained pending trial because there was no condition or combination of

conditions that would reasonably assure the safety of any person and the community based on the nature of the charges and the weight of the evidence against him. The court did not find that he presented a flight risk.

An indictment was filed against Mr. Easterday on December 14, 2022, alleging the following five felony and three misdemeanor charges: civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count I); assaulting, resisting, or impeding certain officers using a dangerous weapon in violation of 18 U.S.C. § 111(a)(1), (b) (Count II); disorderly conduct, entering and remaining, and engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon in violation of 18 U.S.C. § 1752(a)(1)-(2) and (4), (b)(1)(A) (Counts III-V); and disorderly conduct, physical violence, and parading, demonstrating, or picketing in a capitol building in violation of 40 U.S.C. § 5104(e)(2)(D) and (F)-(G) (Counts VI-VIII).

The Pretrial Services Agency prepared a Pretrial Services Report (Dkt. No. 9) on January 5, 2023, where it found that Mr. Easterday was eligible for detention under 18 U.S.C. § 3142(f)(1)(A) and did not make any recommendations for or against release. Mr. Easterday had his initial appearance in this district via teleconference on January 5, in which undersigned counsel was appointed and a status hearing was set for January 13, 2023.

## II.       ARGUMENT.

### A. The Court Should Review the Propriety of the Detention Order *De Novo*.

Pursuant to 18 U.S.C. § 3145(b), this Court may revoke a detention order issued by a "person other than a judge of the court having original jurisdiction over the offense." "For purposes of 18 U.S.C. § 3145, 'the court having original jurisdiction over the offense' means the court in the district in which the prosecution is pending, not the court in which the magistrate

judge sits." *United States v. El Edwy*, 272 F.3d 149, 154 (2d Cir. 2001). Because the detention order was issued by a court in an arresting district outside of the charging district, § 3145(b) authorizes Mr. Easterday to file this motion "with the court having original jurisdiction over the offense," and says simply that "[t]he motion shall be determined promptly." § 3145(b).

"A motion under 18 U.S.C. § 3145(b) for review of a Magistrate Judge's detention order requires that the Court review *de novo* whether conditions of release exist that 'will reasonably assure the defendant's appearance in court or the safety of any other person or the community.'" *United States v. Smith*, 160 F. Supp. 3d 280, 282 (D.D.C. 2016); *accord United States v. Chrestman*, 525 F. Supp. 3d 14, 24 (D.D.C. 2021) ("[B]oth the [Bail Reform Act] and the Federal Magistrates Act lead to the conclusion that a district court reviews a magistrate judge's pretrial release or detention order *de novo*. Unsurprisingly, this view is shared by every circuit court to have addressed the standard of review under § 3145, . . . and by the Local Rules of this Court."); *but cf. Munchel*, 991 F.3d at 1280 (noting that D.C. Court of Appeals has not yet weighed in on standard of review and declining to reach issue).

**B. The Bail Reform Act Framework Imposes Strict Limitations On the Types of Cases Subject to Pretrial Detention.**

As the Court is aware, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the BRA thus provides that a defendant "shall" be released pending trial on either personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of

the person as required and the safety of any other person and the community." *See* 18 U.S.C. § 3142(b), (c)(1)(B).

Moreover, in § 3142(f), the BRA "limits the circumstances under which detention may be sought" in the first instance. *Salerno*, 481 U.S. at 747. In other words, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *Singleton*, 182 F.3d at 13 (quoting *Salerno*, 481 U.S. at 747).

Specifically, § 3142(f) authorizes pretrial detention "only if a case involves certain enumerated categories of offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B)." *United States v. Klein*, 533 F. Supp. 3d 1, 7–8 (D.D.C. 2021). If the case meets none of the factors in § 3142(f), "then no matter how dangerous or antisocial a defendant may be, Congress has concluded that such a defendant must be released, either on personal recognizance or on the least restrictive condition[s]" of release that will reasonably assure appearance and safety). *United States v. Gloster*, 969 F. Supp. 92, 94 (D.D.C. 1997).

