```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                       Case No. 22-MJ-04089-LMR
3
  UNITED STATES OF AMERICA,      )
4                                )
       GOVERNMENT,               )
5                                )
       -v-                       )
6                                )
  ISREAL JAMES EASTERDAY,        )
7                                )
       DEFENDANT.                )   Miami, Florida
8                                )   December 13, 2022
  _____)
9


10          TRANSCRIPT OF DETENTION HEARING PROCEEDINGS

11          BEFORE THE HONORABLE ALICIA M. OTAZO-REYES

12                 UNITED STATES MAGISTRATE JUDGE

13


14  Appearances:

15  FOR THE GOVERNMENT          Michael Thakur, ESQ., AUSA
                                U.S. Attorney's Office
16                              99 Northeast 4th Street
                                Miami, FL 33132
17
    FOR THE DEFENDANT           Frank Schwartz, ESQ.
18                              100 North Biscayne Boulevard
                                Suite 1300
19                              Miami, FL 33132

20  Reporter                    Stephen W. Franklin, RMR, CRR, CPE
    (561)313-8439               Official Court Reporter
21                              500 West Capitol Avenue
                                Little Rock, AR 72201
22                              E-mail:  SFranklinUSDC@aol.com

23      Proceedings recorded by Digital Audio Recording, and
    transcript prepared utilizing computer-aided transcription.
24

25
```

```
1           (Call to the order of the Court at 10:11 a.m.)

2                THE COURTROOM DEPUTY:  The United States of America

3      versus Isreal James Easterday, Case Number 22-4089-REID.

4                MR. THAKUR:  Michael Thakur on behalf of the United

5      States.

6                MR. SCHWARTZ:  Good morning, Judge.  Frank Schwartz

7      on behalf of Mr. Isreal Easterday, who's present before the

8      Court.

9                THE COURT:  All right.  So this matter is set for

10     removal, Report Re Counsel and detention hearing.

11               MR. SCHWARTZ:  Yes, Judge.

12               We've signed the waiver of removal.  As far as a

13     detention hearing, we'll have the detention hearing this

14     morning, and I filed a temporary notice of appearance, Judge.

15     This case is out of the District of Columbia, in Washington,

16     D.C.  So I believe my client will be looking to retain

17     counsel, local counsel, in D.C.

18               THE COURT:  All right.  So then Report Re Counsel,

19     we'll have to figure out what to do about that.

20               MR. SCHWARTZ:  I guess he'll get dates from --

21               THE COURT:  From D.C., right?

22               All right.  All right.  So you ready for detention

23     hearing?  You want to go ahead by proffer?

24               MR. THAKUR:  Yes, Your Honor.

25               The government is seeking detention based on risk of
```

1  flight and danger to the community.  The defendant is charged

2  by complaint in the District of Columbia with assaulting an

3  officer using a dangerous weapon or inflicting bodily injury.

4  He's also charged with civil disorder, entering and remaining

5  in a restricted building or grounds with a deadly or dangerous

6  weapon, disorderly and destructive conduct in a restricted

7  building, engaging in physical violence in a restricted

8  building, and disorderly conduct in the Capitol building.  And

9  these charge stem from the defendant's assault of a Capitol

10  police officer during the riot on the Capitol on January 6.

11         On that day, the defendant is on video outside the

12  East Rotunda door of the Capitol.  And that afternoon the

13  Capitol was closed to the public, and there were barricades

14  around the Capitol, and the defendant was holding a large

15  Confederate flag.  Which, he moved his way toward the front of

16  the crowd to get closer to the East Rotunda door.

17         At a certain point, it appeared based on the video

18  that he was handed a chemical irritant container, either a

19  mace or oleoresin capsicum, or OC spray.  The defendant then

20  moved closer to the Capitol police officers.  He put down the

21  Confederate flag, and it appears that either the defendant or

22  someone near him was using the Confederate flag to jam in the

23  direction of the Capitol police officers.

24         The defendant is then seen on the video holding up

25  the chemical irritant spray and spraying a Capitol police

1   officer for approximately 10 seconds, and the officer can be

2   seen on the video turning away from that spray, and that

3   officer later indicated that he was, in fact, hit by that

4   spray and was hurt by that spray.

5          After that, the Capitol police officers issued a

6   flash-bang to try to control the riot, but nevertheless the

7   Capitol door was breached on the east side about four minutes

8   later.  The defendant then went through the breach, went

9   inside the Capitol, and then immediately thereafter started

10  pulling the rioters inside the Capitol, and he remained inside

11  the Capitol for approximately 12 minutes before he left.

12  During that time, he can be seen on video and still

13  photographs in what appears to be confronting a New York Times

14  photographer who's inside the Capitol, as well.

15         The defendant was later identified through three

16  principal means that he was the person who had assaulted the

17  officer.  One is a court-authorized geofence to determine

18  which Google accounts were active and on at the time in the

19  Capitol, and the defendant's Google I.D. was matched.  His

20  name and his address that matched his Kentucky driver's

21  license was found.  Furthermore, the FBI used still

22  photographs to show the local sheriff in Kentucky, where the

23  defendant resided, and that local sheriff, who personally knew

24  the defendant, indicated that that was the defendant in those

25  photographs inside the Capitol and assaulting the officer.

1    Social media photographs also matched the clothing

2    that the defendant was wearing that day.  He was wearing a

3    black cap or black hat with "I Love Trump," and he also has

4    that same hat on his social media photograph.  A similar

5    Confederate flag is also displayed by the defendant in his

6    social media photographs.

7    During the course of the investigation, the FBI

8    interviewed other individuals who were traveling with the

9    defendant from Kentucky to the Capitol around that time, and

10    sometime after that, in March of 2022, the defendant simply

11    stopped residing in Kentucky.  He bought a $20,000 27-foot

12    boat.  He acquired a U.S. passport in March of 2022, and he

13    began living an itinerant life.  He was living on the

14    sailboat, essentially.  He docked at ports in the United

15    States, in the Caribbean.

16    And when the FBI called him last Monday, when they

17    found out his cellphone, he indicated to the FBI agent that he

18    had no plans of returning to Kentucky; would not return to

19    Kentucky for several years.  At that point, the FBI obtained a

20    court-authorized ping warrant to locate the defendant, and

21    they found him on a boat off the coast of Miami.

22    One moment, Your Honor.

23    Your Honor, I will reserve the rest for argument at

24    this time.

