## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cr-00404** |
| | ) | **Hon. James E. Boasberg** |
| **ISREAL JAMES EASTERDAY,** | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND, IN THE ALTERNATIVE, FOR A NEW TRIAL AS TO COUNTS TWO, THREE, FOUR, FIVE, AND SIX

Defendant Isreal Easterday, by counsel, hereby moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 as to counts two through six, and alternatively for a new trial pursuant to Federal Rule of Criminal Procedure 33.

### Introduction

Whether a deadly or dangerous weapon encompasses the use of an object that is merely *capable* of causing serious bodily injury, or instead requires use in a manner that is *likely* to cause such harm, is not a new question. In 1889, the Supreme Court of Florida addressed this issue in the case of an assault with a deadly weapon conviction:

> The sixth paragraph of the charge is as follows: 'Any weapon is a deadly weapon which is capable of producing death. * * *' This part of the charge is not correct. Any weapon or instrument, such as a needle or pin, is capable of producing death, but it is not likely to do so. A deadly weapon is one 'likely' to produce death.

*Pittman v. State*, 25 Fla. 648, 651, 6 So. 437, 438 (1889).

Use of an ordinary object as a dangerous weapon requires proof that the defendant used the object in a dangerous manner, which means use that is *likely* to cause serious bodily harm to a victim. *See United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) (noting that use of car

for flight "would not satisfy the fourth element of § 111(b): that the object be used in a deadly or dangerous manner"); *accord United States v. Klein*, 533 F. Supp. 3d 1, 12 n.6 (D.D.C. 2021) (dangerous weapon is one "likely to endanger life or inflict great bodily harm"); *United States v. Chansley*, 525 F. Supp. 3d 151, 161-62 (D.D.C. 2021) ("As used in Sections 111 and 113, courts have consistently defined 'dangerous weapon' as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm"); *United States v. Munchel*, No. 1:21-CR-118-RCL, 2023 WL 2992689, at *4 n.5 (D.D.C. Apr. 18, 2023) (same). A contrary construction based on the mere "possibility" of harm from the use of an object in an assault increases 18 U.S.C. § 111(b)'s maximum penalty from 8 to 20 years based upon the use of objects that pose almost no actual risk of harm other than to an "eggshell" victim.[1]

Counts two, three, four, five, and six charged Mr. Easterday with using or carrying a "dangerous" weapon – pepper spray – in violation of 18 U.S.C. § 111(b) and § 1752. The evidence at trial, however, established that Mr. Easterday's use of pepper spray posed minimal risk of serious bodily harm based upon the manner of use, and Mr. Easterday inflicted no wounds or physical damage to any officer's body. Indeed, the government's expert evidence was limited to the capability, not likelihood, of harm caused by pepper spray exposure, and its argument to the jury centered on the mere possibility of serious bodily harm due to hypothetical preexisting conditions of victim officers rather than any actual likelihood of injury.

Because the Court's instructions and the government's arguments failed to require proof that Mr. Easterday used or possessed a "dangerous" weapon for purposes of §§ 111(b) and 1752

---

[1] *See, e.g., United States v. Ramey*, Case No. 22-cr-184-DLF (D.D.C.), ECF 56, Mar. 3, 2023, Tr. at 229 ("The Court: Well, what if Mr. Ramey, instead of using pepper spray, was tossing peanuts and one of those officers had his mouth open and he's tossing it right at him and the peanut went in his mouth? Is that an assault with a deadly weapon because the officer goes into anaphylactic shock[?]").

based upon the manner in which Mr. Easterday used or intended to use pepper spray, the Court should vacate Mr. Easterday's convictions as to counts two through six. Furthermore, because the evidence at trial was insufficient to establish that Mr. Easterday inflicted bodily injury as charged in Counts 2 and 3, the Court should enter a judgement of acquittal as to those counts. Finally, the government's failure to adduce evidence of Mr. Easterday's knowledge that the Capitol Grounds were restricted due to the Vice President's temporary visit requires the Court to enter judgment of acquittal as to counts four, five, and six.

## BACKGROUND

The government's theory of guilt with respect to the "dangerous weapon" element is that proof of the mere possibility that an object could cause serious bodily injury when used in an assault, regardless of the likelihood of that outcome, is sufficient to establish the element. Indeed, the government explicitly disclaimed any obligation to present evidence that Mr. Easterday's use of pepper spray was likely to cause any significant harm, and it adduced no such evidence at trial. *See United States v. Easterday*, Oct. 24, 2023, Tr. at 164-65; Oct. 25 Tr. at 35.

