<pre>
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2


 3    UNITED STATES OF AMERICA,         .
                                        .   Case Number 23-cr-300
 4              Plaintiff,              .
                                        .
 5         vs.                          .
                                        .   Washington, D.C.
 6    RAYMOND CHAMBERS, II,             .   March 14, 2024
                                        .   2:17 p.m.
 7              Defendant.              .
      - - - - - - - - - - - - - - - - -
 8


 9                    TRANSCRIPT OF PRETRIAL CONFERENCE
                 BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                    UNITED STATES DISTRICT JUDGE


11


12    APPEARANCES:

13    For the United States:       TAYLOR FONTAN, AUSA
                                   KATHERINE BOYLES, AUSA
14                                 FRANCESCO VALENTINI, AUSA
                                   United States Attorney's Office
15                                 601 D Street Northwest
                                   Washington, D.C. 20579
16


17    For the Defendant:          NATHAN SILVER, II, ESQ.
                                   Law Offices of Nathan I. Silver
18                                 6300 Orchid Drive
                                   Bethesda, Maryland 20817
19


20


21    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24

      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
</pre>

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4     Action 23-300, United States of America versus Raymond Chambers.

 5          If I can have counsel approach the podium, those that are

 6     here, and state your name for the record, starting with the

 7     United States.

 8              MS. FONTAN:  Taylor Fontan for the government.

 9              THE COURT:  All right.  Good afternoon.

10              MR. SILVER:  And good afternoon, Your Honor.  Nathan

11     Silver, appearing for Mr. Chambers.

12              MS. BOYLES:  Your Honor, Katherine Boyles, also here

13     for the government, and at counsel table is Deputy Chief

14     Francesco Valentini.

15              THE COURT:  Okay.  Thank you, all.

16          We are here for a pretrial conference.  And I know that the

17     government has filed some suggestions to voir dire questions.  I

18     also have the defendant's brief regarding the jury instruction

19     that applies to, what is it, 1752.

20          And I have the government's motions in limine, which I

21     think we've discussed preliminarily, Mr. Silver, or am I

22     confusing another case of yours where you didn't have any

23     concerns with their motions in limine?

24              MR. SILVER:  No, I think -- I know I did not have any

25     objections.  So if there's any confusion --
```

```
 1              THE COURT:  Okay.  So you have no objection.

 2              MR. SILVER:  Correct.

 3              THE COURT:  If I haven't done so already, the

 4    government's motions in limine to preclude -- let's see.  There

 5    are four motions in limine.  One is regarding the

 6    cross-examination of U.S. Secret Service witness.

 7         There's no objection to that one; correct?

 8              MR. SILVER:  Yes, correct.

 9              THE COURT:  Okay.  That motion is granted.

10         Another regarding evidence about the specific locations of

11    U.S. Capitol Police surveillance cameras.

12         No objection there.  That's also granted.

13              MR. SILVER:  Yes.

14              THE COURT:  And then a motion to preclude improper

15    defense arguments relating to the First Amendment charging

16    decisions:  Entrapment, public authority, and jury

17    nullification.

18         No objection?

19              MR. SILVER:  No objection.

20              THE COURT:  And that's granted.

21         And finally, a motion in limine regarding the video montage

22    evidence.

