**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ISREAL EASTERDAY,**<br><br>**Defendant.** | **Criminal Action No. 22-404 (JEB)** |

<u>**MEMORANDUM OPINION**</u>

Defendant Isreal Easterday was a member of the crowd that stormed the U.S. Capitol on January 6, 2021. He was recently convicted by a jury of multiple criminal counts related to such conduct, including two assaults on Capitol Police officers using pepper spray. Challenging those results, Easterday has filed a Motion for Judgment of Acquittal or New Trial, claiming a mix of instructional error and insufficiency of the evidence. The key dispute between the parties is whether the jury was properly instructed on what qualifies as a dangerous or deadly weapon. Concluding that the convictions should stand, the Court will deny the Motion.

**I.     Background**

For his conduct on January 6, the Government ultimately charged Defendant with nine counts, only five of which are relevant to the present Motion: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Counts II and III); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count IV); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or

Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count V); and Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count VI).  See ECF No. 35 (Superseding Indictment).  Easterday has no beef with the other four counts of conviction.

Trial began on October 23, 2023, and lasted for four days.  See Minute Entry of Oct. 23, 2023; Minute Entry of Oct. 26, 2023.  The Government's evidence, which the Court must credit in considering sufficiency, showed that upon arriving at the east front of the Capitol on January 6, Easterday bypassed bicycle racks, snow fencing, and area-closed signs as he proceeded to the Capitol steps leading to the East Rotunda Door.  See ECF No. 98 (Gov't Opp.) at 1–2 (summarizing evidence presented at trial).  Once there, he brandished a can containing an unidentified aerosol substance, which the evidence showed was some variety of pepper spray or gel.  See ECF No. 89 (Oct. 23 Tr.) at 231:2–9; ECF No. 90 (Oct. 24 Tr.) at 109:6–18; ECF No. 91 (Oct. 25 Tr.) at 85:18–86:23.  He first discharged the substance against Officer Joshua Pollitt "in the eye" from an "arm's length" distance of approximately three feet.  See Oct. 24 Tr. at 96:1–97:24.  He sprayed for a "couple [of] seconds," until the cannister seemingly ran empty. See Oct. 25 Tr. at 149:16–23.  After stocking up with a new cannister, id. at 88:11–22, he took aim at Officer Miguel Acevedo, this time crop-dusting in his direction for about twelve seconds. See Oct. 24 Tr. at 39:24–40:3; Gov't Opp. at 16–17 (citing video evidence).  Summarizing this evidence at trial, Defense counsel conceded that the exposures lasted "between approximately 8 and 15 seconds" and occurred from a distance of "approximately 3 to 10 feet."  Oct. 25 Tr. at 163:19–21.  Easterday then entered the Capitol Building itself, where he roamed around and eventually left.  See Gov't Opp. at 6.

The jury heard extensive testimony on the effects of pepper spray.  From a U.S. Capitol Police Captain who had been exposed elsewhere on January 6, it heard that being sprayed was "awful — it was an awful burn that affected, not just my eyes, [but] my breathing as well . . . it made it hard to breathe, and it burned severely."  Oct. 23 Tr. at 203:12–20.  The pain was consistent with the Captain's experience with pepper sprays in training exercises, which he called "absolutely painful" and rated a "nine out of ten" on the pain scale.  Id. at 204:8–12.

Officers Pollitt and Acevedo had similar reviews of being sprayed by Easterday.  Pollitt testified that the pain, which lasted for hours, was "a solid eight, nine on the pain scale" and compared it to having "battery acid thrown on your face."  Oct. 24 Tr. at 96:13–15, 98:12–14.  The pain was not the only effect he suffered — his body also stopped cooperating in certain ways.  He testified that his "eyes immediately clamped shut" such that he "wasn't able to see."  Id. at 97:8–12.  The eye that took a direct hit of spray "didn't open again for a few hours."  Id.  As a result of "being blasted in the eye," he also "lost [his] footing and fell to the ground."  Id. at 97:24–25.  For his part, Acevedo testified that the sensation was akin to getting something hot on your hand, but multiplied by "maybe a hundred, 200 times on your sensitive eyes."  Id. at 139:5–7.  He described his pain as a ten out of ten on the pain scale.  Id. at 139:8–11.  In addition, he "couldn't see anything" in the immediate aftermath of exposure.  Id. at 139:15–20.

Each side also presented expert testimony.  The Government's toxicologist, Dr. Vanessa Fitsanakis, testified that pepper spray is generally "designed to cause pain, . . . to cause tearing, to cause a toxic response."  Oct. 25 Tr. at 25:16–18.  She opined that particularly when discharged into the eyes or face where pain receptors are more ubiquitous, the chemical agent is capable of causing "extreme pain."  Oct. 24 Tr. 188:23–25, 189:23–191:4.  Exposure to pepper spray, she added, can sometimes cause "chemical burns" to the eyes, which are also at risk of

"long-term damage" in the aftermath of exposure because the chemical can deplete the body's reservoir of tears, which are necessary for clearing out contaminants.  Id. at 192:1–16, 193:1–13.  Nor are the lungs immune: Dr. Fitsanakis explained that chest pain, "difficulty breathing," and "wheezing" are manifestations of exposure.  Id. at 195:18–196:6.  She also testified to familiarity with a "number of cases" where the substance caused "eye problems that just won't go away or lung problems that just won't go away," or "lung problems . . . so severe that [the victim is] having difficulty breathing" on a chronic basis and requires medical intervention.  Id. at 196:24– 197:14.