Section 3142(e)(2) and (e)(3) describe a subset of cases in which "a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community," but this case does not fall within either section. Mr. Easterday has no criminal history and thus cannot satisfy § 3142(e)(2), and none of the charges fall within the list of enumerated offenses in § 3142(e)(3).

6

**C. This Case Does Not Involve Possession of a "Dangerous Weapon" For Purposes of 18 U.S.C. § 3142(f)(1)(E).**

Although counts 2-5 of the indictment allege offenses involving a "deadly and dangerous weapon," the item specified—"pepper spray, mace spray, or other chemical irritant"—does not qualify as a "dangerous weapon" for purposes of the BRA. For this reason, the Court should revoke the detention order because detention is not otherwise authorized under § 3142(f).

The BRA does not define the term "dangerous weapon," so the definition is determined by its ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *accord Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012). In other words, regardless of whether the definition of a "dangerous weapon" has a distinct and idiosyncratic definition for purposes of the charged offenses, the term in the context of the BRA is defined by its ordinary meaning, and the ordinary meaning of a "dangerous weapon" does not include pepper spray.

As an initial matter, pepper spray is not ordinarily understood as a weapon at all. Black's Law Dictionary, for example, defines a "weapon" as "[a]n instrument used or designed to be used to injure or kill someone." Black's Law Dictionary 1730 (9th ed. 2009). Webster's Third New International Dictionary defines a weapon as "in instrument of offensive or defensive combat," and the American Heritage Dictionary defines the term as an "instrument of attack or defense in combat, as a gun, missile, or sword." *Bond v. United States*, 572 U.S. 844, 861 (2014). While it is indisputable that toxic chemicals can be used as weapons, "no speaker in natural parlance" would describe "irritating chemicals . . . meant to cause discomfort" as a "chemical weapon." *Id.* Even in the midst of the circumstances at the Capitol on January 6, 2021, describing a can of pepper spray as a "deadly weapon" requires a stretch of ordinary English. *But*

7

*cf. United States v. Worrell*, 848 F. App'x 5 (D.C. Cir. 2021) (finding no plain error in district court's finding that pepper spray gel constituted a dangerous weapon); *United States v. Gieswein*, 2021 WL 3168148, at *10 (D.D.C. July 27, 2021) (holding that defendant who "carried a baseball bat and carried and used a chemical spray on law enforcement officers" used a dangerous weapon).

If the Court looks to other statutes to inform the definition in the BRA, some plainly exclude a can of pepper spray. *See, e.g.*, 40 U.S.C.A. § 5104(a)(2) (defining a "dangerous weapon" as any enumerated weapon (including by reference a machine gun, shotgun, blackjack, metal knuckles, devices designed to expel a projectile, and knives)); *Munchel*, 991 F.3d at 1281 n.5 (concluding that a taser constitutes a dangerous weapon under § 5104 in context of bail determination).

By contrast, in the context of defining a "deadly or dangerous weapon" for purposes of 18 U.S.C. § 111, the D.C. Circuit has held that the terms encompass both "inherently deadly" items like firearms and objects "capable of causing serious bodily injury or death to another person" and used as such. *United States v. Arrington*, 309 F.3d 40, 44-45 (D.C. Cir. 2002). The D.C. Circuit applied a similar definition in the context of a D.C. offense. *United States v. Broadie*, 452 F.3d 875, 881–82 (D.C. Cir. 2006) (citing *Strong v. United States*, 581 A.2d 383, 386 (D.C.1990)) (internal quotations omitted) (holding that a dangerous weapon includes devices designed to cause great bodily injury and "an object capable of causing great bodily injury" in circumstances indicating such use). Several courts have used such a definition in the context of detention proceedings. *See, e.g.*, *United States v. Klein*, 2021 WL 1377128, at *6 (D.D.C. Apr. 12, 2021) (citing *United States v. Bullock*, 970 F.3d 210 (3rd Cir. 2020)); *see also United States*

8

*v. Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (noting that the BRA does not provide a definition for "dangerous weapon" and relying on precedent addressing definitions from other statutes in Title 18).