25    THE COURT:  All right.  And you said you're

```
 1   proceeding on danger?

 2          MR. THAKUR:  Danger and risk of flight.

 3          THE COURT:  And then you said that he was

 4   arrested -- when he was arrested, he was living on a sailboat?

 5          MR. THAKUR:  He was on a boat, yeah, off the coast

 6   of Miami.

 7          THE COURT:  How did the -- how did they get to him?

 8          MR. THAKUR:  They located him based on the court-

 9   authorized ping warrant --

10          THE COURT:  Yes.

11          MR. THAKUR:  -- for the location of his cellphone.

12          And so officers basically were on a boat and told

13   him, you know, either we will board that boat, or you come to

14   us and will be arrested.

15          THE COURT:  And who arrested him, the Coast Guard or

16   her (sic)?

17          MR. THAKUR:  One moment, Your Honor.

18          It was the FBI Miami squad, Your Honor.

19          THE COURT:  Oh, they went on the boat?

20          MR. THAKUR:  Yes.

21          THE COURT:  Okay.  All right.  And you have an

22   agent?

23          MR. THAKUR:  One clarification, Your Honor.  The FBI

24   was onshore, but they called out to him.  The defendant was on

25   the boat, and they told him to come back.
```

```
 1                THE COURT:  Oh, from shore they called out?

 2                MR. THAKUR:  Right.

 3                THE COURT:  Bullhorn?

 4                MR. THAKUR:  I guess they called him on his

 5     cellphone.

 6                THE COURT:  Oh, they called him on the cellphone

 7     from shore?

 8                MR. THAKUR:  Yeah, right.

 9                THE COURT:  And told him, give yourself up or we'll

10     board your boat?

11                MR. THAKUR:  Correct.

12                THE COURT:  And he did?

13                MR. THAKUR:  He did.

14                THE COURT:  So he came to some --

15                MR. THAKUR:  He came to shore.  He came to shore.

16                THE COURT:  -- marina?

17                MR. THAKUR:  And so he came to shore.  I'm not sure

18     exactly where in Miami it was, but they took him into custody

19     at that point.

20                THE COURT:  All right.  That was just curiosity.  I

21     was wondering.  You know, because obviously you can't just

22     jump off the boat.  You gotta dock someplace.

23                MR. THAKUR:  Right.

24                THE COURT:  All right.  All right.  So that's the

25     story of how he was arrested, and you have danger and then you
```

```
1   have risk of flight, and you have no -- well, this is out of
2   D.C.  So just for your information, this -- it would be ties
3   to the forum, right?
4            MR. THAKUR:  Yes, Your Honor.  Right.  He has no
5   known ties to D.C.
6            THE COURT:  No ties to D.C. and no ties now to
7   Kentucky, where he came from.
8            MR. THAKUR:  Correct.
9            MR. SCHWARTZ:  Well, I disagree with that, Judge,
10  but I'll get to it.
11           THE COURT:  Well, I'm assuming.  Not no ties.
12  Obviously family there.  I mean, not living in Kentucky I
13  guess would be an accurate way.
14           And then obviously no ties to Miami.
15           MR. THAKUR:  Correct.
16           THE COURT:  He just happened to be here.
17           MR. THAKUR:  Right.  He's just docked here before --
18           THE COURT:  And then you said -- do you have
19  documentation on where -- for what period of time and where he
20  was sailing?
21           MR. THAKUR:  We know that he is docked before --
22  he's gone to the Caribbean.  He's docked in Miami.  I think
23  when the agent called him last Monday, he indicated he was in
24  the Fort Pierce area.  So he had continued to sail south after
25  he spoke with the agent last Monday.  He's docked in Maryland
```

```
 1    before.  We have no indication that he has gone back to
 2    Kentucky since he got on the boat.
 3              THE COURT:  So up and down the East Coast of the
 4    U.S. --
 5              MR. THAKUR:  Yes.
 6              THE COURT:  -- but then some side trips to the
 7    Caribbean?
 8              MR. THAKUR:  And he's gone to the Bahamas, as well.
 9              THE COURT:  Say again?
10              MR. THAKUR:  Gone to the Bahamas, as well.
11              THE COURT:  Right.  That's what I was going to say,
12    side trips to the Caribbean.
13              MR. THAKUR:  Yeah.
14              THE COURT:  Okay.  All right.  And of course, you
15    can ask all the questions.  I was just trying to picture the
16    presentation in my mind in terms of what happened when.
17              All right.  Let's have the agent come up.
18              MR. THAKUR:  Yes.  FBI Special Agent Andy Biggs
19    testifying.  Andy Martin, I'm sorry.
20              THE COURTROOM DEPUTY:  Raise your right hand.
21              Andrew Martin, Government's witness, sworn.
22              THE COURTROOM DEPUTY:  You may be seated.
23              Please state your full name for the record and spell
24    your last name.
25              THE WITNESS:  Andrew Martin, M-a-r-t-i-n.
```

Martin - Cross

```
1              THE COURT:  Go ahead.

2              MR. SCHWARTZ:  Thank you, Judge.

3                    Cross-examination

4    BY MR. SCHWARTZ:

5    Q    Agent Martin, where are you employed?

6    A    Federal Bureau of Investigation, located in Bowling

7    Green, Kentucky, out of Louisville field office.

8    Q    Okay.  And how long have you been assigned to the

9    Kentucky office?

10   A    Four years.

11   Q    Four years?

12              Okay.  And when did you -- are you the primary agent

13   in this case?

14   A    Yes, sir.

15   Q    Okay.  You heard the proffer that the government provided

16   the Court?  Did you hear it?

17   A    Yes, sir.  Yes.

18   Q    And do you adopt it as your own?

19   A    Yes.

20   Q    Is there any additions, deletions, changes that you'd

21   like to make from what the prosecutor said?

22   A    I think he did a good job covering it, yeah.

23   Q    Okay.  Great.

24              When did you get assigned this case?

25   A    Approximately April 2022.
```

Martin - Cross

```
1    Q    April of this year?

2    A    Uh-huh.

3    Q    Okay.  Was my client identified prior to April '22, or

4    that's when he is -- identity was -- it was identified, and

5    then they assigned it to you in Kentucky?

6    A    Um, in -- both, both ways.

7            So I was aware of his name, and I was aware of the

8    group that he traveled to D.C. with back in January of 2021.

9    For other reasons he was not pursued at that time.  And in

10   April of 2022, Washington field office had identified him as

11   spraying mace at the officers at the Capitol, at which point

12   they referred -- there was videos -- to me, and the

13   investigation was initiated.

14   Q    And at what point did you believe you made a positive

15   identification?

16   A    Within -- probably within a week or two of being referred

17   the case.

18   Q    So after some time, April-May of 2022, you identified

19   him?

20   A    Yeah.  Soon thereafter, yeah.

21   Q    Okay.  And what steps did you take in that time to locate

22   him?

23   A    To locate him?

24           We had his driver's license, which put him in Hart

25   County, Kentucky, part of my area of responsibility.  And I
```

Martin - Cross

1   went to the local sheriff's office, showed them a photo spread

2   without any identification, just photos that were taken from

3   the Capitol, and asked them if any of these photos were known

4   to the officers there.  The officers reviewed the photos,

5   immediately identified him as Isreal Easterday, and I just

6   documented that confirmation.

7   Q    Okay.  And this is a small town, correct?

8   A    Correct.

9        (Simultaneous crosstalk)

10  Q    (Inaudible)?

11  A    Correct.

12  Q    So it's common for the local sheriff to know the

13  population, correct?

14  A    Correct.

15  Q    In fact, my client has no prior arrests, correct?

16  A    Correct.

17  Q    Okay.  So just to be clear, it's not a situation that the

18  sheriff knows him because he's constantly getting in trouble?

19  A    Correct.

20  Q    That's not the case.

21       Okay.  Now, you reviewed the videos and the

22  photographs of January 6, 2021, correct?

23  A    Correct.

24  Q    Okay.  And my client wasn't dressed in any kind of

25  military camouflage, correct?

Martin - Cross

```
 1   A    Correct.

 2   Q    He wasn't wearing any kind of bulletproof vest?

 3   A    Correct.

 4   Q    He wasn't wearing a tactical helmet?

 5   A    Correct.

 6   Q    Okay.  He was dressed in just a coat and a winter hat

 7   that says, "I Love Trump," correct?

 8   A    Correct.

 9   Q    Okay.  You have no indication of where that spray came

10   from, correct?

11   A    Correct.

12   Q    All right.  You don't know if he brought it into the

13   Capitol, right?

14   A    Unknown.

15   Q    And in the video, does it look like somebody -- I believe

16   the government indicated somebody handed him the spray?

17   A    It does appear that way.

18   Q    Okay.  So it doesn't -- you don't have any evidence that

19   my client planned to attack the Capitol that day, correct?

20   A    That's a large statement.  I mean, "attacked the

21   Capitol?"  I think he had intent to go to the Capitol and

22   enter it, yeah.

23   Q    Okay.  Is that from interviews that you've conducted?

24   A    That's from interviews of, yeah, the people that he

25   traveled with.
```

Martin - Cross

1  Q    Okay.  Now, let's talk about the spray that was used.

2  Was that recovered by agents on the scene?

3  A    We attempted to look for it.  They did recover some

4  canasters.  Based on the still photographs we could get from

5  the video and trying to match that up, we were unsuccessful.

6  Q    Okay.  So you can't tell this Court what was the actual

7  spray, what were the -- what was the content of that spray,

8  correct?

9  A    The officer that received or that was the victim of being

10  sprayed testified in court earlier that he believed it to be

11  mace, and he made that calculation based on his prior training

12  and experience of being sprayed with OC spray, and he could

13  tell the difference between the sprays.

14  Q    Okay.  And let's, we'll call it mace at this point.  Mace

15  is not made for permanent injury, correct?

16  A    Correct.

17  Q    Okay.  And, in fact, the officer, thankfully in this

18  case, doesn't have any permanent injury as a result of this

19  spray, correct?

20  A    Correct.

21  Q    Okay.  In fact, he was disoriented for a little bit of

22  time, and then he continued on his duties to protect the

23  Capitol, correct?

24  A    Correct.

25  Q    Okay.  So any indication that my client posted any

Martin - Cross

1    pictures or statements against the government after January 6,

2    2021?