Based upon the Court's instructions to the jury and the government's argument, the only fact that mattered at trial was whether it was "possible" for pepper spray to cause serious bodily injury under any circumstance. The manner of use, and particularly whether Mr. Easterday's use of pepper spray posed a significant risk of serious harm, was irrelevant. As the government argued in its rebuttal closing:

> [W]e don't have to prove it was likely to cause serious bodily injury. …
> We have to prove that it was a deadly or dangerous weapon. We have to prove
> that it was capable of causing serious bodily injury, that it was possible, and the
> defendant used it in a manner consistent with that. That's what we have to prove,
> not likely.

Oct. 26 Tr. at 86-87.

**ARGUMENT**

I.    **The Standard for Judgement of Acquittal Pursuant to Federal Rule of
      Criminal Procedure 29 and for a New Trial Pursuant to Federal Rule of
      Criminal Procedure 33.**

    **A. Rule 29**

Federal Rule of Criminal Procedure 29 requires the Court to enter a judgment of acquittal

for "any offense for which the evidence is insufficient to sustain a conviction."[2] A Rule 29

motion tests whether the government has met its burden to present evidence that, with all

conflicting inferences resolved in favor of the prosecution, would allow a rational factfinder to

"reach a subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia*, 443

U.S. 307, 315 (1979). Sufficiency is measured by whether a rational jury could find the

defendant guilty beyond a reasonable doubt "of every fact necessary to constitute the crime[s]

with which he is charged." *Id.* at 315, 319; *see also McDaniel v. Brown*, 558 U.S. 120, 131 n.4

(2010); *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947). The legal standard by which

to assess sufficiency is determined not by "how the jury was instructed, but rather on how a

properly instructed jury would assess the evidence." *United States v. Hillie*, 39 F.4th 674, 679

(D.C. Cir.  2022) (citation omitted).

While a court considering a Rule 29 motion must view the evidence in the light most

favorable to the government, "speculation" and evidence that only allows a factfinder to

"conjecturally support a finding" of guilt is not sufficient to support conviction. *Bailey v. United*

*States*, 416 F.2d 1110, 1116 (D.C. Cir. 1969). A Rule 29 motion requires "a hard look at the

evidence," and the Court should not "view the evidence through dirty windowpanes and assume

---

[2] The Court extended the time for filing a post-verdict motion until December 8, 2023, pursuant
to Federal Rule of Criminal Procedure 45(b). November 1, 2023, Minute Order granting Consent
Motion for Extension of Time to File Post-Trial Motions, ECF 75.

4

that evidence which otherwise can be explained as equally innocent must be evidence of guilt." *United States v. Recognition Equip. Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989).

Moreover, a showing of guilt by a preponderance of evidence, without more, is insufficient to survive a motion for judgment of acquittal. *In re Winship*, 397 U.S. 358, 365 (1970); *Cty. Ct. of Ulster Cty., N. Y. v. Allen*, 442 U.S. 140, 166 (1979) (noting that beyond a reasonable doubt is a "more stringent test" than a preponderance of evidence). Accordingly, "if, upon the whole of the evidence, a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained." *Curley*, 160 F.2d at 233.

**B. Rule 33.**

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The interest of justice standard provides "broad discretion in ruling on a motion for a new trial." *Gaither v. United States*, 413 F.2d 1061, 1078 (D.C. Cir. 1969). Although "[t]he rules do 'not define 'interests of justice' and 'courts have had little success in trying to generalize its meaning[,]'" a new trial is warranted "where 'a serious miscarriage of justice may have occurred.'" *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014).

Additionally, "any error sufficient to require a reversal on appeal is an adequate ground for granting a new trial." *United States v. Sitzmann*, 74 F. Supp. 3d 96, 102 (D.D.C. 2014) (quoting 3 Wright & Welling, Federal Prac. & Proc. § 589 at 547 (4th ed. 2011)). In particular, a new trial is warranted when the jury instructions and the government's arguments to the jury raise a "substantial possibility that the jury convicted on an improper legal theory." *See United States v. Lemire*, 720 F.2d 1327, 1343 (D.C. Cir. 1983).