23         Also no objection there; correct?

24              MR. SILVER:  No objection.

25              THE COURT:  All right.  That motion is granted.
```

1    So let me start with the voir dire and the government's

2    proposals.  It's not that I object to the vast majority of your

3    suggestions, but I don't know if you all know how I conduct jury

4    selection.

5    Like most judges in this court, I will read a series of

6    yes-no questions, which the questions are carefully crafted to

7    elicit a single yes-or-no answer.  If there's yes on anything,

8    then they're examined at the bench.

9    So the kinds of questions you're asking would be

10   appropriate follow-up that the Court will probably ask on its

11   own, and to the extent the Court doesn't, you're free to.

12   All right?

13       MS. FONTAN:  Yes, that's clear.  Thank you.

14       THE COURT:  There was one additional substantive

15   question, Mr. Silver, that related to -- I think this was the

16   government's question regarding the participation in any

17   political campaign, and if so, which one.

18   That's not a question that I'm inclined to ask, but I'm

19   interested in your perspective on that.

20       MR. SILVER:  Well, I'm just interested in knowing

21   really if --

22       THE COURT:  Is this your proposed question, or was it

23   government's?

24       MR. SILVER:  It's really my proposed one.  I discussed

25   it with Ms. Fontan, who presented it.

1      But my sense is that if -- if a potential juror was active

2   in a political campaign for either President Trump or

3   then-candidate Biden, I think that's something we should know.

4      I would restrict it to that.  I wouldn't go into other

5   candidacies.  I don't think it would be suitable.

6           THE COURT:  But where does one draw the line?  I mean,

7   wanting to know who jurors voted for?  Wanting to know what

8   their political views are?  I don't tend to ask questions about

9   TV shows and news sources and all of that.

10      It seems to me that the degree of relevance is -- you know,

11   I wonder whether it's really appropriate.

12           MR. SILVER:  I think the question could be restricted

13   just to whether or not a potential juror worked for a potential

14   campaign, either one, and that's it.

15           THE COURT:  So you're suggesting that working on --

16   let's say, for example, working on the campaign, Biden's

17   campaign would therefore make the person hostile towards anyone

18   who is at the Capitol on January 6?  Is that the theory?

19           MR. SILVER:  Well, it may be.  I think that's the kind

20   of question that could be answered at the bench and just to have

21   it as simple as what's the nature of your work, was this

22   stuffing envelopes or was this somebody that had more of an

23   involvement with the actual presentation of advertising or any

24   kind of placement of ads or any kind of gathering the vote

25   efforts.

1    I think it's appropriate, but it would still be restricted.

2    I don't think we would have to go into much detail.

3         THE COURT:  Just to be clear, nothing is going to be

4    at the bench, because the courtroom's open to the public.

5         So just to clarify to the extent -- I know pre-COVID a lot

6    of judges were doing that, but I think the more appropriate way

7    is to do it publicly.

8         But I'm just curious.  I would like to hear from the

9    government on that.  The government's in agreement that that's

10   an appropriate question?

11        MS. FONTAN:  Yes, Your Honor.  We think it's limited

12   enough in just asking the yes-or-no question "did you work on

13   the presidential campaign in 2020" just generally, and we -- we

14   have no issue with the question.

15        THE COURT:  All right.  Well, since both parties agree

16   to this, I'm reluctant to get into the politics, because I don't

17   know where you stop the line, but I will ask it if both parties

18   want it.  So I will accept that.

19        Does anyone want to argue about the jury instruction issue?

20   So far as I know, that's the only real substantive dispute; is

21   that right?

22        MS. FONTAN:  Yes, Your Honor.  And we would like if we

23   could hear argument on that.

24        THE COURT:  You would like argument?

25        MS. FONTAN:  Yes, please.

1          THE COURT:  All right.  Go ahead.

2          MS. FONTAN:  Your Honor, just to clarify, my

3   colleague, Francesco Valentini, is here to argue.

4          THE COURT:  Okay.  I want you to keep it short,

5   because I've reviewed the briefs.  I'm familiar with the issue.

6          MR. VALENTINI:  Absolutely, Your Honor.  And I want to

7   clarify, we are here -- we welcome your questions, and we are

8   here mostly to address any concerns that Your Honor might have

9   about the issue.  We are not here to force argument, of course,

10   on the Court.

11          THE COURT:  Okay.  Well, I mean, you make any points

12   you want to emphasize.  I'm familiar with the issue.

13          MR. VALENTINI:  Thank you.