The Defense expert, clinical toxicologist Dr. Samuel Rutherfoord Rose, agreed that "pepper spray is designed to produce pain," and that pain receptors are "very prevalent in mucus membranes, so your eyes, ears, nose, throat, lining of your lungs."  Oct. 25 Tr. 124:7–11.  Exposure, he concurred, could be "very painful."  Id. at 139:17–18.  And while "significant toxicity" was, to his knowledge, "very, very rare" "in the normal course of using pepper spray," certain circumstances increased the likelihood of such an adverse reaction.  Id. at 129:17–21.  For instance, "a very high dose, prolonged contact" and "instill[ing] [pepper spray] directly into the eyes" produce "a higher likelihood that you might have a corneal abrasion or something more than just a red eye."  Id. at 131:11–20.  On the topic of distance, he elaborated, "[T]hey are designed to go, most of them, about 10 feet," but "the further away you are is probably the less chemical you will get on your skin or in your eye or in your throat."  Id. at 127:8–14.

After hearing the above evidence, the jury convicted Easterday on all counts.  See ECF No. 71 (Verdict Form).  He has now filed a Motion for Judgment of Acquittal or New Trial.  See ECF No. 83 (Def. Mot.).

## II.      Legal Standard

Federal Rule of Criminal Procedure 29(c)(1) provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  When considering such a motion, the court must "consider[] th[e] evidence in the light most favorable to the government" and uphold a guilty verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Wahl, 290 F.3d 370, 375 (D.C. Cir. 2002) (cleaned up).  Put another way, the court must determine whether "a reasonable juror must necessarily have had a reasonable doubt as to the defendants' guilt."  United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983).

Federal Rule of Criminal Procedure 33(a), in turn, provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "Trial courts enjoy broad discretion in ruling on a motion for a new trial."  United States v. Wheeler, 753 F.3d 200, 208 (D.C. Cir. 2014).  This is true in part because "[t]he rules do not define 'interests of justice' and courts have had little success in trying to generalize its meaning."  Id. (citation and internal quotation marks omitted).  At bottom, the D.C. Circuit counsels that "granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred."  Id. (citation and internal quotation marks omitted).  This Court believes that a clearly erroneous and prejudicial jury instruction could well necessitate a new trial.  Cf. United States v. Vicaria, 12 F.3d 195, 198–99 (11th Cir. 1994) (holding that district court did not abuse its discretion in granting new trial after concluding that it had erroneously omitted particular jury instruction); United States v. Adams, 150 F. Supp. 3d 32, 36 (D.D.C. 2015).

### III.   Analysis

In jockeying for a new trial under Rule 33, Easterday raises two main contentions: (1) the jury was improperly instructed that any weapon <u>capable</u> of causing serious bodily injury — as opposed to <u>likely</u> to do so — suffices for conviction under 18 U.S.C. § 111(b) and 18 U.S.C. § 1752(b)(1)(A), and (2) the jury was not instructed that for conviction of any § 1752 offense, the Defendant must have known that he was in a restricted building or grounds where a Secret-Service protectee was or would be visiting.  He also makes a sufficiency-of-the-evidence challenge sounding in Rule 29.  The Court begins with instructional error under Rule 33 and concludes with sufficiency under Rule 29.

### A.   Motion for New Trial

#### 1.   *Dangerous or Deadly Weapon*

First up is the Court's instruction on the definition of a dangerous or deadly weapon. This term appears in two of the statutes Defendant was charged under.  To start, 18 U.S.C. § 111(b) imposes an enhanced penalty on "[w]hoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon . . . or inflicts bodily injury."  So, too, § 1752(b)(1)(A) ratchets up the penalty for violations of the statute involving the use or carrying of "a deadly or dangerous weapon or firearm."  At trial, the Court instructed the jury that a weapon fits the bill for purposes of § 111(b) if it is "capable of causing serious bodily injury or death to another person and the defendant used it in that manner."  ECF No. 67 (Jury Instructions) at 12.  The § 1752(b)(1)(A) condition is satisfied, the jury was told, "if the object is capable of causing serious bodily injury or death to another person and the defendant <u>intended</u> to use it in that manner."  <u>Id.</u> at 14 (emphasis added); <u>see also</u> <u>id.</u> at 15.  The Court further defined "serious bodily injury" for purposes of both statutes as "bodily injury that involves," as relevant

here, "extreme physical pain" or "protracted loss or impairment of the function of a bodily member, organ, or mental faculty." Id. at 12.

In requesting a new trial, Easterday submits that the Court's definitions improperly swept in all instruments theoretically capable of causing serious bodily injury without reference to the dangerousness of their use. See Def. Mot. at 3. He advances a narrower definition requiring that the object be not just capable of causing, but likely to cause, serious bodily injury as used. Id. at 11.

One preliminary issue of table setting: Easterday addresses his arguments to his convictions under both 18 U.S.C. § 111(b) and 18 U.S.C. § 1752, but they are only truly targeted at the former. Because the latter imposes greater penalties on a perpetrator who "uses or carries" a deadly or dangerous weapon, see § 1752(b)(1)(A) (emphasis added), all the Government needed to establish was the capability of pepper spray to cause serious bodily injury and Defendant's intent to use it in that manner. See United States v. Robertson, 610 F. Supp. 3d 229, 237–38 (D.D.C. 2022) (citing United States v. Vinton, 594 F.3d 14, 22 (D.C. Cir. 2010)). Defendant does not dispute the weapon's capability and makes no genuine effort to argue that the Government's evidence of his intent to use the pepper spray in a dangerous manner was insufficient under his proposed definition. What is more, any such argument would necessarily come up short if the Court finds his contentions regarding the § 111(b) charge lacking, since evidence of actually using a weapon in a dangerous manner generally establishes intent to so use.