But even if the Court were to look to such definitions for purposes of the bail determination, a can of pepper spray is not an inherently deadly device. Furthermore, the allegations in the criminal complaint do not allege that Mr. Easterday used a can of chemical irritant in a manner "capable of causing great bodily injury." *See* 18 U.S.C. § 1365 ("Great bodily injury" "involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.").

Indeed, the D.C. Court of Appeals has previously held that pepper spray did *not* constitute a "dangerous weapon" in the context of possession of a prohibited weapon in violation of D.C. Code § 22-4514(b). *See Jones v. United States*, 67 A.3d 547 (D.C. Ct. App. 2013). In arriving at this conclusion, the court referred to the legislative history to suggest that "possession of such sprays was authorized precisely because they are *not* dangerous *per se* – the [D.C.] Council noted that, while self-defence sprays may cause pain, their effects are non-lethal and temporary." *Id.* at 551. In that case, the court also pointed to the government's lack of evidence that pepper spray is dangerous as a matter of law and/or any additional information regarding the pepper spray's type, concentration, and heat rating, as well as the victim's pain. *Id.* at 551-52. Accordingly, the court acknowledged that while "pepper spray could inflict 'great bodily injury' under some circumstances, the government did not meet its burden to show that the [defendant's] use of pepper spray was likely to or did cause such injury here." *Id.* at 552. In so holding, the

9

court held that "pain that is 'merely significant,' rather than 'exceptionally severe if not unbearable,' does not constitute extreme physical pain." *Id.* (internal quotations omitted).[1]

In the criminal complaint in this case, the government alleges that Mr. Easterday picked-up and pointed "what appears to be some sort of bottle at USCP Officer 1" and "sprayed him with what appears to be a chemical irritant." *See* Statement of Facts (Dkt. No. 1-1) 3. USCP Officer 1 "had described to law enforcement, in sum and substance, that he believed he was sprayed with mace; that the irritant sprayed him was different from pepper spray used by the [USCP]; that the irritant got in his eyes and caused him pain." *Id.* at 4. There is no information in the present record regarding the type of chemical irritant Mr. Easterday allegedly used, its concentration, or its heat rating, which are necessary to ascertain whether that particular chemical irritant could inflict great bodily injury on USCP Officer 1. Moreover, USCP Officer 1 stated that he simply experienced "pain." There is no further description that the officer experienced a substantial risk of death (nor could he), extreme physical pain, disfigurement, or loss or impairment of a bodily function. To the extent USCP Officer 1 did experience pain, and consistent with D.C. Council's decision to authorize possession of pepper spray, the effects may have been "incapacitating," but only temporary and non-lethal. *See Jones*, 67 A.3d at 553. This is not enough to satisfy the definition of a "dangerous weapon."

---

[1] Other courts have similarly arrived at the same conclusion. *See, e.g.*, *United States v. Harris*, 44 F.3d 1206, 1318 (3rd Cir. 1995) (holding that the record was insufficient to support that mace spray had caused 'bodily injury' for purposes of a sentencing enhancement by noting that "[t]he degree of injury from mace will differ depending on such factors as the strength of a particular product used, the distance between the victim and the dispenser, and the angle of delivery. Accordingly, there will undoubtedly be crimes involving the use of mace where no 'bodily injury' will occur, just as there will be such crimes where a victim will experience such injury.").

Therefore, Mr. Easterday was not in possession of a dangerous weapon. *See Broadie*, 452 F.3d at 881-82. Regardless of whether the government can establish beyond a reasonable doubt before a jury that Counts 2-5 establish possession and use of a "dangerous weapon," a can of chemical irritant does not constitute a "dangerous weapon" for purposes of the BRA.