3    A    Unknown at this time.

4    Q    Okay.  But you've looked for that information, correct?

5    A    I'm waiting on search warrant returns.

6    Q    Okay.  And I believe the prosecutor advised the Court

7    that you reached out to the -- my client two weeks ago?

8    A    Correct.

9    Q    Okay.  And that was as a result of my client calling the

10   general number for the FBI, correct?

11   A    Correct.

12   Q    Okay.  So let me understand this.  At some point my

13   client is advised that the FBI is looking for him, right?

14   A    Correct.

15   Q    He doesn't have your direct number?

16   A    Correct.

17   Q    He has -- I guess he Googles "FBI Kentucky" and gets the

18   general number, right?

19   A    I would assume that, yes.

20   Q    Okay.  And obviously whoever answered that phone doesn't

21   know that you're -- that he's being investigated, so it takes

22   a couple of days for them to get -- track you down and for you

23   to call him back, right?

24   A    Yeah, there's a little bit of a gap, but the referral was

25   made to me, yes.

Martin - Cross

1    Q    Okay.  So then when you do call him it's a result of him

2    calling the FBI first, and when you call him you ask him,

3    where are you, right?

4    A    I asked what his name was just to make sure I had -- who

5    I was looking, yeah.

6    Q    And he told you that he's -- he's not in Kentucky,

7    because he's been sailing for eight months?

8    A    He told me he was in Fort Pierce, he told me he was on a

9    sailboat that he purchased approximately six months earlier,

10   and he told me he was en route to the Caribbean.

11   Q    Okay.  And then your next contact with him was when you

12   fly down a couple days later to Miami?

13   A    Negative.  I was not present at the time of his arrest.

14   Q    Okay.

15   A    The arrest happened relatively quickly after the ping

16   went up, and just coordination, I was not able to get down.

17   Q    Did you tell him not to go anywhere?

18   A    I did not.

19   Q    Okay.  Did you -- you told him you wanted to interview

20   him, right?

21   A    Correct.

22   Q    And he indicated that he wanted to hire an attorney to do

23   that?

24   A    Negative.

25   Q    He didn't?

Martin - Cross

1              Oh, he offered to do a Zoom, correct?

2      A     Correct.

3      Q     Okay.  And obviously that's not what you wanted to do?

4      A     Yeah, I didn't -- I deferred to the U.S. Attorney in D.C.

5      at that time.  I just said, let me -- let me confirm with him

6      how we would like to proceed.  So I left it open-ended with

7      him until I could get a better confirmation how we wanted to

8      proceed.

9      Q     And he gave you his cell number, correct?

10     A     Yes.

11     Q     And that's how you guys were able to track him down in

12     Miami, right?

13     A     Yes.

14     Q     Okay.  And just to clarify for the Court, I think the

15     Judge asked the actual arrest.  I know you weren't there, but

16     I assume you spoke to the agents that actually conducted the

17     arrest?

18     A     I spoke to a few people that were there, yes.

19     Q     Okay.  So basically he's on his sailboat, and he's got a

20     little dingy attached to it, right?  And they called him and

21     they say, listen, we got a warrant for your arrest, we need

22     you to come ashore.  And he said, not a problem.  He got on

23     his dingy, and he took the dingy to shore, where he

24     surrendered, correct?

25     A     I think it was a little bit more to it, but in sum and

Martin - Cross

1   substance, yes.

2   Q    Okay.

3   A    I think he was doubtful that it was the FBI and doubtful

4   that we had an arrest warrant.  So we ended up having -- I was

5   told that he was sent, I think via text, a copy of the arrest

6   warrant just to kinda provide some bona fides that this is

7   what was happening.  And I think when he saw a drone above his

8   boat, he -- that, plus the arrest warrant, provided him the

9   context necessary to believe that he was under arrest.

10  Q    So, but he didn't make any efforts to pull up the anchor

11  and sail away from the agents, correct?

12  A    No.  I believe they made clear to him that we have boats

13  in the water, we will board your vessel, but to avoid doing

14  that we're asking him to come off the vessel and present

15  towards land, where the agents were meeting him.

16  Q    And so once he saw the arrest warrant he complied,

17  correct?

18  A    Yeah, within a relatively short period of time.  I think

19  there was a little bit of gap.  I think maybe he was -- I

20  don't know if he was getting dressed or getting his affairs in

21  order or something like that, but he got on the boat a little

22  bit later.

23            THE COURT:  I'm sorry.  Did this all happen in Fort

24  Pierce?

25            THE WITNESS:  This happened in the -- in the realm,

Martin - Cross

1    in the vicinity of Fisher Island, Miami.

2              THE COURT:  Over here?

3              THE WITNESS:  Correct.

4              THE COURT:  By the port?

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  But the last time you located him, he

7    was in Fort Pierce?

8              THE WITNESS:  I spoke with him on Monday.

9    Forgetting exactly the date, maybe the 12th.  And when I spoke

10   with him on Monday, he said he was in Fort Pierce.

11             So I was working with the Fort Pierce FBI office to

12   coordinate an interview and arrest of him.  We were unsure of

13   his exact location.  We knew he was on a boat.  We were

14   looking for the boat.  We were unsuccessful in finding the

15   boat.

16             It took a couple days to get the ping warrant

17   online, and once the ping warrant was online, we -- the first

18   ping was in the vicinity of Fisher Island, Miami.  At which

19   point, the case was referred down to FBI Miami field office

20   instead of the Fort Pierce field office, or RA.  And then FBI

21   Miami quickly moved to locate the boat, located the boat

22   within a period of hours and then planned an operation to

23   arrest him.

24             THE COURT:  And when he was near Fort Pierce he was

25   not docked or anything, he was out in the water?

Martin - Cross

```
 1              THE WITNESS:  It's unknown to me.  I'm relying on

 2   the client's words, or Isreal's words at that point, that he

 3   was in Fort Pierce.  I didn't have verification.

 4              THE COURT:  No; I meant by Fisher Island.

 5              THE WITNESS:  Oh, in -- yeah, in Fisher Island he

 6   was in the water.  He was not on land, from what I was told.

 7   I don't -- I don't know what that distance is, but, you know,

 8   had to take a dingy to get to shore.

 9   BY MR. SCHWARTZ:

10   Q    Now, he lives on the boat, correct?

11   A    From what I'm aware of.

12   Q    Yeah.  So he lives on the boat.

13        Okay.  And didn't resist arrest, didn't fight with

14   the officers once he came to shore, correct?

15   A    Correct.

16   Q    Okay.  And, in fact, he told you that he's been doing

17   missionary work, taking Bibles to the Bahamas?

18   A    I think that was his future plan.  I don't think -- I

19   don't know if he had done that in the past.

20   Q    Okay.  And there was other -- did he indicate to you or

21   were you aware that there was another individual on a boat

22   next to him that was also doing the missionary work?

23   A    I was unaware of that.

24   Q    Okay.  And my client was 19 years old at the time of this

25   incident in Washington D.C., correct?
```

Martin - Redirect

1    A    I'd have to do some math.  2001 birthday, 2021.  Okay,

2    yeah.

3             MR. SCHWARTZ:  Okay.  Judge, I have nothing further

4    for the agent.  I just have argument for the Court.

5             THE COURT:  All right.

6             MR. SCHWARTZ:  Just --

7             THE COURT:  All right.  So you want (inaudible) a

8    couple questions?

9             MR. THAKUR:  A couple clarifying questions, yeah, in

10   terms of timing.

11                      Redirect Examination

12   BY MR. THAKUR:

13   Q    You said you called last Monday to the defendant, so that

14   would have been December 5th?

15   A    Yes.  I'd have to pull out a calendar.

16   Q    Okay.

17   A    Yeah.

18   Q    And then he was arrested several days later, on Thursday

19   of last week; is that correct?

20   A    That's correct.  We didn't -- the one-week span.  I

21   called on a Monday; he was arrested on Thursday.

22   Q    Got it.

23             THE COURT:  I'm sorry.  And the call to the FBI,

24   when did that come in?

25             THE WITNESS:  The call to the FBI?  That came in the

Martin - Redirect

1   Friday before the Monday I talked to him.  So probably

2   the 3rd, then, if we're going on the 5th.