## II.    A "Dangerous" Weapon Must Be Dangerous By Design or by Manner or Intended Manner of Use.

The starting point for understanding the meaning of a "dangerous weapon" for purposes of 18 U.S.C. § 111(b) and § 1752 is the statutory text. Section 111(b) provides an enhanced statutory maximum of 20 years for violations of § 111(a) in which a defendant "uses a deadly or dangerous weapon." 18 U.S.C. § 111(b). Section 1752(b)(1)(A) provides that if a person "uses or carries a deadly or dangerous weapon" during and in relation to offense conduct, the offense is a felony with a 10 year maximum rather than a misdemeanor. 18 U.S.C. § 1752(b)(1)(A).

Because the word "dangerous" is not defined in either statute, it carries its ordinary common meaning. *See United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023). And the ordinary meaning of the word "dangerous" is something that is "fraught with danger or risk, causing or occasioning danger; perilous, hazardous, risky, unsafe." Dangerous, Oxford English Dictionary (Online Version), http://www.oed.com/view/Entry/47187; *see also* Webster's Third New Int'l Dictionary 573 (2002) ("1: exposing to danger: involving risk: demanding caution or care as extremely unsafe … 2: able or likely to inflict injury: causing or threatening harm"); Black's Law Dictionary 477 (10th ed. 2014) ("1. (Of a condition, situation, etc.) perilous, hazardous, unsafe <a dangerous intersection>. 2. (Of a person, an object, etc.) likely to cause serious bodily harm <a dangerous weapon> <a dangerous criminal>.").

The meaning also turns on the distinction between objects that are "inherently dangerous" and those that are not. "Inherently dangerous" objects are those that are dangerous by design – such as a firearm – in which use in an assault necessarily presents a significant risk of harm. "Non inherently dangerous" objects are, by contrast, not dangerous by design. Instead, such objects become dangerous only when used in an assault in a dangerous manner.

6

A.       **Inherently Dangerous Weapons Are Dangerous By Design.**

As noted above, 18 U.S.C. § 111(b) provides a statutory maximum sentence of 20 years for use of a "deadly or dangerous weapon" in the commission of an assault. In *United States v. Arrington*, 309 F.3d 40, 44-45 (D.C. Cir. 2002), the D.C. Circuit explained that for "inherently deadly" objects, "like a gun," the elements of a § 111(b) offense are: (1) intentional; (2) use; (3) in the commission of a violation of § 111(a).

Inherently deadly or dangerous weapons are items that, by design, present a significant risk of serious bodily injury or death when used against a person. *See McLaughlin v. United States*, 476 U.S. 16, 17 (1986) ("a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place"); *United States v. Vinton*, 594 F.3d 14, 22 (D.C. Cir. 2010) (noting that an "inherently dangerous" object under D.C. law is one "where 'the design of the object is such that in its ordinary use it is likely to cause great bodily injury'"); *United States v. Broadie*, 452 F.3d 875, 882 (D.C. Cir. 2006) (same); *United States v. Robertson*, 610 F. Supp.3d 229, 238 (D.D.C. 2022) (citing *Vinton*, 594 F.3d at 22, for definition of "inherently dangerous" weapon in context of § 1752 charge); *see also* 79 Am. Jur. 2d Weapons and Firearms § 1 (defining "dangerous or deadly weapon" as an "instrument which, when used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause death or great bodily harm.") (citing *Acers v. United States*, 164 U.S. 388 (1896)); *Acers*, 164 U.S. at 391 (stating that if object "is a thing with which death can be easily and readily produced, the law recognizes it as a deadly weapon").

7

The government does not contend, and presented no evidence at trial, that pepper spray constitutes an inherently deadly or dangerous weapon.

**B.**   **Non-Inherently Dangerous Objects Must Be Used in a Dangerous Manner.**

In *Arrington*, 309 F.3d at 45, the D.C. Circuit also explained that an additional element is necessary to satisfy § 111(b) in the context of an object "that is deadly [or dangerous] only if used in a certain manner, like [a] car." "For an object that is not inherently deadly [or dangerous]" to satisfy § 111(b), the object must be "capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner." *Id.* (emphasis in orig.). The court clarified that for a non-inherently dangerous object to be used as a "deadly or dangerous weapon," a defendant must use the object "in a deadly or dangerous manner." *Id.* "For a car to qualify as a deadly weapon," for example, "the defendant must use it as a deadly weapon and not simply as a mode of transportation." *Id.*

A "deadly or dangerous weapon" for purposes of 18 U.S.C. § 111(b) therefore is defined not only by its inherent characteristics but also by the risk of harm posed by the manner in which the object is used. As the Fourth Circuit explained in 1963, "[n]ot the object's latent capability alone, but that, coupled with the manner of its use, is determinative." *United States v. Johnson*, 324 F.2d 264, 266 (4th Cir. 1963). To satisfy § 111(b), in other words, the manner of a defendant's use must transform an ordinary object into a dangerous weapon because of the risk of harm posed by the manner of use.