14      And the question here, of course, as Your Honor knows, is

15   whether the federal protectee requirement in 1752(c)(1)(B) is

16   jurisdictional, in which case no mens rea attaches to that

17   requirement, or whether it is something else, something of a

18   more substantive nature, or quintessentially substantive nature,

19   in which a mens rea requirement might apply.

20      And of course, there's some analytical complexity to all of

21   this, and decisions of Your Honor's colleagues, including a

22   decision by Judge Howell in Carnell and by -- more recently by

23   Judge Chutkan in Nester, sort of chart the way that we think the

24   issue should be resolved.

25      But at bottom, the question of whether an element is

jurisdictional is a question that boils down to congressional intent.  And here, the clearest indicia of congressional intent is, of course, what Congress did in 1970 when it first enacted 1752.

And this is one of those instances in which not only is the statute text quite illustrative, but we also have a wealth of legislative history that makes really quite abundantly clear that Congress's intent in 1970 when it enacted the statute was to make this particular element under the statute jurisdictional.

And so for instance, on page 6 of that Senate Report from 1970, the committee stated that the bill is designed to provide a uniform minimum of federal jurisdiction for presidential security when the president is on temporary visits where he is most vulnerable.

And then the committee went on and said, for instance, if those state and local ordinances differ as to the exact extent of the coverage, almost everything prescribed in subsection (a), which is the lead section, subsection on that point, is presently outlawed in some form or other at the state and local level, subsection (a) makes these activities a federal offense, so that the Secret Service has the authority to prevent such activity.

And so, like, these and other excerpts from the report make clear Congress's objective in 1970 was both narrowing scope but

1    also critical in function.  What Congress attempted to do was to

2    provide a uniform enforcement mechanism when a restricted area

3    is put in place against things that are ordinarily just

4    violation of state law, like things like trespass, which is

5    prohibited under (a)(1), or disorderly conduct in (a)(2), or

6    acts of physical violence in (a)(4).

7         And that remained Congress's primary objective through all

8    the amendments and tweaks that Congress made to the statute over

9    time.

10        So now turning very briefly to the analytical framework

11   here, Judge Howell's decision in Carnell, we think, charts the

12   right course, as we mentioned.  So too does Judge Chutkan's

13   decision in Nester and, for that matter, Judge Cooper's decision

14   in Groseclose.  Although he reached a different conclusion, a

15   conclusion that we vehemently disagree with, it really charts

16   the same course of analysis and a course of analysis that at

17   least at a framework level is correct.  And that is, the

18   question again, first of all, is whether the federal protectee

19   requirement in (c)(1)(B) is jurisdictional.

20        And Groseclose and the other decisions also correctly

21   identify -- identified the legal principles that primarily drive

22   the answer to that question, which is the Supreme Court decision

23   in Feola, which back in the 1970s held that another statute that

24   the Court is intimately familiar with, 18 U.S.C. 111, under that

25   statute, the federal victim element was jurisdictional and

1    therefore did not require a mens rea.

2         And so applying those principles, Judge Howell in Carnell,

3    Judge Chutkan in Nester, and Judge Cooper in Groseclose

4    correctly determined that at least -- they all agreed that at

5    least until 2006 -- and here, I will quote Judge Cooper, because

6    again, he reached a different decision in the end, but as the

7    statute stood from 1970 to 2006, he wrote, one would be

8    hard-pressed to find any difference between Feola, where again

9    that seven-justice majority, majority of the Supreme Court held

10   that the requirement was jurisdictional, and the (c)(1)(B)

11   jurisdictional element at issue here.

12        So then the only question is whether after -- in 2006,

13   something changed so dramatically.  And on that, Judge Cooper in

14   Groseclose took one view, and Judge Howell and Judge Chutkan

15   more recently took a different view.

16        And we think that --

17             THE COURT:  And Judge Contreras and McFadden as well;

18   correct?

19             MR. VALENTINI:  That is correct.  I am focusing on

20   Judge Howell's decision and Judge Chutkan's decision, just

21   because they had the opportunity because of the briefing to

22   really zero in on the jurisdictional question.

23        But yes, there is more judges from this Court, Judge

24   Contreras in United States v. Rhine, and of course, Judge