As such, the Court will focus its analysis on § 111(b). It first addresses Easterday's definitional concerns and then turns to the Government's alternative argument that any error was harmless.

a.   Definition

The parties agree that the definition of "deadly or dangerous weapon" laid out in United States v. Arrington, 309 F.3d 40 (D.C. Cir. 2002), controls, and employs "dangerous" as shorthand for "deadly or dangerous."  In that case, the D.C. Circuit confronted the outer boundaries of what constitutes a dangerous weapon under § 111(b).  It held that a car — although certainly capable of causing serious injury — is not a dangerous weapon when used "as a mode of transportation" or purely for flight.  Id. at 45.  Setting forth a general rule, the Circuit stated that a weapon is dangerous if "capable of causing serious bodily injury or death to another person and the defendant . . . use[d] it in that manner."  Id.  That is, verbatim, the language that this Court used to instruct the jury in the instant case.  See Jury Instructions at 12.  As this is what we district courts are instructed to do — viz., follow the law as laid down by the Circuit — one would think that this should settle the matter.  Apparently not.

The Government contended in closing — and in opposing Defendant's Motion — that all this language requires is use in a manner capable of causing serious injury.  See ECF No. 92 (Oct. 26 Tr.) at 86–87; Gov't Opp. at 21.  Easterday, conversely, puts more stock in Arrington's shorthand expression of the standard elsewhere in the opinion — namely, that to qualify as dangerous, an "object [must] be used in a deadly or dangerous manner."  309 F.3d at 45; Def. Mot. at 11.  He contends that use in a "dangerous" manner requires a showing of significant risk of harm, not just a possibility of it.  See Def. Mot. at 11.

The Government has the better reading.  As it explains, the focus in that case was on separating out innocuous uses of possibly dangerous instruments from their use as a weapon.  See Arrington, 309 F.3d at 45 ("[F]or a car to qualify as a 'deadly weapon,' the defendant must use it as a deadly weapon and not simply as a mode of transportation."); Gov't Opp. at 24.

Nothing in the opinion suggests that when the court abbreviated the requirement in question —
that an object be used in a manner capable of causing serious bodily injury — as use "in a deadly
or dangerous manner," it created a heightened standard and left behind the one it had just set out
two paragraphs previously.  See Arrington, 309 F.3d at 45.  Rather, it employed a shortened
version of the definition while underlining its main conclusion that innocent uses of possibly
dangerous items do not trigger liability under § 111(b).

 The Circuit underscored this point when it explained that the district court's instruction
below had not been vague as to the "manner of use" required.  The district court was clear, the
Circuit held, because it had specified for the jury that "a deadly weapon was a device 'capable of
inflicting serious bodily injury' . . . and that an 'automobile may be considered a deadly or
dangerous weapon if used in this manner.'"  Arrington, 309 F.3d at 47 n.12 (cleaned up).
Capacity to inflict serious injury is clearly the referent the court had in mind.

 Even accepting Defendant's suggestion that Arrington requires use in a "dangerous"
manner, the Court is not convinced that his "likely to cause serious bodily injury" interpretation
necessarily follows.  His argument supposedly flows from a straight-ahead textual reading of the
statutory language.  On Easterday's view, "the ordinary and common meaning of the word
'dangerous' requires evidence that the object presents a significant risk of serious bodily harm
when employed in the manner used."  Def. Mot. at 10; see also id. at 6 (citing dictionary
definitions).  But the word "dangerous" does not clearly implicate any specific quantum of risk.
Indeed, even one of the dictionaries Defendant himself cites defines dangerous as: "able or likely
to inflict injury."  Id. at 6 (citing Webster's Third New Int'l Dictionary 573 (2002)) (emphasis
added).  Ordinary meaning therefore does not so clash with the Government's view of Arrington
as to counsel a different interpretation.

Continuing his ordinary-meaning crusade, Defendant next proposes that the use of "dangerous" in combination with "weapon" indicates that the statute "refers to a subset [of weapons] that poses a particularly significant risk of harm." Id. at 10. That might be a sensible enough point were it not for the fact that the phrase "dangerous weapon" is a legal term of art that cannot be so finely parsed because it carries a well-established denotation. As a whole, the term means: "An object or device that, because of the way it is used, is capable of causing serious bodily injury." Black's Law Dictionary 17c (11th ed. 2019); cf. Simons v. United States, 2020 WL 3549179, at *6 (E.D. Va. June 30, 2020) (citing Black's for definition of "[a]ssault with a dangerous weapon," which "is a legal term of art with a readily understood meaning") (cleaned up); Bradley v. United States, 410 U.S. 605, 609 (1973) ("Rather than using terms in their everyday sense, the law uses familiar legal expressions in their familiar legal sense.") (cleaned up). The Court has no reason to depart from this long-accepted sense of the phrase, nor does it believe the Circuit so departed in Arrington.

What is more, Arrington is far from alone in adopting a definition of § 111(b)'s "dangerous or deadly weapon" element that requires only the ability to cause serious injury. Other circuits are broadly in agreement. See United States v. Taylor, 848 F.3d 476, 494 (1st Cir. 2017) ("A defendant who acts 'forcibly' using a deadly or dangerous weapon under § 111(b) must have . . . at least threatened the employee[] with an object that, as used, is capable of causing great bodily harm.") (emphasis added); United States v. Gray, 980 F.3d 264, 266–67 (2d Cir. 2020) (same); United States v. Bullock, 970 F.3d 210, 215 (3d Cir. 2020) (same); United States v. Gumbs, 964 F.3d 1340, 1350 (11th Cir. 2020) (interpreting Arrington to mean that under § 111(b), "the defendant must use the [weapon] in such a manner that it is 'capable of causing serious bodily injury or death to another person'" and endorsing such standard); United

States v. Bey, 667 F.2d 7, 11 (5th Cir. 1982) (hingeing question on object's "capacity, given the manner of its use," to inflict injury); United States v. Sanchez, 914 F.2d 1355, 1358–59 (9th Cir. 1990) (collecting cases "interpreting § 111 [that] have adopted the commonly accepted definition of a deadly or dangerous weapon as . . . : 'any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person'") (emphasis added); but see United States v. Moore, 846 F.2d 1163, 1166 (8th Cir. 1988) (citing "likely" standard but also stating that "it is not necessary that the object, as used by a defendant, actually cause great bodily harm, as long as it has the capacity to inflict such harm in the way it was used").