**D.    The Government Cannot Prove by Clear and Convincing Evidence that Detention is Necessary to Assure the Safety of the Community.**

Even if the Court were to find that Mr. Easterday did possess a dangerous weapon for purposes of 18 U.S.C. § 3142(f)(1), under the BRA, the Court must consider the following factors when determining whether there are conditions of release that will reasonably assure the safety of the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the person charged; and (4) the nature and seriousness of the danger posed by the person to any person in the community if he is released. *See* 18 U.S.C. § 3142(g). As described below, the balance of these factors weighs strongly in favor of release in this case. Accordingly, this Court should release Mr. Easterday with the conditions it deems appropriate.

**1.    The Nature and Circumstances of the Offense Charged.**

The nature and circumstances of the offenses charged weigh in favor of release in Mr. Easterday's case given the release of defendants charged with similar offenses who engaged in far more egregious conduct. According to the complaint and the indictment, the conduct at issue involved unauthorized entry into the Capitol and spraying pepper spray at a law enforcement officer. Neither the complaint nor the indictment allege that Mr. Easterday inflicted bodily injury, destroyed or defaced property, that he is a member of any organized group, that he coordinated his conduct with any other individual, or that his conduct or dress indicate prior

11

planning and preparation for a potentially violent assault. Finally, neither the complaint nor the indictment allege that Mr. Easterday has engaged in any conduct over the past two years since January 6, 2021, that would weigh in favor of detention in this case.

As such, release orders issued in cases involving allegations of far more serious conduct weigh in favor of release in this case. For example:

- *United States v. Scott Miller*, 1:22CR412 (TSC). Miller was a leading member of the Maryland/DC chapter of the Proud Boys organization and is alleged to have struck, hit, and jabbed police officers with poles, threw various items at officers, and ripped a police riot shield out of the hands of police who were near the entrance of the Capitol. Like Mr. Easterday, Miller was charged with, *inter alia*, assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). Miller was released to a third party custodian and to home incarceration. *See* Dec. 30, 2022 Minute Entry.

- *United States v. Michael Foy*, 1:21CR108 (TSC). Foy was positioned at the entrance of the "tunnel" and is alleged to have thrown a sharpened pole at officers. He is also alleged to have struck officers with a hockey stick. After acknowledging that 18 U.S.C. § 111(b) is *not* an offense for which there is a presumption for detention under the BRA, the Honorable Judge Chutkan released Foy to home incarceration. *See* ECF. No. 44. A review of the docket shows that defendant Foy has been compliant with conditions of release and Judge Chutkan has since modified Foy's conditions of release.

- *United States v. Ryan Miller*, 21CR75 (RDM). Miller was charged with assault on law enforcement with a dangerous weapon for discharging a fire extinguisher upon the steps leading to an entrance to the Capitol. *See* Dkt. No. 13 at 4 (Government's Detention Memorandum). The defendant self-identifies as a member of the "Patriotic American Cowboys" and donned a flag, known as the Gadsden Flag, during the riots at the U.S. Capitol on January 6, 2021. . . [T]he Gadsden Flag has more recently become a symbol for the Tea Party, Second Amendment advocates, and organizations opposing government overreach." *Id.* at 10. The Court released him with conditions. Dkt. No. 22.

- *United States v. Robert Sanford*, 1:21CR86 (PLF). Sanford is alleged to have hurled a fire extinguisher into a crowd of police officers and striking at least three officers in the head. Video footage allegedly captures Sanford screaming "traitors" and "cowards" at the officers. *See* Dkt. No. 10 (Government's Opposition to Defendant's Motion to Reconsider Detention). Like Mr. Easterday, Sanford was charged with, *inter alia*, assaulting police officers using a dangerous

weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). On March 2, 2021, Judge Friedman granted Sanford's motion for release and placed him on GPS monitoring. Dkt. No. 11.