3              MR. THAKUR:  Or the 2nd.

4              THE WITNESS:  If the 5th is a Monday, or 2nd.

5              THE COURT:  Second, yes.

6              So the sequence is you have put out, you know, BOLO

7   and stuff like that, and then December 2nd he calls,

8   December 5th you call him back, and you locate him with a ping

9   warrant sometime, and then you arrest him Thursday?

10             THE WITNESS:  Correct.  The ping, we were getting

11  ping data Thursday morning, and we arrested him that

12  afternoon.

13             THE COURT:  And when you spoke to him -- I'm sorry,

14  I don't mean to butt in.

15             MR. THAKUR:  That's fine.

16             THE COURT:  When you spoke to him on that Monday,

17  you informed him that he was subject to an arrest warrant?

18             THE WITNESS:  Negative.

19             THE COURT:  You did not.  So --

20             THE WITNESS:  I did not.

21             THE COURT:  So what did you talk to him about when

22  you spoke to him on Monday, returning his call to the FBI

23  general number?

24             THE WITNESS:  I told him that I wanted to interview

25  him --

Martin - Redirect

 1              THE COURT:  Okay.

 2              THE WITNESS:  -- for his associates and experiences

 3  surrounding January 6, 2021.

 4              THE COURT:  Okay.  And then he agreed to that?

 5              THE WITNESS:  He -- yeah.  I don't think we ever

 6  agreed on an interview, but we were working out how the

 7  interview would be scheduled.

 8              THE COURT:  So he was receptive to the interview

 9  and --

10              THE WITNESS:  Yes.  Yes, ma'am.

11              THE COURT:  -- agreed to work out the logistics?

12              THE WITNESS:  Yes.

13              THE COURT:  And then in the meantime you get the

14  ping warrant to locate him?

15              THE WITNESS:  Yes, Your Honor.

16              THE COURT:  And you knew he was on a boat at that

17  time?

18              THE WITNESS:  Yes, Your Honor.

19              THE COURT:  How?  How did you know?  Did he tell

20  you?

21              THE WITNESS:  Based on his statements.

22              THE COURT:  He told you, hi, I'm on a boat by Fort

23  Pierce?

24              THE WITNESS:  Yes.

25              THE COURT:  All right.  Okay.  All right.  You can

Martin - Redirect

```
 1   follow up.
 2              MR. THAKUR:  Sure.
 3              THE COURT:  Again, my object here is just basically
 4   to set the timeframe of the events.
 5              MR. THAKUR:  Yes.
 6   BY MR. THAKUR:
 7   Q    And prior to that, local law enforcement had reached out
 8   to the defendant's father, right?  Is that how the defendant
 9   knew the FBI was looking to talk to him?
10   A    Yes.
11   Q    Okay.  And in terms of logistics, he never offered to
12   actually come ashore to talk to the FBI in person?
13   A    Correct; he offered to do a video call.
14   Q    Okay.  And he had your direct number on Monday, and as of
15   Thursday, when he was arrested, he made no effort to reach out
16   to you again --
17   A    Correct.
18   Q    -- to set that up interview?
19              Okay.  And --
20              THE COURT:  I'm sorry.  One question.
21              How do you -- I thought I heard you say something
22   about -- because he went from Fort Pierce, down, you know, the
23   coast to near Fisher Island, which is near the Port of Miami.
24   How do you know he -- I thought you said something, that he
25   was heading to the Bahamas.  How do you know that?
```

Martin - Redirect

1              THE WITNESS:  When I spoke with him on Monday, he

2     said he was in Fort Pierce, and we discussed, you know, when

3     he was going to return to Kentucky.  He said he was planning

4     on going to the Bahamas and would be gone for a couple years.

5     And I said, where are now you?  He said, I'm in Fort Pierce.

6     My plan is to sail down to Miami and then to sail to the Keys

7     and then to wait for a weather window whereby to cross to the

8     Bahamas, with his first stop possibly being Freeport and his

9     next stop destination possibly being the Dominican Republic.

10              So he laid out his trajectory to me on that Monday,

11    and on Thursday, when the ping warrant went live, he appeared

12    to have followed the trajectory from Fort Pierce to Miami, as

13    he had discussed earlier.

14              THE COURT:  All right.

15    BY MR. THAKUR:

16    Q    Okay.  And to be clear, there was some questions about

17    whether he was handed the spray and what he did.  Once he was

18    handed the spray, based on the video, did the defendant move

19    closer to the Capitol officers at that time?

20    A    Correct.  Based on~-- based on the video footage of where

21    the spray enters his hand, he appeared to be, if you're

22    looking at the East Rotunda Columbus Doors, he appeared to be

23    the right side of that towards a pillar.  And you can track on

24    a video where he's holding a Confederate flag in that general

25    vicinity of where he would have been handed the spray or

Martin - Redirect

1    holding the spray.  Through the video, you can see that he

2    moves through a very tight crowd.  It takes him a few minutes

3    to do this because the crowd is very tight, but he moves from

4    the right side of the door all the way to the left side of the

5    door, where there is a pocket of U.S. Capitol police officers

6    standing ready to make whatever move they were trying to make

7    to protect the door, but they didn't have access to the door

8    at that time.

9         So he moves from the right side, across the crowd,

10   to within direct vicinity of the officers, at which point he

11   deploys the spray.

12   Q    Okay.  And then did he actually reach up and kind of over

13   people to spray the officer?

14   A    Correct.

15        He originally started spraying about his~-- the

16   height of his head.  You can see one of the officers closest

17   to him immediately turn his head away from the direction of

18   the spray.  And then at that point, Isreal reaches his hand

19   higher, about as, you know, above, about as high as his hand

20   would go, and you can see him moving the spray around to

21   maybe -- I'm reading that to say he can affect a larger,

22   larger vicinity of the spray.

23   Q    Okay.  And approximately how long did the spraying last?

24   A    Approximately 10 seconds.

25        MR. THAKUR:  Okay.  No further questions at this

```
 1   time.
 2            THE COURT:  All right.  So on the spray, what you're
 3   saying, if I understand correctly, your narrative based on the
 4   videos is that there was a group of people going towards one
 5   of the entry doors.  I don't know.  I've seen the movies.
 6   There's the tunnel and there's the other door.  Was this the
 7   tunnel or the (inaudible) door?
 8            THE WITNESS:  This is not the tunnel.
 9            THE COURT:  Right.  So there's officers guarding
10   that door, and he moves in the direction of the officers and
11   aims spray at one or more of the officers guarding that door.
12   Would that be your interpretation of what happened?
13            THE WITNESS:  Yes.
14            THE COURT:  Okay.  All right.  And then after that
15   happened, the door was breached, I'm assuming, right?
16            THE WITNESS:  Within I think about approximately
17   four minutes of him spraying.
18            THE COURT:  The officers couldn't hold the door
19   anymore --
20            THE WITNESS:  The officers --
21            THE COURT:  -- and the crowd came in?
22            THE WITNESS:  They were physically located just to
23   the left of the door.
24            THE COURT:  Yeah.
25            THE WITNESS:  They didn't -- they had tried to get
```

Martin - Recross

1  access to the doors themselves to barricade.

2           THE COURT:  Yes.

3           THE WITNESS:  They were unsuccessful in doing that

4  based on the crowd.  So they were just to the side.

5           Immediately after Isreal finished spraying the mace,

6  he threw the canister at the officers, and within

7  approximately five seconds after that, the officers deployed a

8  flash-bang.  And according to one of the officer's testimony,

9  they deployed the flash-bang to help gain control of that

10 situation following the mace spraying.  And you can see on the

11 video where the flash-bang is deployed, and you can see a

12 large effort by all the officers to push towards the door to

13 regain the door.  They were unsuccessful at doing so, but you

14 can see their efforts on the video.  And then the doors were

15 breached approximately four minutes later.

16          THE COURT:  So up to the spray incident, before the

17 spray incident, the doors had not yet been breached?

18          THE WITNESS:  Correct.

19          MR. SCHWARTZ:  Judge, if I could just clarify.

20                    Recross-examination

21 BY MR. SCHWARTZ:

22 Q    Are we talking about outside the Capitol?  They're

23 already inside the Capitol?

24 A    From the video, the group that Isreal is with, they're

25 all outside.  No one has made it in.