**C.**   **The Government's "Theoretical Possibility of Harm" Definition of a "Dangerous Weapon" Is Inconsistent with Statutory Plain Meaning and Caselaw.**

The jury instructions defined a dangerous weapon as an object that is either "inherently or obviously dangerous or deadly," or "capable of causing serious bodily injury or death to another

person and … used [] in that manner." Oct. 26 Tr. at 35-36. The Court later clarified in response to a question from the jury regarding the § 1752 counts that the "manner" of use required only that the defendant's intended use "could in theory" cause serious bodily injury. *Id.* at 110.

The government likewise argued that use of an object that poses a "possibility" of serious harm, regardless of how unlikely that risk may be, satisfies the definition of a "dangerous weapon." Oct. 26 Tr. at 86-87. Indeed, the government hypothesized on cross examination of the defense expert and in closing argument that the possibility that officers may have had preexisting conditions (although it presented no proof of such conditions) meant that Mr. Easterday's use of pepper spray constituted use of a dangerous weapon. Oct. 25 Tr. at 159 (cross exam); Oct. 26 Tr. at 88 (closing). It also explicitly disclaimed any obligation to prove that Mr. Easterday's use of pepper spray was *likely* to present a significant risk of serious harm. Oct. 24 Tr. at 164-65; Oct. 26 Tr. at 86-87.

The instructions and the government's argument to the jury misstated the definition of a "dangerous weapon." First, defining a "dangerous weapon" as any object that could "*in theory*" cause serious harm, no matter how unlikely that risk may be, is inconsistent with the ordinary meaning of the word "dangerous" and renders that word surplusage.

For example, motor vehicle accidents are possible at any intersection. But a "dangerous" intersection is one that is especially "perilous, hazardous, [or] unsafe." *See* Black's Law Dictionary 477 (defining a "dangerous" condition or situation as "perilous, hazardous, unsafe <a dangerous intersection>."). Likewise, a shoe could potentially satisfy the definition of a "dangerous weapon" when used in a dangerous manner in an assault. *See Medlin v. United States*, 207 F.2d 33, 32 (D.C. Cir. 1953). But using a shoe to kick an officer in the shin is

unlikely to cause any serious harm, notwithstanding the theoretical possibility of a preexisting condition that makes that officer particularly vulnerable to serious harm from the kick.

Just as a motor vehicle accident could theoretically occur at any intersection, almost any object could theoretically cause serious harm if used as a weapon in an assault. But a "dangerous" intersection, like a "dangerous" weapon, refers to a subset that poses a particularly significant risk of harm. If Congress meant to impose an increased statutory penalty for assaults in which any object was used that could theoretically cause serious harm, it could have omitted the word "dangerous" from the statute. But the statutory text requires proof that an object is "dangerous."

To constitute a "dangerous weapon" for purposes of § 111(b) and § 1752, therefore, an object must be dangerous, either by design or by the manner or intended manner of use. *See Arrington*, 309 F.3d at 45. The ordinary and common meaning of the word "dangerous" requires evidence that the object presents a significant risk of serious bodily harm when employed in the manner used by the defendant. Dangerous, Black's Law Dictionary 477 ("(Of a person, an object, etc.) likely to cause serious bodily harm").