25   McFadden in the Griffin case that's currently pending before the

1    D.C. Circuit also reached the same conclusion.  They do not get

2    as deeply into the jurisdiction question --

3              THE COURT:  I understand.

4              MR. VALENTINI:  And so then the only question is

5    whether, like, really something so dramatic happened in 2006

6    that made something that -- that changed the mens rea.

7         And there is, we think, strong reason to believe that

8    that's not the case.  The key fact is that when Congress wants

9    to change the mens rea of a statute, it knows how to do it.  In

10   fact, it did it with respect to this statute, though going the

11   other direction it eased the mens rea in 2012.

12        And so that alone is reason to doubt that Congress would

13   have wanted to change the mens rea requirement without saying

14   anything about it.

15        And in Groseclose, Judge Cooper said well -- it viewed the

16   change in the applicable penalties in 2006 as some strong

17   indication or some indication that Congress intended to change

18   the requirement from jurisdictional to something different.

19        But that reasoning, we think, is wrong, and it's wrong

20   because it runs right into the analysis of the Supreme Court's

21   majority in Feola.

22        In Feola, too, the dissenters made a point of saying well,

23   these penalties for 18 U.S.C. 111 are really out of line with

24   the penalties of generally simple assault charge and simple

25   assault statute.  And the other seven members of the Supreme

Court said well, so be it, it still is jurisdictional.

And in addition to that, imputing a change in mens rea to a change in penalty is also -- it doesn't quite capture the reality of the state equivalent of the violations that are at issue here.

Things like trespass, in 2006, Congress brought the maximum from six months to 12 months.  But the reality is there is -- in Virginia, for instance, some types of trespass are punishable for up to 12 months.

I don't want to belabor these points.  I know they're briefed in our papers, and I don't want to take any more of your time.

THE COURT:  Okay.

MR. VALENTINI:  I would like to stress, though, that there will be severe practical enforcement problems with the other view, both enforcement problems and legal problems.  And that's not just the hundreds of cases that have been brought under the statute --

THE COURT:  But if it's wrong, it's wrong.

MR. VALENTINI:  Absolutely.  So that's why I'm saying, it's not just that.  There's a lot more than that.

There's the application and the applicability of the statute, and there's also the applicability of other subparts of (c)(1), for instance, (c)(1)(A).  The provision applies not when there's a restricted area and a visiting -- a temporarily

1    visiting protectee, but it applies at the White House or at the

2    vice president's official residence.

3        And the problem with that is it's clear, like, a trespasser

4    at the Naval Observatory will surely know that the area is

5    restricted.  That is absolutely clear.  It's virtually a

6    militarized area.  Right?  It's very difficult to miss the fact

7    that it's restricted.

8        But the idea that to find -- to prosecute a violation the

9    government will have to prove beyond a reasonable doubt that the

10   defendant subjectively knew that that area was the residence of

11   the vice president is, frankly, one bridge too far.

12               THE COURT:  I understand.

13               MR. VALENTINI:  Thank you.

14               THE COURT:  All right.  Mr. Silver?

15               MR. SILVER:  I will submit, Your Honor.

16               THE COURT:  Okay.  All right.  Well, as I said, I've

17   reviewed these cases.  In particular, I am in agreement with

18   Judge Howell in Carnell, and she reached the same conclusion, as

19   the government has argued, as Judge Chutkan, as also Judge

20   Contreras and Judge McFadden.

21       I do believe that the fairest, most reasonable reading of

22   the statute is that the statutory provision regarding the Secret

23   Service protectee, here the vice president, is a jurisdictional

24   element and therefore is exempt from the mens rea requirement

25   that the defendant act knowingly with regard to that provision.

1    And so at trial, the government need only prove that the

2    defendant knowingly engaged in the prescribed conduct, knowing

3    the conduct is in a posted, cordoned-off, or otherwise

4    restricted area, and also, for Section 1752(a)(1), knowing such

5    conduct in that area is without lawful authority, or for 1752,

6    with the intent to impede or disrupt the orderly conduct of

7    government business or official functions.

8        So the Court is going to use the government's proposed

9    version of the Section 1752(a) jury instructions.

10       All right.  Aside from that, are there any other legal

11   issues we need to address?  Mr. Silver?

12           MR. SILVER:  The only thing I'm concerned about, I

13   haven't had a chance to review exhibits from Mister -- with my