Defendant identifies no circuit coming out the other way in a § 111(b) case, and several of his competing citations — which arise in analogous contexts — are equivocal on the correct standard.  See United States v. Loman, 551 F.2d 164, 169 (7th Cir. 1977) (referencing both standards); United States v. Johnson, 324 F.2d 264, 266 (4th Cir. 1963) (same); but see United States v. Gibson, 896 F.2d 206, 210 n.1 (6th Cir. 1990) (adopting "likely" standard in applying 18 U.S.C. § 113).  To be sure, Judge Royce C. Lamberth of our district applied the more demanding standard favored by Defendant in a pretrial-detention opinion, United States v. Chansley, 525 F. Supp. 3d 151, 161–62 (D.D.C. 2021), which some courts in this district have subsequently relied on in interpreting § 111(b).  See United States v. Klein, 533 F. Supp. 3d 1, 12 n.6 (D.D.C. 2021); United States v. Owens, 541 F. Supp. 3d 102, 112 n.5 (D.D.C. 2021); United States v. Munchel, 2023 WL 2992689, at *4 (D.D.C. Apr. 18, 2023).  The Court is not swayed by these four cases, however, because none engages with Arrington, and other cases from this district that do so engage have not used the "likely" standard.  See, e.g., United States v. McHugh, 2023 WL 2384444, at *5 (D.D.C. Mar. 6, 2023).

Because Arrington is binding precedent, Easterday also gains little ground in arguing that its interpretation of § 111(b) results in absurd consequences.  The absurdity lies, in his view, in the fact that objects like a peanut (fed to an allergic person) or a banana peel (slipped on) could count as dangerous weapons under the less stringent standard.  See Def. Mot. at 12–13.  But Arrington indeed contemplates that even the most benign of objects may transform into dangerous ones depending on how they are used.  See Arrington, 309 F.3d at 45; see also United States v. Matthews, 106 F.3d 1092, 1095 (2d Cir. 1997) (rejecting defendant's objection that under similar § 111(b) instruction, "the jury could find '[a]lmost any object' to be a dangerous weapon" because "that is in fact a fair statement of the settled law in this and other circuits").

Defendant's related concern that Arrington's definition imposes liability for using an object in a manner capable of causing only an eggshell victim serious injury is not at issue here. See Def. Mot. at 2; Def. Reply at 11.  No such instruction focusing on such a victim was given, and, as discussed later, the evidence was sufficient to establish that pepper spray as used is capable of causing serious bodily injury to victims of average constitutions.  Of course, the Government presented evidence about the effect of pepper spray on those with preexisting conditions, to which it referred in its closing arguments.  See Oct. 26 Tr. at 87:19–89:7.  Still, it never argued at closing that the possibility of a reaction due to a preexisting condition made pepper spray dangerous.  It only referenced the evidence as a set-up for calling into question the defense expert's credibility.  See id.; compare id. at 62:9–17 (arguing in closing that pepper spray is dangerous without reference to preexisting conditions).  The Court thus leaves the question of the eggshell victim for another day.

In sum, it is convinced that Arrington means what it says — namely, that for purposes of § 111(b)'s dangerous-or-deadly-weapon element, it is enough to establish that an object was used

in a manner capable of causing serious injury.  The Court's instruction, accordingly, was not erroneous.

> b.   Harmless error

Recall that a defendant is guilty under 18 U.S.C. § 111(b) for either "us[ing] a deadly or dangerous weapon" or "inflic[ting] bodily injury."  In search of a belt to match its suspenders, the Government maintains that even if the Court's dangerous-weapon instruction was faulty, the § 111(b) conviction can be sustained regardless because the evidence of bodily injury is so overwhelming.  See Gov't Opp. at 42–43.  In other words, it says that any instructional error was harmless.  Defendant, for his part, offers two reasons why this is not the case.  For both officers, he contends that their transient pain does not qualify as bodily injury.  See Def. Mot. at 14–17.  For Officer Acevedo, he also raises a causation issue based on evidence that another rioter sprayed the officer at the same time as Easterday, and the jury cannot know who injured him.  Id. at 17–19.

At the outset, a few words on the harmless-error standard applicable here are in order.  The jury rendered a general verdict — i.e., one that did not specify the basis for conviction between § 111(b)'s two charged theories of guilt.  See Verdict Form.  In cases where instructional error occurs on one basis for liability but the other is properly charged — referred to as Yates error after the case of Yates v. United States, 354 U.S. 298 (1957) — a general verdict is subject to challenge and must be assessed under harmless-error review.  Skilling v. United States, 561 U.S. 358, 414 & n.46 (2010); United States v. Oral George Thompson, 921 F.3d 263, 268–69 (D.C. Cir. 2019).

If Easterday were correct about the dangerous-weapon instruction, then the question for the Court would be: "Is it clear beyond a reasonable doubt that a rational jury would have found

13

the defendant guilty absent the error?" Neder v. United States, 527 U.S. 1, 18 (1999). For

purposes of Yates error, courts have generally, though not uniformly, taken this to mean that

"[w]here there is a clear alternative theory of guilt, supported by overwhelming evidence, a

defendant likely cannot show that an instruction permitting the jury to convict on an improper

basis was not harmless error." United States v. Andrews, 681 F.3d 509, 521 (3d Cir. 2012); see

also United States v. Wright, 937 F.3d 8, 30 (1st Cir. 2019) (similar); United States v. Skilling,

638 F.3d 480, 482 (5th Cir. 2011) (similar); but see United States v. McKye, 734 F.3d 1104,

1112–13 (10th Cir. 2013) (Briscoe, C.J., concurring) (explaining that some circuits require more

for finding of harmless error, such as evidence that "the jury did in fact rely on the valid ground,"

but calling such standards into question in light of later Supreme Court precedent) (cleaned up).