- *United States v. David Alan Blair*, 1:21CR186 (CRC). Blair was captured on body worn camera brandishing a lacrosse stick which served as a pole for a large confederate flag. *See* Dkt. No. 1. While walking back and forth between the crowd and police officers, Blair is alleged to have exhorted, "hell naw, quit backing up, don't be scared. . .". As an officer advanced, Blair yelled at the officer: "what's up motherfucker, what's up, what's up bitch." *Id.* He then struck the officer in the chest with the lacrosse stick and had to be forcibly restrained by multiple officers *Id.* Notwithstanding this direct physical assault with a lacrosse stick, Blair was ordered released subject to conditions. Dkt No. 6. Like Mr. Easterday, Blair is charged with, *inter alia*, assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

- *United States v. Federico Klein*, 1:21CR236 (TNM). Klein is depicted on body worn camera "wedging [the] shield between the doors to the Capitol at approximately 3:00 p.m. in an apparent effort to prevent the officers from closing the doors." Dkt. No. 29, p. 3 (Order granting motion to revoke detention order). Another video showed Klein "pushing the shield into an officer's body in an attempt to break the police line." *Id.* Despite this direct contact, the Court concluded that "Klein does not pose a substantial prospective threat to the community or any other person." *Id.* at 25. Likewise, in Mr. Easterday's case, the government cannot show that he poses a continuing danger to the community, especially now that the events of January 6 have dissipated and Mr. Easterday has been in the community for two years without incident.

- *United States v. David Judd*, 1:21CR40 (TNM). Judd was alleged to have tossed a lit firework into the inaugural tunnel towards a line of police officers and charged with *inter alia*, 18 U.S.C.§ 111(b).[2] The government opposed his pre-trial release. The Honorable Judge Merriweather released Judd over the government's objection. Dkt. No. 60. A review of the docket shows that Judd has been compliant with all conditions of release since May 2021.

### 2.    The Weight of the Evidence.

Because of the presumption of innocence, "the weight of the evidence is the least important of the various factors." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (Op. for court by Kennedy, J.). Moreover, the Court must evaluate that evidence not in

---

[2] Judd has since entered into a stipulated trial agreement with the government.

order to make a pretrial prediction about the likelihood of conviction, "but rather must consider only the weight of the evidence [as it pertains to] defendant's dangerousness." *United States v. Lee*, 195 F. Supp. 3d 120, 129 (D.D.C. 2016). In this case, that evidence suggests that Mr. Easterday engaged in an isolated event over two years ago, and nothing suggests that his alleged conduct presents any indication that he poses an ongoing threat to anyone or to his community. This factor thus weighs in favor of release.

### 3.    Mr. Easterday's History and Characteristics.

Mr. Easterday is 21 years old. He was born in Richfield, Utah, and subsequently moved as a toddler with his family to Kentucky where he was raised in an Amish household. He was home-schooled until he was 15 years old, when he began working full time on his family's farm. When he was 18 ½, Mr. Easterday left his family's residence and moved into his own two-room home, which remains unfinished and that he built himself. Prior to his arrest, he lived there with his fiancée, his father and step-mother, as well as their three children. Mr. Easterday has a very strong and close relationship with his family – they are a pillar of support for him and will continue to support him throughout the case. Counsel has offered to the Pretrial Office that Ms. Fredericks would be a suitable and safe third party custodian.

Mr. Easterday has no prior convictions. He is not a member or affiliated with any political organization or group, and does not know anyone in any type of militia or paramilitary group. He does not possess any firearms or any other type of weapon at his home. Mr. Easterday's history and characteristics thus strongly suggest that any offenses he committed on January 6 were completely isolated incidents, and that conditions of release can be fashioned to ensure that he does not present a continuing danger to any person or the community if released.

**4.      Mr. Easterday Does Not Pose a Danger to the Community.**

The best evidence that Mr. Easterday does not pose a danger to the community is his conduct over the past two years since January 6. When he returned from the rally, Mr. Easterday did not glorify the assault on the Capitol, and became even more committed to his family, his work, and his religion. He resided with his family and performed construction-work with his uncle to be able to financially provide for them. And importantly, Mr. Easterday saved his income during those two years to be able to purchase a small boat and sail to the Bahamas with his fiancée to perform missionary work by distributing free bibles.