Martin - Recross

1    Q     Okay.

2    A     If you're looking at the inside CCTV video, some other

3    people had made it inside the Capitol from the other side of

4    the building.

5                THE COURT:  Right.  That's what I was trying to

6    clarify, because there were two entry points.  So this was

7    that entry point from the door, and after the spray, the

8    flash-bang didn't succeed.

9                THE WITNESS:  Correct.

10               THE COURT:  That's it.

11               THE WITNESS:  Correct.

12               THE COURT:  Horse out of the barn.

13               THE WITNESS:  Yes.

14               THE COURT:  Everybody in.

15               THE WITNESS:  Yes.

16               THE COURT:  Okay.  All right.  All right.  Any more

17   questions from you?

18               MR. THAKUR:  No, Your Honor.

19               THE COURT:  Anymore questions from you?

20               MR. SCHWARTZ:  Just one last question.

21   BY MR. SCHWARTZ:

22   Q     Approximately -- I mean, you don't want this Court to

23   believe that because of the 10-second mace spray, that's what

24   gave the thousands of people the advantage to get into the

25   Capitol, correct?

Martin - Recross

```
1    A    That's -- I don't know how to answer that.
2    Q    Well, what I'm saying is that 10-second spray affected
3    approximately one officer, right?
4    A    I would -- I would not -- I would disagree with that.
5    Q    Okay.  But that's the one officer that testified?
6    A    We have one officer who was closest who we have testimony
7    of.  It would have affected a larger group than that.
8    Q    How many people were pushing against those officers from
9    what you -- the video you saw?
10   A    Um, how many people were pushing against the officers?
11   Q    More than 50?
12   A    More than 50.
13   Q    More than a hundred?  I mean, I've seen the videos.
14   A    Right, right.
15   Q    It's a ton of people.
16   A    Yeah, it's a lot of people.
17   Q    Okay.  So it's not just my client's actions that led to
18   the breach of that door, correct?
19   A    Correct.
20              MR. SCHWARTZ:  Okay.  Nothing further.
21              THE COURT:  Well, I didn't take that inference --
22              MR. SCHWARTZ:  Okay.
23              THE COURT:  -- from what he was saying.
24              MR. SCHWARTZ:  Okay, Judge.
25              THE COURT:  I was trying to put it in chronological
```

```
 1   order --

 2           MR. SCHWARTZ:  I understand.

 3           THE COURT:  -- in terms of when things happened.

 4           MR. SCHWARTZ:  I understand.

 5           THE COURT:  But there is a sequence of events where

 6   the officers are trying to hold the door, there is the mace

 7   spraying, the officers try to counter with the flash-bang,

 8   they're unsuccessful, and as I said, the horse out of the

 9   barn.  I guess I would say the horse into the barn.

10           MR. SCHWARTZ:  Into the barn.

11           THE WITNESS:  That's correct.

12           THE COURT:  That's what happened?

13           THE WITNESS:  Yes.

14           THE COURT:  All right.

15           MR. SCHWARTZ:  I don't have any further questions

16   for this witness.

17           THE COURT:  Thank you.  Thank you so much, and

18   you're excused.

19           THE WITNESS:  Thank you.

20           THE COURT:  All right.  Mr. Thakur, tell me on

21   danger, which you need to show by clear and convincing

22   evidence, and on risk of flight, which you need to show by a

23   preponderance of the evidence, and then I'll hear from

24   Mr. Schwartz.

25           MR. THAKUR:  Yes, Your Honor.
```

1           On risk of flight, first I'll note that the

2   defendant's facing a significant amount of time in prison

3   based on his offense.  The applicable guidelines under the

4   Sentencing Guideline Section 2A2.2 have a number of

5   enhancements that apply, including the use of a dangerous

6   weapon, bodily injury.  There's a 111(b) enhancement.  And

7   then under 3A1.2, there's a six-point enhancement because of

8   an official victim.  That gives a total offense level of 29,

9   for a guideline range of 87 to 108 months in prison.

10          We'll note the nature of this offense is that the

11  defendant intended to harm the officers.  He was not

12  approached by the officers, he sought out the officers in

13  spraying them for 10 seconds with this chemical irritant and

14  then breached the Capitol.

15          We note that on his social media, we found

16  photographs that indicate the defendant has access to arms.

17  He was in one photograph heavily armed during a protest in the

18  summer of 2020, along with others.  And given the nature of

19  this offense, he presents a danger to the community.

20          THE COURT:  I'm sorry.  Which protest was that,

21  summer 2020?

22          MR. THAKUR:  This was an anti-Black Lives Matter

23  protest.

24          THE COURT:  The one in D.C.?

25          MR. THAKUR:  No, I believe it's probably a -- well

```
1    ...

2           MR. SCHWARTZ:  Judge, I haven't been provided that,

3    that photograph, so I don't know what they're talking about.

4           THE COURT:  Okay.

5           MR. THAKUR:  This was in Louisville, Kentucky, Your

6    Honor.

7           THE COURT:  Okay.

8           MR. THAKUR:  Furthermore, as to risk of flight, the

9    defendant really has no settled place of residence.  He

10   doesn't reside in the District of Columbia.  He doesn't

11   presently reside in Kentucky, in Miami, in any relevant

12   district.

13          He has unexplained money.  You know, given that he

14   had, according to Pretrial Services, had worked for his -- at

15   a construction company, we believe that probably was his

16   uncle's construction company, for some period of time, but

17   then to have access to money to buy a 20,000-foot (sic) boat,

18   not work for a year and a half, we have no indication of how

19   he's able to survive that way and obviously has the ability to

20   flee virtually anywhere, given that history.

21          So in light of all of that, we believe he's both a

22   risk of flight and a danger it the community.

23          THE COURT:  All right.  Mr. Schwartz.

24          MR. SCHWARTZ:  Yes, Judge.

25          I can proffer.  I have a witness who was with my
```

```
1   client on the boat, and what he would proffer to the Court is

2   that once -- one, he would proffer as to the missionary

3   reasons for going over to the Caribbean to drop off Bibles.

4   But what more importantly, Judge, I can proffer to the Court

5   what he would testify that the minute my client was advised

6   that the FBI was looking for him, he made contact with the

7   FBI, and the FBI agent said, I'll get back to you.  This was

8   that Monday conversation.  He turned to his fiancée and to my

9   witness and said, hey, we're gonna hold off on the trip until

10  I settle this FBI business, and that's why he stopped on the

11  itinerary that he gave the agent, which was Fort Pierce,

12  Miami, the Keys.  He stayed put in Miami.  And I have a

13  witness, if the Court wants to hear from him, that he said,

14  we're not going anywhere until I solve this FBI issue.

15          So as far as danger to the community, I do have a

16  witness.  If the Court wants to take my proffer or wants to

17  hear from the witness, I'm happy to put him -- put him on.

18  He's present before the Court.

19          THE COURT:  Well, usually I hear all the evidence at

20  the beginning, and then I hear argument.

21          MR. SCHWARTZ:  Sure.  So I can -- I can have him

22  come up and testify, Judge, briefly.

23          THE COURT:  Okay.

24          MR. SCHWARTZ:  His name is Mark Detweiler.

25          THE COURT:  Okay.
```

Detweiler - Direct

```
1              THE COURTROOM DEPUTY:  Raise your right hand.
2              Mark Detweiler, Defendant's witness, sworn.
3              THE COURTROOM DEPUTY:  You may be seated.
4              Please state your full name for the record and spell
5    your last name.
6              THE WITNESS:  Mark Detweiler, D-e-t-w-e-i-l-e-r.
7              MR. SCHWARTZ:  Thank you, Judge.
8                         Direct Examination
9    BY MR. SCHWARTZ:
10   Q    Mark, how long have you known Isreal?
11   A    He was an acquaintance of mine for five years, and more
12   recently we became close.
13   Q    Okay.  Are you from the same town?
14   A    Yes.
15   Q    Okay.  Is this a big town, little town?
16   A    Small town.
17   Q    Okay.  And are you here on a sailboat, as well?
18   A    Yes, I am.
19   Q    Okay.  Are you familiar with Isreal's sailboat?
20   A    Yes.
21   Q    Okay.  Is it -- do you know when he purchased it?
22   A    Um, I -- I -- roughly a year, something like.  I can't
23   remember.  A year and a half.  Some -- I don't have
24   recollection.
25   Q    Is it a brand new boat, or is it a used boat?
```

Detweiler - Direct

1   A    It is a used boat.

2   Q    What kind of condition is it in?

3   A    Decent.

4   Q    Do you know the approximate value?  Is it worth, like --

5   did he pay, like, $4000 for it?