Second, the instructions and the government's argument eliminated the government's burden to establish that Mr. Easterday used pepper spray in a dangerous manner. Evidence at trial established that while significant adverse health effects from pepper spray exposure are "very, very rare," Oct. 25 Tr. at 129, circumstances exist in which there is an increased risk of harm from the use of pepper spray. For example, expert testimony established that children aged 8 and younger, and people aged 60 and older may be especially vulnerable to the impact of pepper spray. Oct. 25 Tr. at 15. Pepper spray directed at someone's face from inches away, as opposed to from several feet away, could present a heightened risk of harm. *Id.* at 126. Likewise,

exposure to pepper spray in small, enclosed environments without ventilation can increase the level of toxicity. *Id.*

Because of the Court's instructions and the government's argument to the jury, however, the government did not have to adduce evidence that Mr. Easterday used pepper spray in a "certain manner," namely a "deadly or dangerous manner." *Arrington*, 309 F.3d at 45. Under the legal definition of "dangerous weapon" contained in the jury instructions and argued by the government, use of pepper spray from 15 feet away is no different from a defendant's use from inches away from a victim's face, because both present the "possibility" of serious bodily harm "in theory," no matter how unlikely the risk. The instructions and argument are thus inconsistent with *Arrington*'s emphasis on the "manner" of use as essential to determining whether a non-inherently deadly object constitutes a "dangerous weapon." Indeed, the instructions and argument eliminated the distinction between an inherently deadly object and a non-inherently deadly one, because the "possibility" of harm from use was the sole criteria by which the jury determined whether pepper spray was a dangerous weapon.

To be sure, the court in *Arrington* described the fourth element of § 111(b) in the context of non-inherently deadly objects as requiring proof that "the object must be capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner." *Arrington*, 309 F.3d at 45 (emphasis in orig.). Construing this passage to define a "dangerous weapon" as including the use of any object that *could possibly* cause harm — no matter how unlikely the risk —ignores the context in which the court explained the necessity for proof that a defendant "actually use[d] the object in a deadly [or dangerous] manner." *Id.* As discussed above, use in a dangerous manner means use in a way that poses a likely risk of harm to a victim. *See United States v. McDaniel*, 85 F.4th 176, 188 (4th Cir. 2023) ("an object becomes a

dangerous or deadly weapon based on how it has been 'used or attempted to be used.' Its use, by definition, must be 'to cause death or serious injury,' or attempt to do so.").

Furthermore, the instructions and the government's argument are contrary to a long list of persuasive precedents that require proof that a non-inherently deadly object must be used in a manner that is "likely" to cause serious bodily injury. *See United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) (en banc); *United States v. Gibson*, 896 F.2d 206, 210 n.1 (6th Cir. 1990) *United States v. Bey*, 667 F.2d 7, 11 (5th Cir. 1982); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982); *United States v. Loman*, 551 F.2d 164, 169 (7th Cir. 1977); *United States v. Johnson*, 324 F.2d 264, 266 (4th Cir. 1963). District courts in this District have likewise defined the term "dangerous weapon" to require proof that the defendant used an object in a manner that is "likely" to cause serious bodily injury. *United States v. Klein*, 533 F. Supp. 3d 1, 12 n.6 (D.D.C. 2021); *United States v. Chansley*, 525 F. Supp. 3d 151, 161-62 (D.D.C. 2021); *United States v. Munchel*, 2023 WL 2992689, at *4 n.5 (D.D.C. Apr. 18, 2023). As Judge Lamberth noted in *Chansley*, "courts have consistently defined 'dangerous weapon' as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm." 525 F. Supp. 3d at 162 (collecting cases).

Finally, limiting the definition of a "dangerous weapon" to objects that are either designed to cause serious bodily injury or are used in a manner likely to cause serious bodily injury is the only statutory construction that avoids "an absurd and unjust result which Congress could not have intended." *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (citation omitted). If any object that "in theory" could cause serious bodily harm constitutes a dangerous

weapon, peanuts,[3] a rubber band,[4] a banana peel,[5] a snowball,[6] and innumerable other relatively innocuous objects would constitute "deadly or dangerous weapons" for purposes of 18 U.S.C. § 111(b) when used in an assault, and raise the statutory maximum penalty from 8 to 20 years. Throwing a peanut or shooting a rubber-band at an officer, while capable of causing significant bodily harm, is not likely to do so. The government's statutory construction has absurd results, and does not satisfy *Arrington*'s requirement that non-inherently dangerous items be used in a manner that is actually "dangerous" to the victim.

### D.   The Evidence Failed To Prove To A Rational Factfinder Use of Pepper Spray in a Dangerous Manner.

As noted earlier, the government explicitly declined to present any evidence that Mr. Easterday's use of pepper spray was likely to cause serious bodily injury. The only evidence presented on this issue at trial was from the defense's expert who testified that Mr. Easterday's use of pepper spray as depicted in the videos of his conduct did not present a significant risk of serious adverse health effects. Oct. 26 Tr. at 150 (defense expert "was asked to say whether this exposure was likely to produce serious bodily harm or death, and [his] answer was no."); *accord id.* at 135-40, 160 (expert testimony reviewing images of Easterday's conduct, and concluding that they reflect ordinary exposure to pepper spray which poses a "very low" risk of significant adverse health effects); *id.* at 143-44 (recounting poison center data showing 0.1 percent of exposures to pepper spray over 22-year period as having significant adverse health impacts).