14   client from Mr. Sobotka's phone.

15       Mr. Sobotka was charged separately and resolved his case

16   separately before Mr. Chambers, I think, might have been

17   arrested.

18       I would just like a chance to review those with my client

19   to determine whether or not I should file any kind of objection

20   to that.  I have not had a chance to do that yet.

21           THE COURT:  Why do you not have the exhibits?

22           MR. SILVER:  I have the exhibits.  I'm saying --

23           THE COURT:  You do?  But what?  You haven't reviewed

24   them with your client?

25           MR. SILVER:  I haven't been able to review them yet

1    with my client.  I can probably just -- I'll be meeting with

2    him.  I spoke with him earlier before the Court took the bench,

3    and I plan to speak with him this afternoon.

4         But if there's any issue, I would like --

5              THE COURT:  If there's an issue, if you can file

6    something tomorrow on the docket so I know that I need to

7    address that.

8              MR. SILVER:  Yes, Your Honor.

9              THE COURT:  And in the pretrial order, did I not ask

10   parties -- and I know the defense may not have a lot, but I do

11   like two binders of exhibits.

12        Are you all planning on providing those today or tomorrow?

13             MS. BOYLES:  Yes, Your Honor.  We wanted to ask

14   whether you'd like them tomorrow or on Monday when we're

15   starting with openings and evidence.

16             THE COURT:  I would like them tomorrow.  I would like

17   to take a look at them before trial.

18             MS. BOYLES:  Understood.  We will have them to you

19   tomorrow.

20             THE COURT:  And then, Mr. Silver, I think your

21   deadline -- I don't have the pretrial order in from of me, but

22   typically, it's the day of trial, beginning of trial, in terms of

23   witnesses and exhibits.

24        You're going to be prepared for that?  Obviously, the

25   defendant can decide later about testimony, and there can always

1    be surprises.  But in terms of evidence you intend to introduce

2    into your case-in-chief, it seems to me that it's only fair to

3    turn that over at the start of the case so the government's not

4    blindsided.

5            MR. SILVER:  Yes.  And actually, there's an issue, if

6    I can raise it with the Court.

7        There were some photographs that for some reason were not

8    included in the discovery.  It wasn't the fault of the

9    government.  They were there, but I think they somehow got lost

10   when it went to the USAFx website.

11       And I've been in touch with Ms. Fontan earlier this week

12   about that.  She's provided me the photographs.  They were

13   actually photographs that were used when the FBI interviewed

14   Mr. Chambers.  And for some reason, they didn't make it into the

15   discovery pack, but Ms. Fontan has provided that.

16       I also made a request of Ms. Fontan that Mr. Chambers had

17   told the FBI in his interview that in effect a police officer

18   allowed him to enter the Capitol, giving him the impression,

19   giving him, Mr. Chambers, the impression that he was permitted

20   inside.

21       And I did make a request of Ms. Fontan whether or not the

22   government had any information that that particular officer

23   was -- and there may have been two officers, actually, Your

24   Honor, had been disciplined for dereliction of duty.

25           THE COURT:  You don't need to say it now in court, but

1    have you provided the names of the officers?

2              MR. SILVER:  I think the -- Ms. Fontan, I think, has

3    the names of the officers.  We've talked about them earlier this

4    week.  She knows who they are.

5              THE COURT:  All right.  But why is the fact that the

6    officer is being disciplined for that relevant to your client's

7    guilt or innocence?

8              MR. SILVER:  Well, if the officer was disciplined for

9    letting people in when the officer should not have done so, I

10   think that would go to whether or not my client's version of the

11   events, that he was actually permitted inside or welcome inside,

12   that would I think bolster his contention that either he thought

13   he had permission or he didn't think he was without permission

14   to enter.

15       I mean, that's how I would --

16             THE COURT:  Well, you have to prove up that these

17   officers talked to your client, number 1; right?

18             MR. SILVER:  Well, he would testify to that at trial.

19             THE COURT:  Okay.  So he will testify that the

20   officers told him that.

21       But why isn't the fact that the officers told your client

22   that enough for you to prove that he's not guilty of the

23   offenses?  Why is the discipline that happened after the fact

24   relevant to your client's guilt or innocence?

25             MR. SILVER:  It seems to me if there was an

investigation, an official investigation that concluded that the
officer was derelict, I think that would -- and there were