     Easterday does not join in this understanding of the Yates harmless-error standard. He

instead recites the view that "where the [general] verdict is supportable on one ground, but not

on another," the relevant yardstick is whether "it is impossible to tell which ground the jury

selected." Def. Reply at 15 (quoting Black v. United States, 561 U.S. 465, 470 (2010)). If that

uncertainty exists, he says, the verdict cannot be supported. Id. That language — which comes

from the two Supreme Court cases that first recognized this kind of error, Stromberg v. People of

State of Cal., 283 U.S. 359, 368 (1931), and Yates, 354 U.S. at 312 — is out of step with the

Court's later recognition that Yates error is not structural. See Hedgpeth v. Pulido, 555 U.S. 57,

58–60 (2008) (noting that Stromberg and Yates were decided before advent of harmless-error

review and vacating lower court's finding of prejudice, which was based on fact that "the

instructions 'le[ft] open the possibility' that the jury convicted . . . on the impermissible

ground"). Because setting the bar at divining the jury's actual decisionmaking process is so high

as to erase the distinction between structural and non-structural error, the Court declines to apply

it.  See Skilling, 638 F.3d at 482 n.1 (holding that "impossible-to-tell standard . . . is closer to the 'absolute certainty' standard that the Supreme Court invalidated in Pulido" and is thus "inconsistent with harmless-error review").  Instead, it will hew to the consensus "supported by overwhelming evidence" standard.

i.      Damage to the Body

Defendant first takes aim at the Government's contention that he inflicted bodily injury merely by causing the officers temporary pain and no damage to the body.  Easterday insists that "bodily injury," as used in § 111(b), must entail more than transient pain; it must involve "[p]hysical damage to a person's body."  Def. Mot. at 15 (quoting Black's Law Dictionary 906 (10th ed. 2014)).  The Government correctly points to a substantial body of authority suggesting otherwise.  See Gov't Opp. at 13–15.

Several circuits, when faced with interpreting the meaning of "bodily injury" in a federal statute where it was left undefined, have turned to Congress's oft-repeated formulation of the term in other statutes — that is, one that includes "physical pain" without any temporal requirement, as well as "any other injury to the body, no matter how temporary."  United States v. Myers, 972 F.2d 1566, 1572–73 (11th Cir. 1992) (reasoning that this definition appears in "18 U.S.C. §§ 831(f)(4) (prohibiting transactions involving nuclear materials); 1365(g)(4) (tampering with consumer products); 1515(a)(5) (obstruction of justice); 1864(d)(2) (hazardous or injurious devices on federal lands)"); United States v. Bailey, 405 F.3d 102, 111 (1st Cir. 2005) (same); United States v. Perkins, 470 F.3d 150, 161 (4th Cir. 2006) (same); United States v. Gonzalez, 436 F.3d 560, 575 (5th Cir. 2006) (same), overruled on other grounds, United States v. Vargas-Ocampo, 747 F.3d 299, 300–02 (5th Cir. 2014) (en banc); United States v. DiSantis, 565 F.3d 354, 362 (7th Cir. 2009) (same).  This definition of bodily injury has been interpreted to

"encompass[] practically any adverse impact on the victim, including simple physical pain or an extremely transitory injury." United States v. Cunningham, 54 F.3d 295, 299 (7th Cir. 1995).

The above cases interpreted bodily injury as used in 18 U.S.C. § 242, which criminalizes the deprivation of rights under color of law and does not appear to mean "bodily injury" any differently from § 111(b). See, e.g., Myers, 972 F.2d at 1572–73. The Sixth and Seventh Circuits, in fact, have relied on this line of cases in interpreting "bodily injury" as it is used in § 111(b). United States v. Perry, 401 F. App'x 56, 65 (6th Cir. 2010); United States v. Ofarrit-Figueroa, 15 F. App'x 360, 365 (7th Cir. 2001). Still another circuit has independently relied on similar reasoning in concluding that charging the aforementioned definition of bodily injury in a § 111(b) case does not constitute error. United States v. Steele, 550 F.3d 693, 703 (8th Cir. 2008) (noting that definition in question also appears in "18 U.S.C. § 113 (assaults within territorial jurisdiction); id. § 2119 (carjacking); 8 U.S.C. § 1324(a)(1)(B)(iii) (alien smuggling)").

The Court sees no reason to depart from this sensible course. Congress's go-to definition comports with the commonsense understanding of bodily injury. Consider tasers, for instance. It would defy typical usage to say that just because a taser does not always damage the body, a victim subjected to intense pain and convulsions was uninjured. So, too, with the pepper spray used here. The Court does not rule out that this definition excludes de minimis or truly momentary pain, but that issue is not posed here, where the officers reported substantial pain that lasted hours. See Oct. 24 Tr. at 96:12–17, 98:12–14, 139:5–7.

Defendant is no doubt correct that his definition of bodily injury — "damage to a person's body" — has been relied on by courts in other contexts. But none suggests that pain alone falls short of that standard. See United States v. Eason, 953 F.3d 1184, 1194 (11th Cir. 2020) (relying on definition to conclude that sentencing guideline required threatened use of

force against <u>person</u>, not <u>property</u>); <u>United States v. Green</u>, 996 F.3d 176, 183 (4th Cir. 2021)

(same); <u>United States v. Scott</u>, 14 F.4th 190, 197 (3d Cir. 2021) (same); <u>Bridges v. United States</u>,

991 F.3d 793, 802 (7th Cir. 2021) (same).

Contrary to Easterday's contentions, moreover, the Court's instructions were sufficiently

aligned with the widely embraced definition of bodily injury that includes simple pain.  <u>See</u> Def.