While Mr. Easterday was in Miami, Florida (where he sailed his boat to then make travel arrangements to Bahamas), he learned that there was an active warrant for his arrest. Instead of continuing with his plans, he did not hesitate and canceled his missionary trip and turned himself into the authorities. He has been detained for approximately one month as of today's date.

The D.C. Circuit has held that the mere fact that a defendant incurred charges stemming from the events of January 6 at the Capitol is not in itself a sufficient basis upon which to conclude that he is a present danger. Not only must the Court identify an articulable threat posed by the defendant to an individual or the community, but "the threat must be considered in context." *Munchel*, 991 F.3d at 1283 (internal citation omitted). "It follows that whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." *Id.* at 1283. Here, the Court must consider "the specific circumstances that made it possible, on January 6," for the defendant in question "to threaten the peaceful transfer of power," namely the "unique opportunity to obstruct democracy

on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests." *Id.* at 1284.

Two years after the fact, an event like January 6 is unlikely to happen again, so the volatile mix of circumstances in which many otherwise law-abiding Americans were incited to violence by none other than the President of the United States himself are not going repeat themselves.[3] Importantly, during those two years, Mr. Easterday has returned home to his quiet life with his family. He has not engaged in any rhetoric surrounding January 6. This was an isolated incident that is not representative of Mr. Easterday's character and values.

Under 18 U.S.C. §3142, the Court is required to release the defendant under the "least restrictive condition or combination of conditions" to ensure the safety of the community. The past two years since January 6 show that the circumstances surrounding Mr. Easterday's alleged offenses will not be repeated and that he does not generally pose a threat to the community. Any concerns that the Court may have can be met by carefully-tailored conditions of release.

**E.     The Government Cannot Prove by a Preponderance of the Evidence that Detention is Necessary to Assure that Mr. Easterday will Appear at Future Court Proceedings.**

There is no evidence in the record to indicate that Mr. Easterday poses a flight risk. To the contrary, he has substantial ties to his community and voluntarily turned himself in. Mr. Easterday has lived in the United States his entire life. His fiancée is located here. His family is located here. His work is located here. And when he learned of the arrest warrant in this case, he canceled his trip to sail to the Bahamas to perform missionary work and turned himself into

---

[3] *See* transcript of video sentencing in *United States v. Douglas Swee*t, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").

authorities in Florida. On top of all of that, Mr. Easterday has very few resources with which to flee.[4] Accordingly, there is nothing in Mr. Easterday's record to establish by a preponderance that he would not appear for further proceedings.

### III. CONCLUSION.

For the foregoing reasons, the government has not met its burden of demonstrating that there are no conditions or combinations of conditions that will assure the safety of the community or risk of flight. Mr. Easterday respectfully requests that the Court release him to his third party custodian, Ms. Fredericks, with conditions that the Court deems appropriate.

Respectfully submitted,

**ISREAL JAMES EASTERDAY**

By counsel,

/s/ Geremy C. Kamens
Geremy C. Kamens
Va. Bar No. 41596
Federal Public Defender
Office of the Federal Public Defender
1650 King St, Suite 500
Alexandria, VA 22314
703-600-0848
703-600-0880 (fax)
Geremy_Kamens@fd.org

---

[4] *United States v. Chrestman*, No. 1:21-mj-218-ZMF, 2021 WL 765662 (D.D.C. Feb. 26, 2021) ("[T]here's nothing in the record suggesting [the defendant] has much in the way of accumulated financial resources, and therefore he doesn't appear to have way to finance flight from the jurisdiction for any extended period of time"); *see also United States v. Nwokoro*, 651 F.3d 108, 110-11 (D.C. Cir. 2011) (noting that evidence "favoring appellant's pretrial release" included the fact that appellant had no assets under his control, no ability to flee the country, and "no prior criminal record").

Brittany Davidson
Va. Bar No. 90660
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King St, Suite 500
Alexandria, VA 22314
703-600-0817
703-600-0880 (fax)
Brittany_Davidson@fd.org