6   A    Yes, he paid $4000 for it.

7   Q    Okay.  Now, what were the plans that you, Mark and his

8   fiancée, Hanna, had?

9   A    Well, Isreal said -- asked me to -- he said, I'm going to

10   go do mission work.  And I said, okay.  And we got our church

11   together, we got a bunch of Bibles put together, and then I

12   was going to join Isreal, and we were going to go to the

13   Bahamas and Caribbeans to people that don't have access to

14   Bibles and present Bibles to them.

15   Q    So what point did you join Isreal?

16   A    I would say the decision to join Isreal was made roughly

17   five, five, six months ago, four months ago, somewhere in that

18   timeline.

19   Q    And where -- when did you physically join him?

20   A    I first bought the boat, I'm going to say four months

21   ago.  I personally bought the boat, and then I physically

22   joined him probably three months ago.

23   Q    And where did you join him?

24   A    Um, Titusville, I think.

25   Q    Okay.  And from Titusville, where did you guys go?

Detweiler - Direct

1  A    We went down to Fort Pierce, Fort Pierce from Titusville,
2  which --
3  Q    And are you guys always close enough to shore where you
4  have signal on your cellphones?
5  A    I think -- I would say so.  I think so.
6  Q    You could see the shore from --
7  A    Yeah, yeah.  Absolutely, absolutely.
8  Q    Okay.  All right.  And I want to take your attention to
9  when you get to Miami.  Did Isreal advise you that he had been
10  in contact with the FBI?
11  A    Yes.
12  Q    Okay.  And is that when he told you the plans to go to
13  the Caribbean are off until he resolves and figures out what's
14  going on with the FBI?
15  A    Yes.  He actually told his brother, he said, I gotta work
16  this thing out with the FBI.  He said, this would be a good
17  time for you to go back home, work, make some more money,
18  et cetera.
19  Q    Oh, his brother was down at the time?
20  A    Yes.  And his brother wanted to join the crusade, as
21  well, and he offered, he said, until things get settled, he
22  said, you can go back home and make more money.
23  Q    Okay.  And at that point did you observe him speaking to
24  the FBI?
25  A    No.

Detweiler - Direct

```
1    Q    Okay.  The day that he was arrested, were you present?

2    A    Yes, I was.

3    Q    Okay.  Can you -- were you on his boat, or were you on

4    your boat?

5    A    I was on my boat, but I could see everything.

6    Q    Okay.  How close is your boat to his boat?

7    A    I'm just going to guess 200 feet.

8    Q    Okay.  Did he make any attempts to flee from the FBI?

9    A    No, absolutely not.

10   Q    Okay.  Did they come out to get him on his boat, or did

11   he get on his dingy and just go to shore?

12   A    From my understanding, they asked for him to come to

13   shore.  He got on his dingy.  I seen him go on his dingy and

14   they yelled where they were, so he swerved over and met them

15   onshore.

16   Q    Okay.  And he went by himself on the dingy?

17   A    Yes.

18   Q    Okay.  So as far as you were concerned, before that day

19   the trip to the Caribbean was canceled, correct?

20   A    Yes.

21            MR. SCHWARTZ:  Okay.  Nothing further, Judge.

22            THE COURT:  Mr. Thakur.

23            MR. THAKUR:  Yes, Your Honor.  One second.

24                      Cross-Examination

25   BY MR. THAKUR:
```

Detweiler - Cross

1  Q    Mr. Detweiler, are you related to Andy Detweiler?

2  A    No, sir.

3  Q    Do you know an Andy Detweiler?

4  A    I do.

5  Q    And what is his relation to you, if any?

6  A    Just a friend, I guess.  We're not like close, close, but

7  we're friends.

8  Q    Okay.  But same last name?

9  A    Yes, same last name.

10  Q    Okay.  And are you aware that Mr. Detweiler was

11  interviewed by the FBI?

12  A    I am, yes.

13        MR. SCHWARTZ:  Objection to relevance, Judge,

14  somebody that's not related to him.

15        THE COURT:  Is this some kind of impeachment?

16        MR. THAKUR:  Well, it's for the defendant's

17  knowledge, Your Honor.

18  BY MR. THAKUR:

19  Q    Was the defendant aware that Mr. Detweiler was

20  interviewed by the FBI before purchasing the boat?

21  A    I do not know.

22  Q    What did you have aboard the boat?  What sort of items?

23  A    Clothes.

24  Q    Clothing?

25        THE COURT:  As I understand it there's two boats.

Detweiler - Cross

```
 1   Am I right?
 2          THE WITNESS:  Yeah; I have my own personal boat.
 3          THE COURT:  Oh.  Which boat are you asking him
 4   about?
 5   BY MR. THAKUR:
 6   Q    So the defendant's boat, did you ever go aboard his boat?
 7   A    Yes.
 8   Q    Okay.  And what sort of items did he have on his boat?
 9   A    Sailboat items, you know, food for the voyage, just
10   items.
11   Q    Did he have a gun?
12   A    Do what?
13   Q    Did he have a gun?
14   A    I believe so, yes.
15   Q    Okay.  How much cash did he have with him?
16   A    He had -- I think he had $300 with him to -- that was
17   just enough to get to the Bahamas.  Isreal is extremely tight
18   with his money, and his -- he won't -- his -- yeah.
19   Q    Okay.  And ...
20          MR. THAKUR:  One second, Your Honor.
21   BY MR. THAKUR:
22   Q    And as far as you know, the plan was to stay there for a
23   couple of years in the Caribbean?
24   A    Um, the plan -- there wasn't any exact, you know, hey,
25   we're going to stay "X".  The plan was to go out and just
```

Detweiler - Cross

1   kinda see where God takes us, and, you know, we were just

2   going to follow God and see where He would take us on this

3   journey.  We didn't know exactly how long, but roughly a year,

4   year and a half.

5   Q    Okay.  And previous to that, how was the defendant living

6   kind of day to day?

7   A    Just a very casual lifestyle.

8   Q    But how was he -- what was he doing for money?

9   A    Oh, he had worked very hard back, you know, in Kentucky.

10  And like I said, he's very tight.  He's very good with money,

11  and he saved -- you know, he saved up some money to do this.

12  Q    And you know the defendant pretty well?

13  A    I would say so, yeah.  Apparently, yes.

14  Q    Does he sometimes jump on trains as a means of getting

15  around?

16  A    Not that I'm -- like, he hasn't -- since the -- I haven't

17  known him to jump on trains recently, no.

18  Q    Recently.  But based on his social media, you're aware he

19  does do that?

20  A    I currently am not friends with anyone on social media,

21  so I don't follow his social media.

22  Q    Okay.  Has he ever told you about it?

23  A    About?

24  Q    About jumping on trains without paying for it in order to

25  get around.

Detweiler - Examination

```
 1   A    He -- I am under the understanding that there was a time
 2   that he was on a train, yes.  I didn't know that he didn't pay
 3   for it or something like that.
 4            MR. THAKUR:  No further questions at this time.
 5                        Examination
 6   BY THE COURT:
 7   Q    I'm sorry.  I just have one question, again, to set the
 8   stage, because some things have been said and not followed up
 9   on.
10            There's some mention of a fiancée?
11   A    Sorry?
12   Q    Mention of a fiancée?
13   A    Yes.
14   Q    Mr. Easterday's fiancée?
15   A    Yes.
16   Q    Was the fiancée part of this trip?
17   A    Yes.
18   Q    On his boat?
19   A    Yes.
20   Q    So the two of them on his boat and you on your boat.
21   Anyone else?
22   A    Well, his -- there was more people, but they left and
23   went back home, like I said, which was on a separate boat, as
24   well.  But just me and her boat were ... yes.
25   Q    "Me and her boat?"
```

Detweiler - Examination

1   A    Or his boat, sorry.

2   Q    So there were three boats?

3   A    Yes.

4   Q    And one boat left?

5   A    No.  Isreal -- I -- with the FBI thing going on and the

6   invest -- or the interview, he said, hey -- because his

7   friend, his brother was short on money.  So he said, this

8   would be a good time for you to go back home and make more

9   money until these -- until this thing gets settled.