---

[3] "Peanut allergy is the food allergy most likely to be fatal." Jonathan Bridges, *Suing for Peanuts*, 75 Notre Dame L. Rev. 1269, 1273 (2000).

[4] *Prows v. Indus. Comm'n of Utah*, 610 P.2d 1362, 1362 (Utah 1980) (discussing workers compensation claim for injury from rubber band).

[5] *Williamson v. F. W. Woolworth Co.*, 112 So. 2d 529, 532 (Miss. 1959) (discussing tort claim for injuries caused by slip on banana peel).

[6] *Flores v. Ashcroft*, 350 F.3d 666, 670 (7th Cir. 2003) (noting that "a snowball, spitball, or paper airplane" could be used to commit a battery under Indiana law, but such conduct would not constitute violent force for purposes of classification as a crime of violence.

Because the evidence must be evaluated based upon "how a properly instructed jury would assess the evidence," *Hillie*, 39 F.4th at 679, and no evidence established that Mr. Easterday used or intended to use pepper spray in a "dangerous manner" such that it was likely to cause serious bodily harm or death, the Court should vacate Mr. Easterday's convictions that contain the "dangerous weapon" element. The erroneous instruction and closing argument by the prosecution "went to a central and close issue in the case," and therefore the Court should vacate Mr. Easterday's convictions on all counts containing the "dangerous weapon" element. *See United States v. Williams*, 836 F.3d 1, 16 (D.C. Cir. 2016) (reversing conviction based on jury instruction error that went to central issue); *United States v. Rhone*, 864 F.2d 832, 835 (D.C. Cir. 1989) (noting that vacatur is required when a substantial possibility exists that jury convicted on an "improper legal theory").

Although the government also charged in Counts Two and Three that Mr. Easterday inflicted bodily injury, the submission of the invalid "theoretical possibility of harm" definition of dangerousness to the jury requires the Court to vacate the conviction on those counts. *See Yates v. United States*, 354 U.S. 298, 312 (1957) (general verdict set aside "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."). As discussed below, however, the government also failed to adduce evidence beyond a reasonable doubt that Mr. Easterday inflicted bodily injury on any victim.

## III. Evidence at Trial Failed To Prove Beyond a Reasonable Doubt that Mr. Easterday Inflicted Bodily Injury.

### A. <u>Transient Pain is Not Bodily Injury</u>

The testimony at trial established that pepper spray is widely used by law enforcement and civilians as a non-lethal means of self-defense that almost always results in only temporary pain and redness that can be alleviated with water. Oct. 24 Tr. at 115-17; Oct. 25 Tr. at 42, 52-

53. Testimony from the two law enforcement officers was consistent with an ordinary physical reaction to pepper spray: temporary pain that went away within a relatively short period of time and no lasting physical impacts. Oct. 24 Tr. at 123; 138-39. Neither sought medical attention either immediately or at a later time, and both were able to complete their shifts at the Capitol. Oct. 24 Tr. at 123, 143, 147.[7]

Pepper spray works because the active ingredient stimulates pain receptors in skin. Oct. 25 Tr. at 189. Pain receptors trigger the pain response to notify the brain of something that may or may not constitute an injury. Oct. 25 Tr. at 39 ("Pain is an unpleasant association -- an unpleasant sensation associated with actual or potential damage to the body"). The effects of pepper spray are "transient and self limiting," and thus typically go away "with minimum or no special treatment." Oct. 25 Tr. at 123-24. The active ingredient, capsaicin, is classified as an irritant rather than a corrosive, and thus does not typically cause tissue damage. *Id.*

"Bodily injury," by contrast, means "[p]hysical damage to a person's body." Black's Law Dictionary 906 (10th ed. 2014); *see also* Stedman's Med. Dictionary 903 (27th ed. 2000) ("injury: The damage or wound of trauma."). The definition of "bodily injury" does not encompass any injury even if painful. As the Court instructed, bodily injury means "an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." Oct. 26 Tr. at 35.