findings with respect to that, I think that would bolster,
corroborate my client's version of the events.

THE COURT:  Anything from the government on that?

I mean, it seems to me if the officers -- the officers
could well be disciplined for saying that to someone else.  I
mean, it seems like the crux of the issue is did they or did
they not tell your client that, and whether they were
disciplined or not, he thought he had a reasonable expectation
that he had authority to enter; right?

I mean, this seems like a little mini trial on whether the
officers were appropriately sanctioned.  It's confusing to the
jury.  The issue is, did they or did they not tell your client
he could enter the building.  And if he testifies they did and
the jury believes him, then he's proven his case -- I mean, the
government hasn't prove its.  It's not his burden, of course.

MR. SILVER:  Right.  I understand.

THE COURT:  I just don't see the relevance to his
guilt or innocence.  You say simply because the officers were
disciplined for letting some people in the building, that that
makes it more likely than not that those officers told your
client that he could enter the building?  I don't necessarily
see the link.

MR. SILVER:  Actually, that is my view, that if they

1    were -- if an officer is disciplined for having done -- if it

2    had to do with my client in particular, that would be pertinent.

3              THE COURT:  Can I hear from the government on that?

4    Can you come up to the podium, please.

5              MS. FONTAN:  Yes, sure, Your Honor.

6         Your Honor, we do agree with some of the reasons that you

7    pointed out.  It could be very confusing for the jury, and we

8    don't think it's relevant.

9         We also think that the way that Mr. Silver is describing is

10   really a propensity argument, which wouldn't be permissible

11   under the rules.

12        And also to this point, we do -- one of the officers that

13   is planning on testifying was at the door, and we have disclosed

14   any Giglio that we were required to for that officer.

15        At this point, Mr. Silver hasn't identified any other

16   officer at the door.  So I guess step 1 hasn't even been

17   completed either.

18        So for those reasons --

19             THE COURT:  You mean there's no -- he doesn't have a

20   good-faith basis for believing that he was disciplined?  What do

21   you mean?

22             MS. FONTAN:  So I guess -- sorry, Your Honor.  I

23   wasn't super-clear.

24        Mr. Silver and I had a conversation where he asked me for

25   disciplinary records for the officer that he talked to or waved

1   in.  It's our position that no officer did that.

2       And so we are -- we disclosed if there was any disciplinary

3   record, which there was not, for the officer that's testifying,

4   but otherwise, we don't -- we're not producing anything else for

5   a nonwitness officer.

6       THE COURT:  On this issue, Mr. Silver, I invite you,

7   to the extent you have authority that suggests the opposite, and

8   the government, if you want to give me -- I don't need briefing

9   on this -- your best cases, you all can file that tomorrow.

10      My inclination is, without having read any authority that

11  you might have in your back pocket, Mr. Silver, is that this is

12  not -- under the 403 analysis, this is potentially confusing and

13  unduly prejudicial, and that any relevance, which I'm not sure

14  it has, but any relevance is outweighed under 403.

15      But if you want me to review some case law that suggests

16  the contrary, I invite you to provide it, and I would ask the

17  government to do the same.  I would say by 5:00 p.m. tomorrow so

18  that we have it when we start on Monday.

19      MR. SILVER:  That's fine.

20      THE COURT:  But I was confused by your question about

21  the photos.  You were saying they were or were not provided?

22  You've resolved that issue?

23      MR. SILVER:  No, they have been provided.  They didn't

24  appear for some reason in the discovery materials, and they

25  should have, and it wasn't the government's fault.

1          THE COURT:  Is it prejudicing you that you didn't get

2     them earlier?

3          MR. SILVER:  No, no, it's not; no, there's no

4     prejudice.  It's just that I wanted to have them in time for the

5     trial and be able to see them before the trial.

6      I'm aware of them.  They were --

7          THE COURT:  So you have them, and you have enough time

8     to meet with --

9          MR. SILVER:  It's all been taken care of.

10          THE COURT:  Okay.  Do you expect to move to exclude

11     them for any reason?

12          MR. SILVER:  No, no.  It's just that we would need

13     them in the event that -- and the government may be interested

14     in them in its own case.  I don't know.

15          THE COURT:  All right.  So anything else for you,

16     Mr. Silver?

17          MR. SILVER:  No, Your Honor.

18          THE COURT:  Okay.  Anything else for the government?

19          MS. FONTAN:  Yes, just briefly, Your Honor.