Reply at 17 (submitting that Government cannot show harmless error beyond a reasonable doubt

"based upon a legal definition of 'bodily injury' that . . . was [not] provided to the jury").

"Injury," the jury was charged, is "<u>any</u> physical injury, however small, including a touching

offensive to a person of reasonable sensibility."  Jury Instructions at 14 (emphasis added).

"Bodily injury," in turn, was defined as "an injury that is painful and obvious, or is of a type for

which medical attention ordinarily would be sought."  <u>Id.</u>  Taken together, these definitions do

not convey that damage to the body must occur, nor that pain must be long-lasting to count as

bodily injury.  <u>See</u> <u>Bailey</u>, 405 F.3d at 111 (a "jury instruction regarding bodily injury" need not

be "identical," but only "consistent with [the statutory] definition").  To the extent that the

proffered instruction differed from a definition of bodily injury embracing temporary pain,

moreover, it suggested a <u>higher</u> bar for conviction.  That the jury rendered a guilty verdict based

on that instruction is thus no reason to question its result.

Nor does Defendant "bring forth facts contesting" that the officers experienced pain.  <u>See</u>

<u>Neder</u>, 527 U.S. at 19.  The evidence at trial on that front, as already discussed, was clear and

uncontested.  <u>See</u> Oct. 24 Tr. at 96:12–17, 139:1–11.  To be sure, Easterday cites D.C. caselaw

for the proposition that "a victim's statements regarding pain are not alone sufficient to support

factual findings about severity of pain."  Def. Mot. at 16 (cleaned up).  But that statement of law

does not cast doubt on the utility of victim testimony regarding the existence of pain, as opposed

to its severity.  What is more, both experts testified to the pain produced by pepper spray, so the evidence went beyond subjective accounts.  See Oct. 24 Tr. at 188:23–25; Oct. 25 Tr. at 139:17–18.  In any event, to the extent that this caselaw runs counter to the Court's previous conclusions regarding extreme pain, it is both not binding and unpersuasive in a case where the evidence of severe pain is so ubiquitous and uncontested.

ii.    Causation

The Government has one more bridge to traverse before it can claim harmless error: it must show via overwhelming evidence that Easterday was in fact the one who inflicted the above-discussed bodily injury on the officers.  Causation is only contested as to the assault on Officer Acevedo charged in Count III.

Defendant points to evidence that another rioter — James Haffner — sprayed Acevedo at closer range than Easterday and closer in time to the moment that Acevedo fully turned away to protect his face.  See Def. Mot. at 17–19 (citing, inter alia, Gov't Exh. 408).  In addition, he notes, Acevedo testified that he believed he was sprayed just once, suggesting that he might not have felt Defendant's pepper spray at all.  Id. at 17 (citing Oct. 24 Tr. at 146).  The Government agrees that Haffner's spray overlapped in time with Easterday's.  See Gov't Opp. at 16–17 (spray lasted twelve seconds and Haffner began spraying seven seconds after him).  It nevertheless views this overlap as immaterial because, in its interpretation of the video, Acevedo appears to turn away before Haffner begins discharging his pepper spray.  Id. at 17 (citing Gov't Exh. 408).  The parties also debate whether Easterday can truly be said to have "inflicted" the injury if both rioters' spray made contact with the victim.  See Def. Mot. at 17–19; Gov't Opp. at 18–20.

The Government cannot carry its heavy burden to show overwhelming evidence on this point.  As it notes, the Court concluded during trial that although a "reasonable jury could find

that both the defendant and another individual were spraying pepper spray in the direction of

Officer Acevedo," the evidence was sufficient to conclude that Easterday had at least aided and

abetted the injury to Acevedo by adding his spray to the mix.  See Oct. 25 Tr. at 109:1–11; Gov't

Opp. at 7.  The Court stands by that ruling: a reasonable factfinder could so interpret the video.

The footage, however, does not rise to the level of overwhelming evidence, as is required for

harmless-error review no matter what the correct causation standard is.  That is so because a

reasonable juror could also conclude that Haffner's spray alone caused Acevedo's injury, given

that Easterday had sprayed for so long before Acevedo reacted, Haffner was closer to Acevedo,

and the video does not clearly show the precise timing of Acevedo's retreat.  See Gov't Exh.

408.  Put differently, there is some question as to whether Easterday's pepper spray reached

Acevedo at all.  Any instructional error regarding § 111(b) thus would not have been harmless as

to Count III.

In sum, a new trial on Count II is doubly unwarranted both because of a lack of

instructional error and the formidable evidence of Pollitt's bodily injury.  The same cannot be

said of Count III, but the Court's conclusion that the dangerous-weapon instruction was correct

still carries the day for the Government on that count.

### 2.  *Mens Rea in § 1752*

Easterday's second instructional bone to pick centers on how far the knowledge

requirement in 18 U.S.C. § 1752 extends.  Taking § 1752(a)(1) as an example, the statute forbids

"knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful

authority to do so."  The term "restricted building or grounds" is defined in a separate but not-

too-distant subsection as "any posted, cordoned off, or otherwise restricted area," with three

further alternative qualifiers.  See § 1752(c)(1).  The triggering criterion relevant here states that

the restricted building or grounds must be one "where the President or other person protected by the Secret Service is or will be temporarily visiting." § 1752(c)(1)(B). The jury was instructed on those criteria and told that Defendant must have "acted" knowingly, but not which elements were necessary components of Defendant's knowledge. See Jury Instructions at 13–14. Easterday submits that this was impermissibly vague because the Government had to prove that he knew not just that the area was restricted on January 6, but also that a Secret-Service protectee was there or would be there in the near future. See Def. Mot. at 19–20.