10  Q    So the brother was the owner of the other boat or the

11  third boat?

12  A    The third boat, yes.

13  Q    The brother?

14  A    Yes.

15  Q    So the brother with one boat, Mr. Easterday one boat, and

16  you on one boat?

17  A    That is correct.

18  Q    Each of your boats.

19  A    That is correct.

20  Q    He with his girlfriend, the brother --

21  A    His wife.

22  Q    The brother and his wife, and you on your own?

23  A    Yeah, just ... I'm just on my own.

24  Q    And this was all part of a church mission?

25  A    Yes.  From my church, yes.

Detweiler - Recross

```
 1   Q    And everybody was part of this church?

 2   A    No, the brother wasn't.  Isreal -- Isreal is an

 3   acquaintance of mine, so he's part of that community, yes.

 4   Q    And the brother just tagged along?

 5   A    Yeah.  I think he was just there for the ride, yes.

 6              THE COURT:  Okay.  All right.  You can follow up.

 7              MR. SCHWARTZ:  I don't have any further questions,

 8   Judge.

 9                        Recross-examination

10   BY MR. THAKUR:

11   Q    And, but prior to you joining, the defendant wasn't part

12   of -- of a mission to go down there, he was simply living on a

13   boat; is that correct?

14   A    Can you ask one more time?

15   Q    Before you joined the trip, the defendant was simply

16   living on the sailboat.  He wasn't on a mission to the

17   Caribbean?

18   A    That is correct.  Because it was in a -- from my

19   understanding, he was -- like eight months ago he was on a --

20   it was a raging storm at sea, and in the middle of the storm

21   he found God.  And because of that, me and him became very

22   close because of his relationship with God now.

23   Q    And the defendant hasn't worked for approximately a year

24   and a half; is that correct?

25   A    That is incorrect.
```

Detweiler - Recross

1    Q     Okay.

2    A     Because he came back to Kentucky, and he worked for me,

3    and I paid him, like, I paid him very well, because Isreal's a

4    very good worker.  And then he also worked with his brother,

5    which also paid him very well, because Isreal, like I said, is

6    an extremely good worker.

7    Q     And when was this, the last time that he worked?

8    A     I'm going to say this was -- this was roughly five, five

9    months ago, probably.

10   Q     Okay.  And how much did you pay him?

11   A     Me?

12   Q     Yes.

13   A     I think I pay him $3000 cash for a week's worth of work.

14   Q     Okay.  And what kind of work is that?

15   A     Commercial roofing.

16   Q     Okay.  And how were you planning on funding the trip?

17   A     Myself?

18   Q     Yes.

19   A     Well, I don't -- I never ask for donations, but there

20   were a few people that donated to the cause.  So, you know, I

21   do have donations coming in.  Like I said, I don't ask for

22   donations, but sometimes people do.  And then I also, you

23   know, these jobs pay very well, and they're able to supply me.

24   I don't know.  You know, I might run out of money in a year; I

25   might not.  Just kinda go 'til the money runs out and, like I

Detweiler - Examination

```
 1   said, just follow God through it all.
 2             MR. THAKUR:  No further questions, Your Honor.
 3                       Examination
 4   BY THE COURT:
 5   Q    So this mission, was it your idea?
 6   A    No.  Isreal actually said that he wanted to start a
 7   church in Andros about seven months ago.  He said he'd like to
 8   start a church there in -- Andros is in the Bahamas.
 9   Q    After his encounter with nature?
10   A    Sure.
11   Q    After his encounter with nature, he decided he wanted to
12   start a church in Andros Island, in the Bahamas?
13   A    Yes.
14   Q    And you said, okay, I'm coming along?
15   A    You're saying I said, come alone?
16   Q    No, no.  I'm wondering how you became part of the
17   mission.
18   A    Um, see, Isreal said, he said, hey, I'm going to go start
19   a church in Andros.
20   Q    Right.
21   A    He said, you know, feel free to join me.  Which, I
22   declined at that time --
23   Q    Uh-huh.
24   A    -- because I didn't feel led to go.  However, I prayed
25   about it, and then I felt a leading to join and carry out this
```

Detweiler - Redirect

```
 1   mission.
 2   Q    And then the brother came along for the ride in his boat?
 3   A    Yes.
 4              THE COURT:  Okay.  All right.  I'm sorry, but I try
 5   to -- and I don't mean to -- I don't mean to invade --
 6              MR. THAKUR:  No, that's fine.
 7              THE COURT:  -- the attorneys, but I'm just trying to
 8   get a complete picture.  And like I said, some little comments
 9   are made, and nobody follows up, and I kinda wonder where did
10   that come from.  So basically ...
11              MR. SCHWARTZ:  Judge, can I just redirect based on a
12   statement that he made during cross?
13              THE COURT:  Yes, yes.
14                     Redirect Examination
15   BY MR. SCHWARTZ:
16   Q    Okay.  You indicated that five months ago Isreal went
17   back to Kentucky to work for you?
18   A    Yes.
19   Q    Okay.  So he's gone back and forth.  In the last eight
20   months that he's been on his boat, he's gone back and -- he's
21   gone back to Kentucky, worked, and then --
22              (Simultaneous crosstalk.)
23   A    Yeah.  I'd say -- I'm just going to take a -- at least
24   twice, if not three, four times.
25              MR. SCHWARTZ:  Okay.  Nothing further, Judge.  Thank
```

1  you.

2          THE COURT:  Oh, okay.  All right.

3          MR. SCHWARTZ:  You can step -- can he be excused,

4  Judge?

5          THE COURT:  Yes.

6          So you were in the middle of argument, you called

7  him, so finish your argument.

8          MR. SCHWARTZ:  Okay.  So, Judge, I guess I'll stick

9  with the -- I'll start with risk of flight.  Okay?

10          You know, the government's making an argument.  I'm

11  not sure how, you know, how clear it is, and I don't even

12  think they've met their preponderance standard, because he was

13  on a sailboat.  But what we need to focus on, Judge, is my

14  client's conduct for the last two years since this incident

15  occurred, right, in 2021.  He's had no contact with law

16  enforcement.

17          When -- he's been going back and forth on this boat.

18  This is not a $20,000 sailboat.  He paid $4000 for it.  It's a

19  used boat.  He spent the majority of his time going up and

20  down the East Coast.

21          But I think what is more impressive with regards to

22  how he is not a risk of flight, Judge, is the fact that once

23  he was advised that the FBI was looking for him, he didn't get

24  on that boat and disappear, turn off his phone so that they

25  couldn't trace him.  He didn't throw it overboard.  What did

 1  he do?  He called the general number to the FBI in his -- in

 2  Kentucky.  It took two days; the FBI reached out to him.  He

 3  was honest with the agent, told him what he was doing, what

 4  his plans were, and this agent was very honest with the Court

 5  when he said it sounded like he was following his plan.

 6          Now, you have testimony from a witness who indicates

 7  that the minute my client found out that the FBI was looking

 8  for him, he canceled the overseas part of the trip to another

 9  country, sent his brother home, saying, hey, I don't know how

10  long this is going to take, you better go home.  And what did

11  he do, Judge?  He stayed, because the agent said, we'll be in

12  touch.

13          Now, it was the agent's choice not to advise him

14  that there's an arrest warrant.  It's the agent's choice not

15  to say, stay put.  They chose to do that.  My client has no

16  obligation to make further inquiries.

17          And let's just look at his conduct.  He reached out

18  to them; he stayed put.  And when, in fact, they did show up,

19  unbeknownst to my client, all he asked was what's standard I

20  think for any individual, please let me know who you are and

21  show me the warrant.  They send him a text of the warrant, and

22  what did he do?  Did he flee?  No.  He got on that little

23  dingy by himself, got dressed, and, you know, went to the

24  officers, and he was detained.

25          So I believe that the government has not met their

1  burden with regards to risk of flight.

2          Judge, he is 21 years old.  He's a young man.  Okay.

3  He's got strong ties to Kentucky.  His father is present and

4  is willing to cosign on the bond.  He drove down to (sic)

5  Kentucky so that if the Court had any issues of, well, if he

6  gets out by the marshals here, where is he gonna go.  Dad is

7  right here.  His step mom is right here.  They're going to

8  physically put him in a car, take him back to Kentucky.