No evidence was introduced at trial that either Officer Pollitt or Officer Acevedo sustained physical injuries or damage to their bodies from pepper spray. Ordinary exposure to

---

[7] After Officer Pollitt was pepper sprayed, he moved to the Rotunda doorway to assist another officer, and he then became "crushed against the door" by the weight of the crowd. Oct. 24 Tr. at 111, 114. The pressure against the officer's chest made it difficult for him to breathe, and as a result he passed out for a short period of time. *Id.* at 122. No evidence established that Officer Pollitt passed out because he was previously pepper sprayed, or that he would not have passed out but for being pepper sprayed.

pepper spray is not something for which "medical attention ordinarily would be sought." Oct. 25 Tr. at 53 (testimony from government expert: "Q. Studies show that most people do not seek medical attention? A. That is correct."); *id.* at 218 (testimony from defense expert that only a "small number" of exposures have more than a "minor effect," and most are treated at home or at site of exposure).[8] Indeed, symptoms from pepper spray are "transient and self-limiting," and exposure is treated by irrigating exposed skin with water. *Id.* at 52-53 ("majority" of exposures "result in minor effects that resolve quickly," often "within 30 or 45 minutes"); *id.* at 123 (effects are transient and self limiting). The fact that Officer Pollitt and Officer Acevedo both completed their shifts without needing medical attention supports the conclusion that neither sustained physical injury or damage to their bodies.

Although both officers testified that they experienced temporary pain from being pepper sprayed based upon a subjective ten-point scale, such subjective testimony about pain does not establish that either suffered an injury to their body. "[S]everity of pain is inherently subjective." *Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987); *cf. White v. United States*, 207 A.3d 580, 590 (D.C. 2019) (victim's "subjective rating that he experienced the highest pain on a ten-point scale is relevant but not dispositive"); *In re P.F.*, 954 A.2d 949, 952 (D.C. 2008) (noting that "a victim's statements regarding pain are not alone sufficient to support" factual finding about severity of pain); *Swinton v. United States*, 902 A.2d 772, 777 (D.C. 2006) ("[t]he extremity of the victim's pain must be established by probative evidence, not left to the jury's untethered speculation"). As noted above, pain is the body's response to stimulus that may or may not be an injury. As such, testimony that the officers experienced temporary pain, by itself, is insufficient

---

[8] Because law enforcement protocols are designed to protect officers and departments from liability, testimony that the Capitol Police are trained to call an ambulance when using pepper spray on a civilian does not establish that pepper spray exposure is something for which medical attention is ordinarily sought outside of that context.

to establish proof upon which any reasonable juror could conclude that either officer sustained an actual injury to their body.

### B. Evidence Did Not Establish that Mr. Easterday Inflicted Bodily Injury on Officer Acevedo.

The government also failed to adduce sufficient evidence that Mr. Easterday is responsible for inflicting any harm to Officer Acevedo. Section "111(b) does not apply to someone who merely 'causes' bodily injury; it applies only to someone who 'inflicts' bodily injury." *Gray v. United States*, 980 F.3d 264, 267 (2d Cir. 2020). The video evidence at trial established that another person, James Haffner, was closer to Officer Acevedo than Mr. Easterday and sprayed pepper spray directly at Officer Acevedo at the time when Officer Acevedo stated that he was hit by pepper spray. Accordingly, Mr. Easterday cannot be held criminally responsible based upon the theory, argued by the government, that Mr. Easterday's conduct was a "contributing cause." *See Burrage v. United States*, 571 U.S. 204, 217-18 (2014).

Officer Acevedo testified that when he was sprayed, he was standing next to the rotunda doors against a wall looking outward, and officers were on his right side. Oct. 24 Tr. at 138-39, 146-47. He did not see who sprayed him or where it came from, but he knew the spray did not come from "in front of [him] or from the right side because there were officers to [his] right." *Id.* at 146-47. At that point he "felt like I got sprayed. I believe it was one time. I wasn't sure. I don't know how many times I got sprayed. From the video, it looks like I got sprayed, yes." *Id.* at 146.