20      The government just wants to put on the record that it's

21     our position that those photographs were produced on

22     September 1st, 2023, as a part of that discovery.

23      But like Mr. Silver says, it seems that we've resolved that

24     issue, and he was provided those.

25          THE COURT:  Okay.

1          MS. FONTAN:  And also, as far as the briefing goes for
2   tomorrow, do you mind if we have until 6:00 p.m., given that --
3          THE COURT:  That's fine.  I really don't want
4   briefing.  If you want to do a short brief, fine, but I'm just
5   interested in -- and principally, it's for Mr. Silver, but to
6   the extent he thinks I'm overlooking something, I would like to
7   see his best cases, and therefore, I would like your response as
8   well.
9       So this is not formal briefing.  This is just some
10  authority that supports your position on the admissibility of
11  the fact that any Capitol Police officers were or were not
12  disciplined.  It sounds like Mr. Silver is looking at more than
13  just the officer at the door.  He clearly wants to ask the
14  question, and I'm not, at least at this stage, thinking that
15  that's an appropriate question, for all the reasons I've stated.
16         MS. FONTAN:  Understood, Your Honor.
17         MR. SILVER:  Your Honor, let me just say, on the
18  officer at the door, I'm not looking to expand it.
19         THE COURT:  I thought you mentioned there were two
20  officers.
21         MR. SILVER:  But I think there was only one who may
22  have spoken to my client.  That's the thing.
23      I talked to Ms. Fontan about that.  I can clarify it with
24  my client.
25         THE COURT:  Based on your argument you've presented

1   without any authority, at this stage, to be clear, I don't think

2   asking the officer whether or not he was disciplined is

3   relevant.  And to the extent it is relevant, I think it's unduly

4   prejudicial, for the reasons I've stated.

5       I will revisit the issue if the authority you submit

6   supports your reading of the Rules of Evidence, but I'm not

7   inclined to allow that.

8       Have you all had time to meet with IT people?  Do you know

9   how to work all of the electronics here?

10      And you all understand -- have you done a jury selection

11  here in the method that I'm describing, where we have a large

12  group of potential jurors.  I go down a list of questions.  They

13  answer -- they write down the numbers only of those questions

14  they've answered positively yes to.  And then we excuse the

15  large group, and we bring in one by one each juror to address

16  those questions that they've answered yes to.  All right?

17      I did have one issue, and I meant to raise this earlier.

18  I've found -- having done a number of these January 6 cases,

19  I've found that the question that I've been asking since the

20  first January 6 case that I tried, it was the first one, that

21  the question "have you heard anything about January 6" is really

22  an unhelpful question, because everybody has.

23      I think there's one person who has answered no to that

24  question, and the person who answered no answered no to every

25  question.  And so I engaged with that potential juror in general

1    about why he or she didn't answer yes to any questions, because

2    some seem like -- it was odd to me that there were no yes

3    answers to any of the questions.   I wanted to make sure the

4    juror was paying attention and could hear my questions.

5        I would rather ask -- and I'm interested in both sides'

6    perspective.   I would rather ask whether the large group of

7    jurors in the courtroom have heard anything about this

8    defendant, Mr. Chambers, as opposed to January 6 in general, or

9    his involvement or alleged involvement in January 6.

10        Mr. Silver, do you have an objection to that?

11            MR. SILVER:   No.   I think that's proper.

12            THE COURT:   All right.   Because I feel like we just

13   end up getting yes answers and then bring them up here and they

14   say well, yeah, we were watching the news that day, or we've

15   seen it since.   It's just not that helpful in terms of sussing

16   out who might have a bias one way or the other.

17        So I will change that question.   Instead of saying -- I

18   think it's an early question, question 2 or 3.   "Has anyone read

19   or heard anything about Mr. Chambers's alleged involvement in

20   the events at the Capitol on January 6?"

21        I will give you the precise language before I read it on

22   Monday.   Remind me.   I will give that to you, because this is a

23   change to the voir dire you've seen.   But that was one question.

24        So I will go down this list of questions.   We'll bring them

25   in one at a time.   If either side has a strike for cause, I'm

1   going to ask you to raise it immediately once the prospective

2   juror steps out.

3        So if you don't raise a strike for cause at that time,

4   you've waived the strike for cause.  Of course, you can still