As a preliminary matter, the Government contends that this question comes before the Court for plain-error review. It is true that Defendant proposed an instruction that would have required the jury to find that he "knew that the area he entered or remained in was a 'restricted building or grounds' as defined below" — viz., as "any posted or cordoned off or otherwise restricted area of a building where the Vice President is or would be temporarily visiting." ECF No. 65 (Def. Proposed Instructions) at 16. That does not cut it, the Government says, because Easterday never re-upped his objection during the charging conference, at which point the Court had not incorporated his proposed instruction. See Gov't Opp. at 45. Whether a proposed instruction is sufficient to preserve an objection of this kind is the subject of some dissensus. Compare United States v. Lopez, 477 F.3d 1110, 1113 (9th Cir. 2007) ("We review a complaint regarding jury instruction for plain error where a defendant neither proposed nor objected to a jury instruction."), with United States v. Hunt, 82 F.4th 129, 138 (2d Cir. 2023) ("A party does not [preserve error] merely by submitting its own proposed language as part of a requested charge.") (cleaned up), and United States v. Jones, 880 F.2d 55, 66 (8th Cir. 1989) ("[T]he mere offering of an instruction does not preserve an alleged error[.]"). The Court need not weigh in on this divide, however, because even reviewing de novo, it concludes that no error occurred.

Easterday's contention that the statute requires knowledge as to the presence of a Secret-Service protectee is not without force. Courts in this district have split nearly down the middle on the question. Four have endorsed Easterday's reading. United States v. Samsel, No. 21-537, ECF No. 345, at 32–33 (D.D.C. Feb. 9, 2024) (Cobb, J.); United States v. Groseclose, 2024 WL 68248, at *9 (D.D.C. Jan. 5, 2024) (Cooper, J.); United States v. Elizalde, 2023 WL 8354932, at *7 (D.D.C. Dec. 1, 2023) (Nichols, J.); United States v. Hostetter, 2023 WL 4539842, at *4 (D.D.C. July 13, 2023) (Lamberth, J.). A cadre of six has rejected it. See United States v. Warnagiris, No. 21-382, ECF No. 128 at 4–5 (D.D.C. Mar. 28, 2024) (Friedman, J.); United States v. Chambers, No. 23-300 (D.D.C. Mar. 14, 2024) (Friedrich, J.); United States v. Nester, No. 22-183 (D.D.C. Mar. 5, 2024) (Chutkan, J.); United States v. Carnell, 2024 WL 639842, at *14 (D.D.C. Feb. 15, 2024) (Howell, J.); United States v. Rhine, No. 21-687, ECF No. 104, at 4 (D.D.C. Apr. 24, 2023) (Contreras, J.); United States v. Griffin, No. 21-92, ECF No. 106, at 330–32 (D.D.C. Mar. 22, 2022) (McFadden, J.). This discord is not long for this world, thankfully, as the D.C. Circuit is expected to decide this issue in the reasonably near future in United States v. Griffin, No. 22-3042 (oral argument held December 4, 2023).

All things considered, the Court finds the latter view set out by Judge Beryl Howell and echoed by others to be the more persuasive. In particular, taking into account the statute's text, structure, and history, § 1752(c)(1)(B)'s further definition of "restricted building or grounds" was intended as a jurisdictional-only provision rather than an element dividing wrongful from lawful conduct. See Carnell, 2024 WL 639842, at *9–14 (citing United States v. Feola, 420 U.S. 671 (1975)). As such, the *mens rea* requirement does not attach to it. Feola, 420 U.S. at 685 ("The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum."). Since

other courts in this district have ably and thoroughly dissected this question, the Court will stop

there.  With guidance from the D.C. Circuit forthcoming, any additional exposition would be like

writing on the beach at low tide, soon to be washed away.  The Court will reserve its elaborate

sandcastles for safer shorelines.

      B.    <u>Motion for Judgment of Acquittal</u>

      Easterday next assails the sufficiency of the evidence.  While he spends most of his time

on bodily injury, as opposed to use of a dangerous weapon, the Court will consider both.

      First up is § 111(b)'s bodily-injury prong.  As already discussed in detail above — and

employing the higher overwhelming-evidence standard — this line of attack is unsuccessful.

Bodily injury encompasses short-term pain of the kind that Officers Pollitt and Acevedo

undoubtedly suffered.  <u>See</u> Sec. III.A.1.b.i, *supra*.  Although the evidence that Easterday — as

opposed to Haffner — inflicted injury on Acevedo may not have been overwhelming, it was

enough for a reasonable juror to convict.  <u>See</u> Sec. III.A.1.b.ii, *supra*.

      Defendant's next sufficiency argument — on the use of a dangerous weapon — assumes

that the Court gave an incorrect instruction on that basis for liability.  <u>See</u> Def. Mot. at 13–14.

As explained earlier, that is not the case, but the Court nevertheless addresses whether the

evidence was sufficient under the instruction actually given — *i.e.*, capable of causing serious

bodily injury and used in that manner, <u>see</u> Jury Instructions at 12 — and concludes that it was.

      First, the low-hanging fruit.  The jury could have found that pepper spray is generally

capable of causing serious bodily injury in the form of extreme physical pain and protracted

impairment of a bodily organ.  The first is particularly easy: both experts testified that being

sprayed with pepper spray, particularly in the face, can be highly painful.  <u>See</u> Oct. 24 Tr. at

188:23–25, 189:23–191:4; Oct. 25 Tr. at 124:7–11, 139:17–18.  With respect to protracted

impairment of a bodily function, Dr. Fitsanakis explained that "long-term damage to the eye" resulting from chemical burns and tear depletion is possible, and she testified to familiarity with several cases where exposure caused chronic eye or lung problems. See Oct. 24 Tr. at 192:1–16, 193:1–13, 196:24–197:14; see also United States v. Bartolotta, 153 F.3d 875, 879 (8th Cir. 1998) (victim "who was sprayed in the face with mace . . . developed chemical pneumonia as a result of the incident").