9          Pretrial Services has already confirmed that the

10  Western District of Kentucky can monitor him if the Court

11  wants any kind of monitoring device.  I don't necessarily

12  think it's necessary.

13          And then what do we hear in cross-examination,

14  Judge?  The government reaching with regards to him being on a

15  train.  Well, there's nothing illegal about going on a train

16  inside the United States.  Here is his passport that he just

17  obtained in March of this year.  So we're prepared to

18  surrender the passport, Judge.

19          Now, with regards to danger to the community, Judge,

20  I would note to the Court that this is not a preponderance

21  case, Judge, and the Bail Reform Act is asking this Court, and

22  the Court is very well aware, to find combinations and

23  assurances so that the person to (sic) appear.  This is not a

24  situation where he's a danger.

25          Once again, this activity took place two years ago.

1    He hasn't been rearrested.  He hasn't been on any kind of

2    social media post, you know, advocating anarchy, taking over

3    the government, participating in other rallies.  The

4    government briefly mentioned a rally in 2020, which is prior

5    to this incident.

6              So I don't believe they've met their burden when it

7    comes to danger.

8              I will also point out, Judge, that the guidelines

9    that the government is giving the Court, they're claiming that

10   the pepper spray, which the agent testified is nonlethal, that

11   there was thankfully no permanent injuries to this officer

12   except a few minutes of disorientation, and then he went back

13   to his duties, okay, is not a lethal weapon.

14             There is a case from the Eleventh Circuit, Judge,

15   United States versus Perez, 519 F.App'x 525, where the

16   government was seeking an enhancement on a robbery case for

17   the use of pepper spray, and the Eleventh Circuit said that

18   the pepper spray is not a dangerous weapon as defined by that

19   section of the guidelines.

20             So when it comes to dangerous, Judge, danger to the

21   community, I think it's a stretch.  I don't think the

22   government has been able to meet their burden either.

23             So I'll go back and indicate that we agree with

24   Pretrial Services of a personal surety bond.  You're dealing,

25   again, with a 21-year-old who's a construction worker.  He's

1   got an eighth grade education, Judge.  He's got 21 half

2   brothers and sisters.  So he's got strong ties to his

3   community in Kentucky.

4           Like I said, his father and stepmother are here.

5   They're willing to sign on the bond.  He would be staying --

6   he is a property owner, Judge.  He's got a two-acre house in

7   Bonnieville, Kentucky.  And more importantly, his father has a

8   77-acre farm that's worth $450,000.  He's got a $250,000

9   mortgage on it, so he's got $200,000 in equity.  I explained

10  to him that if he cosigns on that bond he cannot encumber that

11  property, and that would basically be guaranteeing his son's

12  presence.  He's willing and able to take his son to court in

13  D.C. to any court appearances that he'll have.  So there is a

14  property that can be used to collateralize this personal

15  surety bond.

16          His fiancée, Hanna Fredericks, is also present,

17  Judge.  She is pregnant; she's due next year.  So there are

18  ample reasons and ties to this community that Mr. Easterday is

19  not a flight risk or a danger.

20          And, again, Judge, you have -- you know, a lot of

21  times we get cases here, and the acts occurred recently, the

22  arrests are done recently.  You have two years of hindsight

23  here, where you've seen his conduct for the last two years.

24  And you've seen how he was the one who reached out, again, to

25  the FBI.

1           So before I start repeating myself, Judge, I believe

2    that the government has not met their burden, and I'd ask the

3    Court to follow the Pretrial Services recommendations, the

4    father's here for the co-signature, and we'll agree to any

5    special conditions that the Court would like to put in place.

6           THE COURT:  All right.  Any further comment,

7    Mr. Thakur?

8           MR. THAKUR:  Yes, Your Honor.

9           I think regardless of whether or not the dangerous

10   weapon enhancement applies -- and I'm not sure, you know,

11   whether the D.C. Circuit would follow similarly what counsel

12   has said -- he still would be facing a number of other

13   enhancements and a number of years in prison for this act.

14   And the act, you know, is based on the video and based on the

15   testimony of the officer at a previous hearing was undeniably

16   violent.  I mean, this was done with the intent of harming the

17   officer.  This wasn't a single second.  He stayed with the

18   spray, aiming the spray at the officer, using what appeared --

19   the flag, the Confederate flag, at some point as a weapon, as

20   well.  So I think all this indicates that he clearly is a

21   danger to the community based on those actions.

22           And, you know, the preeminent factor really for the

23   risk of flight is his ties to the community.  He simply does

24   not have any ties to the District of Columbia, and based on

25   his itinerant nature, I don't think that it could be said that

```
 1   we could reasonably assure his presence in the court.
 2            THE COURT:  All right.  All right.  So on risk of
 3   flight, obviously this occurred in D.C.  He traveled there for
 4   the event.  He has no ties whatsoever to D.C.  He does appear
 5   to have strong ties to his hometown in Kentucky, extended
 6   family, family who have traveled from Kentucky to support him,
 7   family who are willing to cosign a bond.  So the ties as to
 8   Kentucky are strong.
 9            And I do know, and I have the situation often here
10   with Miami, obviously, where people don't have ties to our
11   forum but have ties to another community.
12            I think on the risk of flight, although the burden
13   is low, it's only preponderance of the evidence, generally you
14   have risk of flight when the person either flees or resists
15   arrest, things along those lines.  It appears that in this
16   case the defendant did, in fact, comply with the request of
17   the officer.  I very pointedly asked the agent did he advise
18   him that there was an arrest warrant in his name, and he did
19   not do so at that time.  But the contacts appear to have been
20   not in any way indicative of any intention to flee.
21            And, again, I understand that the burden is low, but
22   even a low, burden by the conduct of the defendant of
23   complying, coming ashore, not exhibiting any conduct that
24   would indicate avoidance of the -- of the arrest, even after
25   receiving apparently the arrest warrant by text.
```

```
1              So that's what I find.

2              The part about danger to the community is a little

3    bit harder to deal with, because even though the standard is

4    higher, clear and convincing evidence, it appears to me, based

5    on the evidence that has been presented, that the defendant

6    did intentionally aim the spray at officers who were guarding

7    the entrance to the Capitol building during those events.

8    That seems to me to show disregard for lawful protection of

9    our institutions, and the conduct that is described as I

10   understood it, although, and I agree with Mr. Schwartz, can't

11   put it all on him, he sprayed, and everything happened.  But

12   the sequence of events, he was part of the effort to break

13   down the police protection of that door in order for him and

14   his cohorts to make entry into the Capitol building.  So that

15   kind of conduct towards law enforcement officers, I do find by

16   clear and convincing evidence it does constitute a danger to

17   the community.  So on that basis I will require pretrial

18   detention.

19             All right.  And I'll ask Mr. Thakur to please submit

20   a proposed detention order by the close of business tomorrow.

21             MR. THAKUR:  Yes, Your Honor.

22             THE COURT:  Now, with regard to further proceedings,

23   because I am ordering detention, he may be transported to

24   D.C., and he then can have Report Re Counsel scheduled over

25   there for permanent counsel to represent him there.
```

```
 1          All right.

 2          MR. SCHWARTZ:  Thank you, Judge.

 3          THE COURT:  All right.

 4          Thank you very much.

 5      (Proceedings concluded.)

 6                      *  *  *  *  *

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          * * * * *

 2                          I N D E X

 3  Testimony of Andrew Martin

 4           Cross by Mr. Schwartz            10

 5           Redirect by Mr. Thakur           21

 6           Recross by Mr. Schwartz          28

 7  Testimony of Mark Detweiler

 8           Direct by Mr. Schwartz           35

 9           Cross by Mr. Thakur              39

10           Examination by the Court         42

11           Recross by Mr. Thakur            44

12           Examination by the Court         46

13           Redirect by Mr. Schwartz         47

14                          * * * * *

15                          CERTIFICATE

16       I, Stephen W. Franklin, Registered Merit Reporter, and

17  Certified Realtime Reporter, certify that the foregoing is a

18  correct transcript, to the best of my ability, from the

19  DIGITAL AUDIO RECORDING of proceedings in the above-entitled

20  matter.

21       Dated this 13th day of JANUARY, 2023.

22

23       /s/Stephen W. Franklin
         _____
24       Stephen W. Franklin, RMR, CRR

25
```