At trial, the government presented a video showing Mr. Easterday standing approximately 10 to 15 feet away from Officer Acevedo when he sprayed pepper spray in Acevedo's direction. Gov. Ex. 408. After he was hit with pepper spray, Officer Acevedo turned away from the spray. *Id.* (at time 1:07). Immediately before Officer Acevedo turned away, James Haffner – who was in front of Mr. Easterday and closer to Acevedo -- sprayed pepper

spray in Acevedo's direction. *Id.*; Def. Ex. 17F (screenshot of time 1:05 from Gov. Ex. 408); *see also* Def. Ex 19 (Haffner criminal complaint). The evidence showed that Haffner continued to spray pepper spray in Officer Acevedo's direction right before Officer Acevedo turned away:



Def. Ex. 17F (screenshot of Gov. 408 at time 1:05).

*Burrage v. United States* addressed the level of evidence required to establish that "death or serious bodily injury result[ed] from the use of [a controlled] substance" for purposes of the 20-year mandatory minimum in 21 U.S.C. § 841. Although that opinion determined the minimum evidence necessary to establish the lower standard of but-for causation, not "infliction" of bodily injury, 571 U.S. at 214, it establishes that the evidence at trial was insufficient to prove causation of injury in this case.

Even in the context of a lower standard, the Supreme Court rejected the government's argument that a "contributing cause" of injury is sufficient to establish but-for causation. *Id.* at 217. Authorizing criminal liability based upon "every act or omission that makes a positive incremental contribution, however small, to a particular result," the Court held, was inconsistent with both the reasonable doubt standard and the requirement that criminal liability not be

unconstitutionally vague. *Id.* at 218. As the Court explained, "[i]s it sufficient that use of a drug made the victim's death 50 percent more likely? Fifteen percent? Five? Who knows. Uncertainty of that kind cannot be squared with the beyond-a-reasonable-doubt standard applicable in criminal trials or with the need to express criminal laws in terms ordinary persons can comprehend." *Id.*

Officer Acevedo testified that he believed he was sprayed one time. The video evidence supports the conclusion that Mr. Haffner sprayed pepper spray at Officer Acevedo right before the Officer turned to his right, and therefore was responsible for hitting Officer Acevedo with pepper spray. Gov't Ex. 408; Def. Ex. 17F. The video also does not show Mr. Easterday spraying pepper spray at the time that Officer Acevedo turned to his right. Accordingly, the evidence at trial does not establish beyond a reasonable doubt that Mr. Easterday inflicted bodily injury on Officer Acevedo. For this additional reason, the Court should enter a judgment of acquittal on Count 3.

**IV.   The Government Failed to Adduce Evidence of Knowledge that the Capitol Grounds Constituted a "Restricted Building or Grounds" Due to Visitation by the Vice President As Required For Counts Four through Six.**

18 U.S.C. § 1752 prohibits certain conduct done knowingly in a "restricted building or grounds," which is defined, inter alia, as a restricted area where a Secret Service protectee is or will be temporarily visiting. "[T]o know that an area is a 'restricted building or grounds,' one must know that the area is of the sort described in the statutory definition." *United States v. Elizalde*, No. 1:23-CR-00170 (CJN), 2023 WL 8354932, at *3 (D.D.C. Dec. 1, 2023).[9] "A defendant therefore lacks the requisite knowledge if all he knows is that the building or grounds

---

[9] Mr. Easterday's proposed jury instruction with respect to Counts Four, Five, and Six required the government to prove that Mr. Easterday "knew that the area he entered or remained in was a 'restricted building or grounds,'" meaning a "restricted area where the Vice President is or would be temporarily visiting." Def. Proposed Jury Instructions ECF 65 at 16.

is 'restricted' in the colloquial sense. Here, that means [Easterday] must know that the area was a 'posted cordoned off, or otherwise restricted area ... of a building or grounds where [a] person protected by the Secret Service is or will be temporarily visiting.'" *Id.*

The jury instructions did not require such knowledge, nor did the government adduce any evidence that Mr. Easterday knew that the Capitol Grounds were restricted due to the Vice President's visit. Accordingly, for this additional reason, the Court should enter a judgment of acquittal as to Counts Four through Six.

## CONCLUSION

For the foregoing reasons, the Court should grant a judgment of acquittal as to Counts 2 through 6, or alternatively a new trial.

Respectfully submitted,

Isreal Easterday
Defendant

By:    /s/ Geremy C. Kamens
       Geremy C. Kamens
       Federal Public Defender
       Office of the Federal Public Defender (Alexandria)
       1650 King St, Suite 500
       Alexandria, VA 22314
       T: 703-600-0848
       F: 703-600-0880
       Geremy_Kamens@fd.org