5   exercise a peremptory.  But we will excuse the juror.  We will

6   have any argument on a strike for cause.  And then we will

7   continue in that way.

8        And once we've qualified enough jurors to select a jury

9   with all of your strikes on each side, we'll stop the

10  questioning, and we will bring everyone in.  And you all will

11  simultaneously exercise your strikes, and then you will give

12  your paper indicating which jurors you're striking to

13  Mr. Hopkins.

14       I'll take a look to make sure in your initial round you're

15  not striking any alternates.  And then I'll give it back to

16  Mr. Hopkins, and you can exchange it.  And then we will do

17  another round for the alternates.

18       Okay?  Does that all make sense to everyone?

19            MS. BOYLES:  Yes, Your Honor.

20            MR. SILVER:  Yes, Your Honor.

21            MS. BOYLES:  And just to clarify, if both parties in

22  the first round of strikes were to strike outside of the box,

23  we're done?

24            THE COURT:  What do you mean "strike outside of the

25  box"?

1          MS. BOYLES:  So I --

2          THE COURT:  No, I leave them in the gallery, but

3     they're in order.  So 1 starts in the corner of the far right

4     set of pews, first row, and goes 1 through 6 or 7 on the front

5     row, and then --

6          MS. BOYLES:  But so if we were strike beyond juror

7     number 14, if the parties are striking beyond those 14, then we

8     would be done; we wouldn't need to continue with any strikes?

9          THE COURT:  I think so.  So one thing that can happen

10    is you both can strike the same person, and you don't get

11    another strike.  That person is just gone.

12         And if you strike beyond 14 -- oh, if the first 14 are fine

13    with you for both sides -- I've never seen that happen, by the

14    way.  But yes, if that were to happen, then the jury would be

15    the first 14.

16         Before the jurors come in, before you see the list of

17    potential jurors and the order they're in, I'll ask each side to

18    provide a number to Mr. Hopkins, a random number between 1 and

19    14 so that the alternates are randomly positioned.  So they know

20    two of them are alternates, but it's not the 13th and 14th seat.

21         MS. BOYLES:  Thank you, Your Honor.

22         THE COURT:  And you all think 14 jurors is adequate,

23    with COVID where it is right now?

24         MS. BOYLES:  Yes, Your Honor.  The government only

25    expects maybe a day and a half for evidence.  I'm not sure,

1    obviously, whether or not there will be a defense case, but I

2    think 14 should be plenty to get through just a couple of days.

3                THE COURT:  Okay.  What do you think, Mr. Silver?

4                MR. SILVER:  I think the same.  I think 14 are fine.

5                THE COURT:  All right.  So what time do I have us

6    starting tomorrow?  9:00 or 9:30?

7                COURTROOM DEPUTY:  I think you set it at 9:00.

8                THE COURT:  For the attorneys?

9                COURTROOM DEPUTY:  So the attorneys get here on time

10   and so we get the potential jurors here early.

11               THE COURT:  All right.  So I will see you all at 9:00,

12   but the jury, it takes a while to get them in.  We might

13   actually start the selection at 9:30.  But I would ask that you

14   all be here before.  Okay?

15               COURTROOM DEPUTY:  This might be kind of relevant.

16   Since we're starting on a Friday, it's highly unlikely there's

17   any other judges who are going to have jurors.

18               THE COURT:  So we will excuse jurors to go home?  If

19   they're excused for cause, they're going home.  They're not

20   going to the jury office for us to call back.  So they are

21   bye-bye.  All right?

22         So once we finish the jury selection, we will stop for the

23   day.  I don't expect you to do opening statements.  I might give

24   the jurors just the very preliminary instructions, but I won't

25   empanel them until Monday morning, just in case we have a COVID

1    breakout over the weekend.

2                MR. SILVER:  That's fine.

3                THE COURT:  All right.  Any questions from either

4    side?

5                MS. BOYLES:  No, Your Honor.  Thank you.

6                MR. SILVER:  No, Your Honor.  Thank you.

7                THE COURT:  All right.  Mr. Chambers, do you have any

8    questions?  Do you want to talk to your attorney privately

9    before we adjourn, or are you okay, good to go for tomorrow?

10               THE DEFENDANT:  Thank you, ma'am.  Yes, I'm good to go

11   for tomorrow, and obviously, I'll touch base with Mr. Silver,

12   and we will go from there.

13               THE COURT:  Okay.  Great.

14          All right, then.  So I will see you all tomorrow at

15   9:00 a.m.  Thank you.

16          (Proceedings adjourned at 2:53 p.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.




/s/ Sara A. Wick                    March 18, 2024
SIGNATURE OF COURT REPORTER         DATE