In applying the analogous Sentencing Guidelines definition, moreover, courts have generally found chemicals like pepper spray to be dangerous based on their capacity to cause these exact kinds of injuries. See, e.g., United States v. Dukovich, 11 F.3d 140, 142 (11th Cir. 1994) (categorizing tear gas as dangerous weapon because it can cause "eye damage, vomiting, loss of breath or a rash" and victim testified that "she experienced eye pain and a severe headache"); United States v. Douglas, 957 F.3d 602, 607 (5th Cir. 2020) (relying on fact that after being sprayed, "one victim suffered protracted impairment in his right eye"); United States v. Melton, 233 F. App'x 545, 547 (6th Cir. 2007) (relying on statement that pepper spray "burns the face, nostrils, restricts breathing passages, and causes blindness").

So, too, a factfinder presented with the evidence in this case could have reasonably concluded that Easterday's manner of use — spraying into his victims' faces for upwards of eight seconds and from no further than ten feet away — was at least capable of causing the average person extreme physical pain. Defendant did not engage in some mild or unconventional use like throwing the can of pepper spray or, to borrow the Government's example, tickling the bottom of somebody's foot with it. See Oct. 26 Tr. at 62:3–4. He engaged in the paradigmatic method of deploying pepper spray, a substance designed to incapacitate its victims and cause them pain. See Oct. 24 Tr. at 30:10–14; Oct. 25 Tr. at 25:16–18, 124:7–11.

That manner of use will generally suffice to make a discharge of pepper spray dangerous.  See United States v. Worrell, No. 21-292, ECF No. 51-1 at 62 (D.D.C. Mar. 19 2021) (concluding in Bail Reform Act context that pepper gel is dangerous weapon in part because "it can cause people who get it in their mouth, their nose, and their eyes to feel very serious stinging and be very uncomfortable unless they can promptly wash it out"), aff'd, 848 F. App'x 5 (D.C. Cir. 2021).

There may exist outlier cases involving the spraying of chemical irritants from a great distance, in very small amounts, on a very windy day, or in a manner unlikely to reach a victim's face that would present more difficult questions, but this is not such a case.  Officer Pollitt was sprayed in the face from an "arm's length" distance of approximately three feet.  See Oct. 24 Tr. at 95:23–96:1.  The evidence is less clear on the distance from which Officer Acevedo was sprayed, but even Easterday acknowledges that it could have been as close as ten feet, which defense expert Dr. Rose testified was within the range of most pepper sprays.  See Def. Mot. at 17; Oct. 25 Tr. at 126:7–9.  The evidence also showed that Defendant's sprays were less short burst, more fire hose — they lasted between 8 and 15 seconds each.  See Oct. 25 Tr. at 163:19–21; cf. United States v. Ramey, No. 22-184, ECF No. 56, at 313–21 (D.D.C. Mar. 3, 2023) (finding reasonable doubt as to use of pepper spray in dangerous manner where defendant sprayed very short burst into victims' faces).  To be sure, Dr. Rose testified that "serious toxicity" was a "very, very rare" outcome of using pepper spray in the "normal course," Oct. 25 Tr. at 129:17–18, but he did not controvert the evidence of the chemical's capacity to cause extreme pain in typical use.  Had he done so, the jury would have been free to credit Dr. Fitsanakis's testimony over his in any event.

The jury also could have determined that the officers in fact suffered extreme pain.  A victim's "description of his pain as an 8 or 8.5 on a scale of 1 to 10" is generally enough to support a finding of extreme physical pain.  See United States v. Villalobos-Macias, 2023 WL 2889481, at *3 (10th Cir. Apr. 11, 2023) (affirming district court's decision based on pain scale); see also United States v. Neill, 166 F.3d 943, 949 (9th Cir. 1999) (affirming application of sentencing enhancement for use of pepper spray as dangerous weapon based in part on extreme pain evinced by victim's testimony that being sprayed felt "like [she] was on fire"); Harris v. Warden, 2015 WL 5231266, at *3 (W.D. La. Aug. 11, 2015) (upholding state-court determination that extreme physical pain "would include the pain inflicted by . . . pepper spray" based on victim testimony about pain).  Both officers testified that they experienced pain at a 9 or 10 on a 10-point scale, and one described the feeling as having "battery acid thrown on your face."  See Oct. 24 Tr. at 96:12–15, 98:12–15, 139:8–11.

That testimony regarding the severity of their pain was also corroborated by other evidence.  Both officers were incapable of keeping their eyes open after the fact.  Id. at 97:8–12, 139:17–20.  In addition, Officer Pollitt, seemingly disoriented by the pain, "lost [his] footing and fell to the ground."  Id. at 97:24–25.  Such a strong reaction is consistent, moreover, with the expert testimony that pepper spray is designed to cause pain and can cause "extreme pain."  Id. at 188:23–25; Oct. 25 Tr. at 25:16–18, 124:7–11.  This was enough evidence for a factfinder to determine that Easterday used the pepper spray in a manner that was capable of causing, and in fact did cause, serious bodily injury.

*     *     *

At the end of the day, the § 111(b) conviction would remain intact if the evidence was sufficient on either of the just-discussed bases of liability.  A general verdict should not "be set

aside merely because of insufficient evidence supporting one of two alternative theories."

United States v. Safavian, 644 F. Supp. 2d 1, 19 (D.D.C. 2009); see also Griffin v. United States, 502 U.S. 46, 56–57 (1991) ("When a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.") (cleaned up).  Even if the evidence was lacking on either the use of a dangerous weapon or the infliction of bodily injury, then, the conviction would stand.  As Easterday has shown neither to be true, he has come up woefully short.

The Court, accordingly, denies Easterday's contentions under Rule 29 just as it did with his Rule 33 attempts.

## IV.    Conclusion

The Court will therefore deny Easterday's Motion for Acquittal or, in the alternative, a New Trial.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  April 8, 2024