### IN THE UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cr-00404** |
| | ) | **Hon. James E. Boasberg** |
| **ISREAL JAMES EASTERDAY,** | ) | **Sentencing: April 22, 2024** |
| **Defendant.** | ) | |
| | ) | |

### <u>DEFENSE POSITION ON SENTENCING</u>

For the vast majority of his life, Isreal Easterday had a sheltered upbringing in an Amish family in rural Kentucky. His family was his main source of information: he was homeschooled until 14 years old; he worked for his father around the farm to gain practical experience for his livelihood; he learned about religion from his family; and everything he knew was filtered through the lens of his parents. He was not involved in or knowledgeable about politics. In fact, Isreal did not plan on attending the "Stop the Steal" Rally on January 6 until his uncle invited him to tag along with a group of fellow Trump supporters driving from Kentucky to Washington, D.C. Unlike other defendants who posted messages on various social media platforms voicing their support for former President Trump and otherwise encouraging violent rhetoric, Isreal used this trip as an excuse to leave his family farm, which he never did until he was about 16 or 17 years old. That's why there is no evidence in this case from Isreal's social media accounts, text messages, or any other form of communication. That is also why on January 6, he was not dressed in combat gear and did not bring any items with him, such as a firearm, a taser, pepper spray, a bat, or even a megaphone.

Isreal was 19 years old on January 6, 2021. He came to the U.S. Capitol wearing a beanie, a leather jacket, and jeans. But he followed a crowd to the Capitol and participated in the

riot. Near the East Rotunda Doors, he was handed a small cannister of pepper spray by rioters in the crowd, and he then sprayed the O.C. spray two times. Isreal then went into the Capitol, walked around aimlessly, and left the building within minutes of his entry.

There is no doubt that Isreal's conduct on January 6, 2021 was serious. That said, this is not a case involving a member of an extremist group who prepared for violence, incited violence, and celebrated violence on January 6. Instead, this case centers on 20 seconds in which a teenager made the worst decision in his life, is extremely remorseful, and whose conduct did not result in any lasting physical injuries.

Since the beginning of this case, Isreal has not contested that he went to the Capitol and directed pepper spray at two Capitol Police Officers. He admits he went to the Capitol, deployed pepper spray on two occasions, one of which the spray hit Officer J.P., walked around the Capitol building for a little over ten minutes, and then left the premises. He did not have any other interactions with law enforcement and did not engage in any destruction of property at the Capitol. The sole reason that he went to trial was to contest the classification of pepper spray as a deadly or dangerous weapon for purposes of the statutory enhancement for Counts Two through Six, and that his admitted conduct did not satisfy the legal definition of "inflicting bodily injury."

Isreal understands that he faces a term of incarceration based on his actions on January 6. Given that he was convicted of assault with a deadly weapon under 18 U.S.C. § 111(b), he is ineligible for Earned Time Credits ("ETCs") under the First Step Act ("FSA"). Meaning, even if he were to participate in FSA-approved programs, such as the BRAVE program that U.S. Probation recommended, he will not receive the benefit of any sentence reduction because he has

a disqualifying conviction.[1] Outside of good time credit, Isreal will not have any further reduction in his sentence and unlike many other January 6 defendants, he will therefore serve the entirety of his sentence.

Before Isreal even steps into a BOP facility, he has already experienced significant collateral consequences. He has spent 44 days in pretrial detention when he was initially arrested, including over the holidays in December 2022. Since he was released at the end of January 2023, he has been on restrictive conditions, including home detention except for small breaks when he volunteers at his church's food ministry from 6-11 AM every Monday and Wednesday. While on pretrial release for over a year, Isreal has not been able to work and therefore has not had a steady source of income. He has used his construction skills to build and sell eight sheds and recently, he finished construction of his family home and has been renting it out on Airbnb. Isreal and his wife have been living in a small shack on the property while others rent their home as a vacation in a "rustic retreat" just so they can pay their necessities. This case has already caused a ripple effect on Isreal's entire life. At only 21 years old, these felony convictions will continue to present substantial barriers to his personal and professional life.

As best demonstrated through the sentencing video and the friend and family letters, Isreal's behavior on January 6 was not reflective of his character. He is described as a selfless, hardworking, and family-oriented young man. As his mother, Marian Easterday, stated, "he doesn't want to hurt people" and "he is not the kind to hurt people." *See* Exhibit 1, Sentencing Video. Isreal's conduct on January 6 was unacceptable, and he knows that. He also is cognizant

---

[1] *See* Department of Justice Federal Bureau of Prisons, *FIRST STEP ACT Approved Programs Guide*, available at https://www.bop.gov/inmates/fsa/docs/2021_fsa_program_guide.pdf (last visited Mar. 22, 2024).

and ashamed of the harm he caused that day and how this case has impacted not just himself, but his entire family.

For the reasons set forth more fully below, the defense respectfully requests that the Court impose a sentence of 12 months and one day. Such a sentence would not cause any undue sentencing disparities. In January 6 cases involving assault against law enforcement under §§ 111(a) and (b), this District has routinely imposed significant downward variant sentences, including a recent sentence where the defendant pleaded guilty § 111(a) based on his assault against law enforcement officers with a large orange cone and a police shield, and the Court imposed a sentence of 36 months probation with a special condition that the defendant serve weekends in a local jail for one year. *See United States v. Adam Lejay Jackson*, 1:22-cr-00230 (RC). The Court has even ordered the early release of some of the "most notorious" January 6 defendants who occupied the Senate chamber, sat in the vice president's chair, and targeted government officials who were charged with 18 U.S.C. § 1512 based on a pending appeal.[2]

Accordingly, for these reasons and those set forth more fully below, a sentence of 12 months and one day is warranted in this case based on Isreal's youth and personal background, and is sufficient but not greater than necessary to achieve the goals of sentencing. Consistent with U.S. Probation's recommendation, the defense requests that Isreal self-surrender to a BOP facility in Kentucky to serve his sentence. *See* Sentencing Rec. (Dkt. No. 113) at 3.

## I.   PROCEDURAL HISTORY

Pursuant to a Geofence Warrant, the government obtained Isreal's unique device ID between January 13 and 15, 2021 and then his subscriber and account information several

---

[2] *See* The Washington Post, *Some Jan. 6 rioters win early release, even before key Supreme Court ruling*, available at https://www.washingtonpost.com/dc-md-va/2024/04/10/jan-6-rioters-released-supreme-court/ (published on Apr. 9, 2024).

months later, on April 14, 2021.[3] However, the government waited until almost a year later to

begin its investigation into Isreal.

Starting in March 2022, the government ran various reports on internal databases to

identify Isreal as being at the U.S. Capitol on January 6, 2021, including pulling Google's returns

in response to the Geofence Warrants for Isreal's account and subscriber information. As a result

of the government's investigation, Isreal was charged on December 2, 2022 and arrested a few

days later on December 8, 2022 in Miami, Florida, which was right before he departed on a

sailing trip with his now-wife and a friend to provide free bibles to individuals in the Bahamas.

He was detained until January 20, 2023, when the Court released him on stringent conditions of

pretrial release. Since that time, the parties engaged in plea negotiations but were unable to

resolve discrete issues relating to sentencing guidelines enhancements. Accordingly, Isreal

proceeded to trial not to contest his factual guilt, but on two legal theories regarding the use of a

dangerous weapon and bodily injury. In October 2023, a jury convicted him on all nine counts in

a superseding indictment,[4] including the two assaults using a dangerous weapon in violation of

18 U.S.C. § 111(a)(1) and (b). On December 8, 2023, the defense filed a Motion for Judgment of

---

[3] On March 26, 2021, the government sought an order pursuant to 18 U.S.C. § 2703(d) to twelve
service providers to produce basic subscriber information for 1,055 cell phone accounts that
geolocated within the U.S. Capitol at the time of the offense. Those orders are redacted and the
government has not provided unredacted versions to the defense in discovery to determine
whether Isreal's information was provided at that time.

[4] The nine counts in the superseding indictment included the following: civil disorder in violation
of 18 U.S.C. § 231(a)(3) and (2); two counts of assault using a dangerous weapon in violation of
18 U.S.C. § 111(a)(1) and (b); entering and remaining in a restricted building or grounds with a
deadly or dangerous weapon in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) and (2);
disorderly conduct in a restricted building or grounds with a deadly or dangerous weapon in
violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) and (2); engaging in physical violence in a
restricted building or grounds with a deadly or dangerous weapon in violation of 18 U.S.C. §
1752(a)(4) and (b)(1)(A) and (2); disorderly conduct in a Capitol Building in violation of 40
U.S.C. § 5104(e)(2)(D); physical violence in a Capitol Building or Grounds in violation of 40
U.S.C. § 5104(e)(2)(F); and parading, demonstrating, or picketing in a Capitol Building in
violation of 40 U.S.C. § 5104(e)(2)(G).

Acquittal and, In the Alternative, for a New Trial as to Counts Two, Three, Four, Five and Six (Dkt. No. 83), which the Court denied on April 8, 2024 (Dkt. No. 111).

## II.    PSR OBJECTIONS

As set forth in the defense's Corrections and Objections to the Presentence Report (Dkt. No. 104), Isreal provided objections to the offense conduct section and objections to the calculated advisory sentencing guidelines. On April 11, 2024, the U.S. Probation Officer filed the final PSR (Dkt. No. 114) and its recommendation for a downward variant sentence of 84 months (Dkt. No. 115). The PSR did not incorporate most of the defense's offense conduct objections or any guidelines objections, which are therefore addressed below. With respect to the government's two objections to the PSR, the first time that the defense learned of the government's objections were in the Final PSR filed on the docket sheet. The Court should overrule the government's objections to grouping and to an enhancement for obstruction of justice under USSG § 3C1.1 based on Isreal "deleting" his Facebook account on January 7, 2021. *See* PSR at pgs. 27-28.

Based on the U.S. Probation's calculation of the advisory guidelines that includes the government's request for an obstruction of justice enhancement, Isreal's range is 135 to 168 months. *See* PSR at pg. 19. An advisory guidelines range that *starts* at 11 years significantly overstates Isreal's conduct in this case and therefore is not a good measure of culpability or what constitutes an appropriate sentence.

Based on the defense's position, the appropriate guideline is § 2A2.4 and Isreal's guidelines range is 6-12 months (CHC I, Total Offense Level 10 (Base Level 10 plus 2 for

grouping, minus 2 for acceptance of responsibility)).[5] If the Court were to find that the appropriate guideline is instead § 2A2.2, then Isreal submits that the guidelines range should be 41-51 months (CHC I, Total Offense Level 22 (Base Level Offense 14, plus 2 for § 111(b) conviction, plus 6 for official victim, plus 2 for grouping, minus 2 for acceptance)).

### A.  Factual objections to trial testimony.[6]

Because the offense conduct section was taken verbatim from the government's pleadings, the defense's factual objections to this section were meant to provide a more holistic picture of the trial testimony. Accordingly, the defense's objections to Paragraphs 21, 23, 26, 27, 28, and 29 are directly pulled from the trial transcripts to provide that context.

For paragraphs 21, 23, 28, and 29, U.S. Probation stated that Isreal disputed that he "sprayed two USCP officers in the face with pepper spray." *See* PSR at pg. 28. That is not accurate. He disputed that the evidence shows that he sprayed Officer M.A. In response, U.S. Probation responded that the information set forth in those paragraphs was pulled from the complaint and the government's post-trial briefing, and that the Court "is in the best posture to determine factual matters concerning the representations made at trial." *See id.* For those paragraphs, the defense includes these specific factual disputes for the Court:

- **Paragraph 21**: Mr. Easterday disputes that he sprayed two United States Capitol Police ("USCP") officers in the face with pepper spray. He admits that he sprayed pepper spray two times, but actually only contacted Officer J.P., not Officer M.A.

---

[5] Even if the Court were to find that both enhancements under § 2A2.4 applied (plus 3 levels for possession and threatened use of a dangerous weapon and plus 2 levels for bodily injury), then Isreal's advisory guidelines range would still be 18-24 months (CHC I, Total Offense Level 15 (base level 10, plus 3 levels for dangerous weapon, plus 2 levels for bodily injury, plus 2 levels for grouping, and minus 2 levels for acceptance of responsibility)).

[6] The PSR adopted some of the defense's proposed revisions to Paragraph 22 to include a portion of Dr. Rose's trial testimony. *See* PSR at pg. 28. The defense preserves the rest of the objections to this paragraph as set forth in its Corrections and Objections to the Presentence Report (Dkt. No. 104).

- **Paragraph 23**: Mr. Easterday disputes that his pepper spray reached Officer M.A. Additionally, the testimony reflected that USCP officers either decontaminate an individual *or* call D.C. Fire after deploying pepper spray, whichever is faster. *See* Oct. 24 Tr. 93:3-16. The defense requests that the following be added to this paragraph: "The USCP officers did not call for DC fire or emergency services after deploying pepper spray on January 6." *See, e.g.*, Oct. 23 Tr. 209:17-21. Additionally, USCP officers testified that they call D.C. Fire to "do decontamination to them." *See id.* at 209:1-3. There is no testimony that calling D.C. Fire was to avoid "serious complications from spray."

- **Paragraph 28**: Mr. Easterday disputes that his use of pepper spray affected Officer M.A. That officer testified that he believed he was sprayed one time, he did not see who did it, and he did not see where it came from. *See* Oct. 24 Tr. 146:19-25; *id.* at 147:1-8. Government Exhibit 408, at 1:05, plainly shows another person spraying directly at Officer M.A. at the time that Officer M.A. was sprayed with pepper spray. Additionally, Officer M.A. testified that he "couldn't see anything" for a period of time, but he did not testify that he could not see for a few hours. *See id.* at 139-140.

- **Paragraph 29:** Mr. Easterday disputes that his pepper spray hit Officer M.A.

For paragraphs 26 and 27, U.S. Probation cited the same basis for not incorporating the defense's suggested revisions. *See* PSR at pg. 29. For these paragraphs, the defense therefore includes these specific factual disputes for the Court:

- **Paragraph 26**: Mr. Easterday objects to the characterization that Officer J.P. "experienced partial blindness for a number of hours." The term "blindness" refers to the inability for an eye to perceive light or convey visual information to the brain.

- **Paragraph 27**: Mr. Easterday objects to the characterization of Officer J.P.'s testimony that being sprayed dramatically reduced his ability to see, hear, and function. Instead, Officer J.P testified as to various factors – outside of just being pepper sprayed – that contributed to how he felt on January 6. *See, e.g.*, Oct. 24 Tr. at 85:9-12.

### B. Government's objections regarding grouping and obstruction of justice.

In the PSR, the government makes two objections. *See* PSR at pgs. 27-28. First, the government argues that Isreal's convictions should be divided into three separate groups, not two. *Id.* at pg. 27. The government is wrong. Isreal was at the U.S. Capitol for less than 20 minute and the bulk of the government's evidence related to the same exact behavior: when Isreal deployed pepper spray on two occasions. As U.S. Probation correctly found, the counts

involve substantially the same harm and therefore are properly grouped together with the exception of the second §111(a)(1) and (b) conviction, which is specifically excluded under the guidelines. *See* PSR at ¶¶ 47-49. *See also* § 3D1.2, Application Note 5 (stating that for § 3D1.2(c), is meant to prevent 'double counting' of offense behavior and "applies only if the offenses are closely related").

And second, the government argues that a two-level enhancement should apply for obstruction of justice under § 3C1.1 because Isreal "deleted the photographs and communications on his Facebook account on January 7, 2021." *See id.* at pg. 28. Without more, U.S. Probation adopted this recommendation. Isreal deactivated – he did not delete – his Facebook, he did this almost *two years* prior to his arrest in this case, and he did not have the requisite intent when he engaged in this conduct. Accordingly, the Court should overrule this enhancement.

Section 3C1.1 requires that a defendant (1) "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant  conduct; or (B) a closely related offense." *Id.* (emphasis added). The D.C. Circuit has held that § 3C1.1 "applies to the 'willful' obstruction . . . [which] clearly contemplates some form of intent," and specifically with the "intent to obstruct justice." *United States v. Henry*, 57 F.3d 641, 646 (D.C. Cir. 2009); *see also United States v. Thorson*, 633 F.3d 312, 320-21 (4th Cir. 2011) (defining "willful" as "meaning that the defendant must have 'consciously act[ed] with the purpose of obstructing justice.'") (internal citations omitted).

The application notes for § 3C1.1 provide further guidance regarding when this enhancement applies. As is relevant here, Application Note 1 requires that there be a connection between the obstructive behavior prior to the investigation: "[o]bstructive conduct that occurred *prior* to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was *purposefully calculated*, and likely, to thwart the investigation or prosecution of the offense of conviction." (emphasis added). Application Note 4 further provides a list of "covered conduct" under this guideline provision, and cites that this enhancement applies to "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." *See* App. Note 4(D). It further provides an example of such behavior: "e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so . . ." *Id.* (emphasis added).

The facts here do not come close to showing that Isreal's conduct was purposely calculated or likely to thwart a federal investigation or prosecution that he did not know existed. First, Isreal appears to have *deactivated* and then, seven minutes later, *reactivated* his Facebook account on January 7, 2021. *See* Oct. 25 Tr. at 70:1-25 – 71:1-13. The government attempted to argue that Isreal *could* have deleted photos and messages at that time, but there is no evidence that he did so. There is also no evidence that even if he did delete photos and messages, such information was relevant to what happened on January 6. In fact, the purpose of deactivating an account is to avoid deleting information.[7]

More importantly, Isreal was not arrested by FBI agents until almost two years later in December 2022. To say that Isreal willfully deactivated and reactivated his Facebook with the

---

[7] *See* Facebook, *Deactivating & Deleting Your Account*, available at https://www.facebook.com/help/154908788002686/ (last visited Apr. 11, 2024).

purpose of obstructing justice almost two years before he was arrested is nonsensical. Furthermore, deactivating his Facebook account clearly did not thwart the federal investigation or prosecution; pursuant to a search warrant to Meta, the government was provided 88 pages related to Isreal's Facebook page. Accordingly, the Court should overrule the government's and U.S. Probation's request to add a two-level enhancement for obstruction of justice.

### C.  The applicable guideline in this case is § 2A2.4 given the lack of evidence surrounding Isreal's intent.

Appendix A identifies both § 2A2.2 and § 2A2.4 as potentially applicable to convictions in violation of 18 U.S.C. § 111. Section 2A2.2 is titled "Aggravated Assault," which is defined as "a felonious assault that involved (A) a dangerous weapon *with intent to cause bodily injury* (*i.e.,* not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) *an intent to commit another felony*." § 2A2.2, Application Note 1 (emphasis added).

The PSR correctly concludes that Isreal's conduct did not cause "serious bodily injury," and the offense did not involve an attempt to strangle or suffocate. However, the PSR incorrectly states that the aggravated assault guideline applies because the offense involved "bodily injury" and because he had the intent to commit another felony. *See* PSR at 29. First, it is not enough to find "bodily injury," but instead there has to be evidence that Isreal had the *intent* to cause bodily injury. Evidence of such intent is lacking here. Additionally, for guidelines purposes, "another felony" has to be factually distinct from the assaultive conduct. Accordingly, the PSR incorrectly applies the aggravated assault guideline § 2A2.2 to Count Group 1 and Count 3. Instead, the appropriate guideline is § 2A2.4 because Isreal's conduct does not meet the heightened standard for an "aggravated assault" as defined by the sentencing guidelines.

**i. There is no evidence in the record that supports a finding of Isreal's intent to cause bodily injury.**

The trial testimony and videos established that Isreal sprayed pepper spray at Officer J.P. from approximately two to three feet away, at Officer M.A. from approximately 10 to 15 feet away, outside on the east landing of the Capitol, and that both uses were consistent with the ordinary uses of pepper spray that are not likely to cause any significant adverse health effects. *See* Oct. 25 Tr. at 136:4-9; 138:2-4, 11-25; 139:1-3.

Contrary to U.S. Probation's position, application of § 2A2.4 based upon use of a dangerous weapon requires not only that the government prove use of such a weapon, but also that the defendant *intended* to cause bodily injury. *See United States v. Kleinbart*, 27 F.3d 586, 592 (D.C. Cir. 1994) (citing *United States v. Feola*, 420 U.S. 671 (1975)). Unlike § 111(a)(1) and (b), in order for this heightened guideline to apply, the government must prove that pepper spray was capable of causing serious bodily injury or death to another person, as well as the additional requirement that Isreal *intended* to cause bodily injury when doing so.

With respect to the first part of the inquiry, and as set forth below in more detail, Isreal's use of pepper spray in this case did not constitute use of a deadly or dangerous weapon for purposes of the sentencing guidelines. *See infra* Section III.b.i.

Regarding the second part, the record is devoid of any evidence that Isreal had the intent to cause bodily injury. As described in greater detail below, the ordinary use of pepper spray is to induce transient pain as a self-defense or deterrent mechanism, the effects of which will resolve once an individual washes the spray off with water. The record shows that Isreal lacked any intent to cause harm. On January 6, Isreal did not bring the pepper spray with him. Instead, he was handed small cannisters of pepper spray on two occasions by other rioters. As Officer J.P. testified, these small cannisters are "meant for one-on-one interactions, something you would

12

give your teenaged kid before they go off to college for self-defense . . . ." *See* Oct. 25 Tr. at 116:19-22. Isreal then sprayed the pepper spray at a distance and outside, consistent with its ordinary use, meaning that he only intended to cause effects that could be washed away and did not intend to physically injure any officer.

Isreal's lack of intent is only compounded by the fact there is no evidence that Isreal promoted any violent rhetoric against law enforcement on January 6, but instead never meant to cause harm. He is deeply remorseful for his behavior. As reflected in the PSR, Isreal was not affiliated with any political organization. There are no statements pre- or post- January 6 condoning any violence that took place. *See* Oct. 25 Tr. 102:9-21. He was wearing jeans, a leather jacket, and a beanie on that day. *See* Oct. 23 Tr. 237:25, 238:1-2. He did not bring the pepper spray with him on January 6 but instead other rioters handed it to him. He sprayed the pepper spray outside and at a distance. *See* Oct. 24 Tr. 95:25, 96:1, 120:21-22, 138:8-15; *see also* Gov. Ex. 408. And he did not have any other physical altercations with officers. Moreover, as is evident from Isreal's letter to the Court and his family's statements, he never went to January 6 to cause harm and is deeply remorseful for his behavior.

Accordingly, the government cannot show by a preponderance of the evidence that Isreal had the intent to cause bodily harm, which, unlike § 111(a)(1) and (b), is necessary for the aggravated assault guideline to apply.

### ii.  There is no evidence in the record that supports a finding of assault with intent to commit another felony.

Although the phrase "another felony" is not defined in § 2A2.2 or § 2A2.4, the term is defined in other sections in the Guidelines to refer to distinct felony conduct. *See, e.g.*, § 2K1.3, Application Note 11 (defining "***another felony offense***" and "***another offense***" as referring to "offenses ***other than*** explosives or firearms possession or trafficking offenses" for the guideline

related to unlawful receipt, possession, or transportation of explosive materials and prohibited transactions involving explosive materials) (emphasis added). In other words, "another" must refer to an offense distinct from the substantive offense for which the person is being sentenced.

In this case, "another felony" means a felony that is *distinct from* the assault on the USCP officers. Isreal's conviction in violation of 18 U.S.C. § 231 cannot constitute "another felony" for purposes of the aggravated assault guideline because the same conduct that supports the assault conviction *also* provides the basis for the § 231 conviction. *See, e.g.*, *United States v. Hamner*, 1:21-cr-00689 (ABJ), Sent. Tr. at 20-21 (rejecting the argument that § 111 offense was committed with intent to violate § 231 offense because "if the Commission is asking: Did you commit the assault with intent to commit some other offense? It didn't mean with intent to commit that exact same assault, just charged differently").[8]

Although the PSR cites to the remaining felony offenses as an example of "another felony" to support the application of the aggravated assault guideline, it also that all of the counts arise from substantially the same harm and are closely related, which is why they are grouped together. For the aggravated assault guideline to apply, there has to be another felony offense that is distinct from the assaultive conduct. That just is not present in this case. Accordingly, the

---

[8] Judge Jackson distinguished what constitutes "another felony" for purposes of the statutory enhancement under § 111 versus what constitutes "another felony" for purposes of an "aggravated assault" guideline. Her commentary in *Hamner* is limited to the sentencing guidelines issue, which is the defense's argument here. *See United States v. Camargo*, 1:21-cr-00070 (ABG), Order (Dkt. No. 114) at 9-12 (confirming that the "Court expressed some misgivings about whether a violation section 111 could serve as the '[] other felony' needed to trigger the applicability of the Aggravated Assault Guideline, and its particular concern – which is clear . . . was 'how the interference with officers during a civil disorder can be the other felony that's the necessary element to charge a felony violation of § 111, while at the same time § 111 is the other felony that makes the interference with the officers an aggravated assault.'"); *United States v. O'Kelly*, 1:23-cr-00061 (ABJ), Order (Dkt. NO. 40) at 5-6 (same).

applicable guideline is § 2A2.4, obstructing or impeding officers, not the heightened guideline § 2A2.2 for aggravated assault.

> ### D. Even if the Court were to apply § 2A2.2, neither the dangerous weapon nor the bodily injury enhancements are supported by the evidence.

With respect to the dangerous weapon enhancement, U.S. Probation states that "numerous Judges in this District have concluded that pepper spray and/or bear spray is a dangerous weapon" and have applied this enhancement. *See* PSR at pg. 29. Nonetheless, this is a fact-specific inquiry not subject to bright-line rules, and the facts of this case do not support its application. With respect to the bodily injury enhancement, U.S. Probation cites to portions of Officer J.P's and M.A.'s testimony and ultimately defers to the Court has having "the best posture to determine factual matters concerning the representations made at trial." *See id.* at 29-30. The defense addresses each enhancement dispute below.

> ### i. There is no evidence in the record to show that Isreal used a dangerous weapon with the intent to commit bodily injury.

"Dangerous weapon" is defined as "(i) an instrument capable of inflicting death or serious bodily injury or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument . . . ." *See* § 1B1.1, Application Note 1(E). Application Note 1 to § 2A2.2 also provides, however, that a "dangerous weapon" includes "any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such instrument is involved in the offense *with the intent* to commit bodily injury." *See* § 2A2.2, Application Note 1 (emphasis added).

Based on the testimony at the trial, there is not a preponderance of evidence to support the conclusion that Isreal's use of pepper spray – as opposed to the use of pepper spray generally

– was capable of causing death or serious bodily injury to Officer J.P. or Officer M.A. There was no evidence that (1) either officer sustained a serious bodily injury from being pepper sprayed or (2) indicated either officer suffered from a pre-existing condition that made them susceptible to serious adverse consequences from pepper spray.

Dr. Rose testified that various factors may affect the toxicity of pepper spray. First, the distance from which pepper spray is deployed. *See* Oct. 25 Tr. 126:4-14 ("So I think certainly if you have somebody holding it right in front of your face, and there are cases where those produce problems, versus several feet away or even 10 feet away, the further away you are is probably the less chemical you will get on your skin and in your eye or in your throat."). Second, whether exposure occurs inside an enclosed space. *Id.* at 126:15-22 ("Well, there are very uncommon reports of more serious toxicity with this. And one of those scenarios is when someone is in a small, enclosed environment with reduced airflow and, therefore, the contact time can get prolonged. And that could make an identical exposure to someone outside with adequate airflow could make it a little worse, yes."). Third, the directness of the spray. *Id.* at 126:23-25, 127:1-11 ("From a toxic standpoint, I think a mist wouldn't be as toxic as a direct installation either into the mouth or the eye."). In sum, unlike the routine use of pepper spray, "a very high dose, prolonged contact, which means the inability to get fresh air or to rinse your eyes" and at a close distance would increase the risk of serious bodily harm. *See id.* at 131:11-15.

None of these factors that could increase the impact of exposure were present in this case. *See* Oct. 24 Tr. 96:1, 120:19-25, 121:1. Isreal sprayed small cannisters of pepper spray outside, at a distance on both occasions, where officers could turn their heads away from the pepper spray, and for a matter of seconds. Because the pepper spray was not recovered, there is no information in the record about the spray's dosage, percentage of active ingredient, and intensity.

The lack of aggravating factors is only compounded by the fact that neither officer sustained a serious bodily injury or testified to having a pre-existing condition. Although Officer J.P. testified he felt pain at a "solid eight, nine of the pain scale" after being sprayed with pepper spray, he also earlier testified that simply getting pepper oil from cooking in his eyes was a five or six in terms of pain. *See id.* at 81:2-11. Importantly, Officer J.P. was able to work the rest of his shift until 10 or 11 PM that day and then decontaminate when he got home by washing it off in the shower. *Id.* at 98:19-22, 118:10-14. By the next day, the physical impact of pepper spray was gone and he returned to work. *Id.* at 123:10-16. He testified that he does not have any underlying health conditions. See id. at 79:22-25, 80:1-5.[9]

With respect to Officer M.A., as the Court stated in its Memorandum Opinion, "there is some question as to whether Easterday's pepper spray reached Acevedo at all." *See* Mem. Op. (Dkt. No. 111) at 19. That's because another January 6 defendant's – James Haffner – spray alone could have caused Officer M.A.'s injuries, Isreal sprayed prior to Officer M.A. reacting, Haffner was closer to Officer M.A., and the government's video footage does not clearly show the precise timing of Officer M.A.'s retreat. *Id.* In addition, Officer M.A. was wearing a ski mask and sunglasses, he was outdoors, and he was sprayed at a distance – he did not even know from what direction he was sprayed or who sprayed him. Oct. 24 Tr. at 135:4-7, 146:19-25, 147:1-8. He continued to work until about 11 PM that night and did not seek medical attention. *Id.* at 143:18-22; 147:9-11. There is no evidence about pre-existing conditions.

---

[9] Officer J.P. testified how after he was pepper sprayed, he was being pushed by other rioters to the East Rotunda doors, he was pinned up against the doors be other rioters, and he was feeling pressure on his chest which made it difficult to breathe and blacked out. *See id.* at 121:10-25, 122:1-17. What happened to Officer J.P. is terrifying but also not a direct result of Isreal spraying pepper spray; as he testified, there were many other factors that contributed to how he felt that day.

As both officers made clear, they did not sustain any physical damage to their bodies, they did not seek medical attention, completed their shifts, and were back at work the next day. In sum, Isreal's use of pepper spray was consistent with its ordinary use that typically does not result in significant adverse health impacts. *See* Oct. 25 Tr. 135:20-25, 136:1-10. Moreover, as stated above, the record is completely devoid of any evidence that Isreal intended to cause bodily injury when he sprayed the pepper spray.

Accordingly, a preponderance of evidence does not establish that Isreal's use of pepper spray based upon the specific facts in this case was capable of causing death or serious bodily injury. Moreover, Isreal's use of pepper spray does not constitute that type of weapon given his lack of intent to commit bodily injury.

### ii. The evidence in the record does not support a finding that there was any physical bodily injury to the officers in this case.

"Bodily injury" is defined in the guidelines as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." *See* § 1B1.1, Application Note 1(B). Exposure to pepper spray may be very painful but it is not an injury. *See* Oct. 25 Tr. 139:17-18. And "bodily injury" is commonly defined as "physical damage to a person's body." *See* Black's Law Dictionary 906 (10th ed. 2014); *see also* Stedman's Med. Dictionary 903 (27th ed. 2000) ("injury: The damage or wound of trauma."). *See also United States v. Eason*, 953 F.3d 1184, 1194 (11th Cir. 2020) ("The ordinary meaning of the term "physical injury" "typically means 'bodily injury,' which in turn is defined as '[p]hysical damage to a person's body.'").

As the government's expert testified, pain is the body's response to a stimulus that may or may not constitute an injury. Oct. 25 Tr. at 39. Here, pepper spray is designed to elicit a pain response from exposure to skin; however, removal of pepper spray from contact with skin by

irrigating with water eliminates the pain associated with such exposure. While this "pain" can be washed away, an injury cannot. As such, no evidence establishes that Isreal's offense caused "bodily injury" warranting this enhancement for purposes of the Sentencing Guidelines. *See United States v. Lancaster*, 6 F.3d 208, 210 (4th Cir. 1993) (finding that being sprayed with mace did not warrant bodily injury enhancement because effects, although "undoubtedly unpleasant," were transient and "the mace produced no lasting harm"); *United States v. Mejia-Canales*, 467 F.3d 1280, 1284 (10th Cir. 2006) (small oral laceration and red mark on head from being punched that were not "painful or lasting" did not warrant bodily injury enhancement). As stated in detail above, Isreal did not use pepper spray in a way to cause bodily injury and as a result, the officers did not sustain such injuries.

The Court previously rejected this argument in the context of the Rule 29 Motion by citing to Congress' definition of bodily injury as "physical pain'" without any temporal requirement and "any other injury to the body, no matter how temporary." *See* Mem. Op. (Dkt. No. 111) at 15. In doing so, the Court cited to tasers as an example where "[i]t would defy typical usage to say that just because a taser does not always damage the body, a victim subjected to intense pain and convulsions was uninjured." *See id.* at 16. However, pepper spray is unlike a taser in terms of the risk of causing serious bodily injury. Indeed, tasers do not depend on the manner of use to achieve the designation as a "dangerous weapon." They are stun guns that temporarily immobilize a person by jolting them with 50,000 volts of electricity,[10] which is

---

[10] *See* The New York Times, *Tasers: Are These Police Tools Effective and Are They Dangerous?*, available at <u>https://www.nytimes.com/article/police-tasers.html</u> (last visited Apr. 15, 2024).

exactly why state laws often ban their use entirely or impose significant restrictions on ownership.[11] Pepper spray is not an inherently dangerous weapon and is categorically different.

Here, Isreal's use of pepper spray in the ordinary manner in which such spray is designed to be employed was neither meant to cause bodily injury nor did so. While there is no doubt that the officers experienced temporary pain from such exposure, they were not injured. They completed their shifts, washed away the pepper spray, and did not seek medical attention. These facts are simply not sufficient to trigger the three-level enhancement under the guidelines.

### E.  Isreal should receive the two-level reduction for acceptance of responsibility.

The PSR cites to the fact that Isreal went to trial and that the obstruction of justice enhancement under § 3C1.1 applies to find that a two-level reduction for acceptance of responsibility does not apply here. Given that Isreal went to trial because of disagreement with the government's legal construction of several elements of his charged offenses, his case reflects the type of "extraordinary circumstance" in which going to trial should not foreclose credit for acceptance of responsibility.

In the defense's opening statement at trial, Isreal took full responsibility for assaulting Officer J.P. on January 6 with pepper spray. *See* Oct. 23 Tr. 150:22-24. In fact, he *asked* that the jury find him guilty of his conduct. *Id.* at 152:25 – 153:1-4. Importantly, he did not contest any of the facts regarding his participation in the riot on January 6 and his use of pepper spray. Instead, Isreal's defense at trial centered on the legal definition of a "dangerous weapon" and "bodily injury."

The guidelines permit a two-point reduction where the defendant "clearly demonstrates acceptance of responsibility for his offense." *See* § 3E1.1(a). The Application Notes provide

---

[11] *See* Sabre, *Stun Gun State Laws*, available at https://www.sabrered.com/stun-gun-state-laws/ (last visited Apr. 15, 2024).

further guidance that to qualify for acceptance of responsibility, the Court may consider certain factors, including that although this reduction is not intended to apply to "a defendant who puts the government to its burden of proof at trial by denying essential elements of guilt, is convicted, and only *then* admits guilty and expresses remorse." *See* App. Note 2. This clarifies that a trial conviction does not "automatically" preclude a defendant from the benefit of this adjustment and that in "rare situations," a defendant may still clearly demonstrate acceptance of responsibility. *Id.* The Note provides that an example of this would be "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt" and further directs courts to refer to pretrial statements and conduct to assess whether this reduction is appropriate. *Id.*

Isreal's case is the exact type of "rare situation" that the sentencing guidelines contemplate where a reduction for acceptance of responsibility is warranted even though a defendant proceeded to trial. In similar circumstances, courts have applied the two-point acceptance of responsibility reduction. *See, e.g.*, *United States v. Shepard*, 857 F. Supp. 105, 107 n. 8 (D.D.C. 1994) (finding that even though the defendant proceeded to trial, this was one of those "rare situations" where an acceptance of responsibility reduction was appropriate because the defendant "never contested her involvement in the crimes at issue," "admitted her criminal involvement," "show[ed] recognition for her criminal conduct in her post-trial interviews," and went to trial to preserve issues unrelated to factual guilt).

Unlike many January 6 defendants, Isreal has expressed tremendous remorse for his behavior on that date. As Isreal stated in his letter to the Court:

> I must begin by extending my deepest apologies to society, the court, and most importantly those affected by my actions. They were merely carrying out their duties, upholding the law, and ensuring the safety of the people present that day. I am totally consumed by remorse for the decisions I made that day. There is no justification for the reprehensible behavior I exhibited, nor can I offer any excuses

21

for the harm I inflicted. The mindset that drove me to such extremes are indefensible, and for that, I am truly sorry.

*See* Exhibit 2, Isreal Letter to Court. As his family as acknowledged, Isreal has shown this remorse since he came home from January 6. Mark Easterday stated that anyone who gets to know Isreal would know that he has a good heart, and that on January 6, he was not trying to rebel against anyone or inflict pain on anyone. *See* Ex. 1. Instead, if he could turn back the clock, he would have just stayed home. *Id. See also* PSR at ¶ 93 (Mark Easterday stating that Isreal is "remorseful over his conduct" and "'understands he did wrong'"). Marian Easterday indicated that Isreal is very sorry for what he did and that his conduct on January 6 is not reflective of the person he is, instead "he is not the kind to hurt people." *See* Ex. 1. His younger brother Elijah stated that Isreal regrets the terrible decision he made that day and regretted it since the moment he did it; this is not his real character. *Id.* And his wife Hannah Easterday stated that he is sorry for what he has done and thinks about it every day. *Id.*

Accordingly, the Court should apply a two-level reduction pursuant to §3E1.1 for acceptance of responsibility.

## III.   SENTENCING FACTORS

Although U.S. Probation stated that a downward departure under § 5K2.20 for aberrant behavior does not apply given the use of a dangerous weapon,[12] this departure was meant for defendants like Isreal where the offense behavior was committed "without significant planning[,] was of limited duration[,] and [] represents a marked deviation by the defendant from an otherwise law-abiding life." *See* § 5K2.20(b). Each of these circumstances apply here.

---

[12] *See* § 5K2.20(c)(1)-(4) (offense did not involve the following: serious bodily injury or death; discharge of a firearm or use of a firearm or a dangerous weapon; a serious drug trafficking offense; or the defendant has more than one criminal history point or a prior state or federal felony conviction or any significant criminal behavior).

First, there is no evidence in the record that Isreal engaged in *any* planning prior to January 6. Second, his conduct in this case was limited to approximately 8 seconds regarding Officer J.P. and 6 seconds regarding Officer M.A. *See* Gov. Ex. 404 at 5:11 – 5:19 and Gov. Ex. 407 at :41 – 47. And lastly, Isreal has no prior criminal history, or even interaction with law enforcement. Instead, Isreal's background demonstrates a young, sheltered individual whose world was confined to his family farm until he was a teenager. He has lived an earnest, quiet life prior to January 6, and has lived that type of life since then. He has maintained perfect compliance with pretrial supervision, which is consistent with his respect for authority.

To the extent that the Court finds that a departure under § 5K2.20 is not appropriate, the defense still requests that the Court grant a downward variant sentence to 12 months and one day based on Isreal's sheltered upbringing, his age and offense conduct, his remorse for his behavior, his compliance with pretrial release, and comparison cases.

### A. Isreal's entire world was limited to his family and their farm until just a few years ago.

Isreal has 20 siblings and was raised in rural Kentucky where his entire universe was confined to his family and the family's farm until he was about 16 or 17 years old, which was only a few years ago. *See* PSR at ¶¶ 85, 88. He was raised Amish and his dad, Mark Easterday, practices fundamentalist Mormonism as a follower of the Fundamentalist Church of Jesus Christ of Latter-Day Saint, including practicing polygamy. *Id.* at ¶¶ 87, 89. Mark Easterday is married to Isreal's stepmother, Heidi Easterday. *Id.* at ¶ 87. As a part of his family's religious values, Isreal did not have electricity, running water, or access to a vehicle until he was about 11 or 12 years old. The family's main source of food was from their self-sustaining farm, which had chickens, goats, and cows, as well as a large garden. *Id.* at ¶¶ 88-89.

His parents also doubled as his educators. Isreal was homeschooled until he was about 14 years old. Every year, Isreal's mom, Marian Easterday, created her own lesson plans and taught the children several subjects, including spelling, math, geography, and health. All lessons, homework assignments, and tests where on a sheet of paper and with a pencil. When he was about 10 years old, Marian Easterday purchased a VCR player so that she could show documentaries for lessons; they would go to a Goodwill and usually buy National Geographic videos to learn about the world outside of the farm. Given that Marian Easterday only completed eighth grade from her Amish school, she sometimes felt limited and Isreal's dad pitched-in to cover some subjects, such as math.

When the kids were not doing schoolwork, they would quickly change into their one pair of overalls – that Marian Easterday made for them – and get to work on the farm with their father. Once the day was done, they would change out of their dirty overalls, eat dinner, and go to bed. With this schedule, there was little time or opportunity for recreation. The sole exception was that each kid built their own "little home" made of sticks, branches, and logs they picked-up from the farm. For Isreal, if he wasn't learning or working, he was at his "little home" where he could spend time being a kid. By the time the children turned 14, they were able to stop homeschooling and start helping their dad with farm work on a full-time basis. It was not until April 2023 that Isreal received the equivalent on a high school diploma, which was signed by his parents. *See* Exhibit 6, High School Diploma at 1-3.

In retrospect, Isreal describes his upbringing as really isolating. The family never left the farm and to the extent they had visitors, they would visit once or twice a month, at most; in fact, Isreal described seeing someone coming up their driveway as a "big shock." To the extent that the family did have visitors, they were other homeschooled families that shared the same beliefs.

In addition to limiting the people coming onto the farm, Isreal was also limited to leaving the farm. He was not allowed to associate with public school kids, be involved in any team sports, or even listen to mainstream music because his parents felt like doing so was "too worldly" and they wanted him to avoid temptations. The family did not even leave the farm for medical purposes. His parents treated the kids if any of them were sick, they never received vaccines, and Isreal only went to the hospital one time when he broke his arm. Even when he was seriously injured in an accident cutting wood when he was around 12 years old, his father sewed up the significant gash in Isreal's leg.

But by the time Isreal turned 16 years old, he was able to work construction for his uncle and leave his father's farm for work. *See, e.g.*, PSR at ¶ 110. This was the *first* time that he left the farm, and a period of his life where he felt a "lot more" freedom. He started dating and, although rarely, even went to a local restaurant to hang with peers. Until he was 18 years old, Isreal gave 80% of work earnings to his father and saved the rest. When he turned 18, he was able to move into his own home on a portion of the family's farm that his paternal grandparents gifted to him. *See id.* at ¶ 113. He lived in a small, one-bedroom outbuilding behind the main house on the property, which was in significant disrepair. Around this time too, he spoke with an army recruiter because he wanted to serve his country. *Id.* at ¶ 104. He thought doing so would make him feel proud of himself. Isreal applied two times to join the marines in 2017 and 2018, but was not able to pass the entrance exam either time, likely because of his extremely sheltered life, and was rejected. *Id.*

For the next few years, Isreal continued to work for his uncle as a crew lead at Detweiler Construction. PSR at ¶ 110. A few months after January 6, 2021, Isreal attempted to run his own construction business, "Misty Valley Commercial Roofing." *Id.* at ¶¶ 109-110. That business

failed because he was not able to secure sufficient work. He then pivoted to saving money again by working for his cousin as the crew lead on a construction site. *Id.* at ¶¶ 108-109. Starting in March 2022, Isreal had saved enough money that he was able to buy himself a boat and embark on a sailing trip to the Bahamas to provide free bibles to various churches. *See id.* at ¶ 107. Since Isreal was a kid, he would practice sailing in a pond on the farm with his brothers. This was finally an opportunity for him to leave his home and begin to understand the world from his own perspective. He was able to do this for about ten months, until he was arrested in December 2022 down in Miami, Florida, where his boat was docked. When FBI agents called Isreal to turn himself in, he sailed back to the beach and did so.

**B. A sentence of 12 months and one day would be sufficient to reflect the severity of his behavior while also taking into account that he was only 19 years old when he committed this offense, and he has demonstrated significant remorse.**

Isreal did not plan on going to Washington, D.C. on January 6 until his uncle invited him to tag along with a group of fellow Trump supporters to attend the Stop the Steal Rally. He did not coordinate with others online to meet at the rally, he did not post anything on social media about this rally, and he did not wear combat clothing or bring any objects with him to the rally. For the criminal conduct in this case, he was by himself, wearing plainclothes, and at times, carrying a Confederate flag. He plainly did not fully understand what the Confederate flag signified, given that he googled "what does the rebel flag represent" on January 6, 2021 in the afternoon.

When he was near the East Rotunda Doors, he was handed a small, handheld cannister of pepper spray on two separate occasions. The first time, Isreal sprayed the pepper spray at Officer J.P., which he does not contest. The second time, Isreal sprayed pepper spray in the air, at a

distance, towards the East Rotunda Doors. After those two incidents, he entered the U.S. Capitol and left under 15 minutes later.

Isreal was 19 years old when he committed this offense conduct. There is "no dispute that a defendant's youth is a relevant mitigating circumstance." *See Johnson v. Texas*, 509 U.S. 350, 367 (1993) (internal citation omitted). That's because "[a] lack of maturity and an under-developed sense of responsibility are found in youth more often than in adults . . . [and] [t]hese qualities often resulting impetuous and ill-considered actions and decisions." *Id.* Indeed, courts have emphasized the significance of the defendant's age in cases that involve more egregious conduct than Isreal's case. *See, e.g.*, *United States v. Gall*, 552 U.S. 38 (2007) (approved the district court's consideration that the defendant was a 21-year-old college student and afforded great weight to his youth and immaturity, as well as the way he changed his life, when determining what sentence to impose for his participation in a federal drug distribution conspiracy). *See also United States v. Brockhoff*, 1:21-cr-00524 (CKK) (imposing downward variant sentence of 36 months with an advisory guidelines range of 46-57 months for 20 year old defendant who pleaded guilty to 18 U.S.C. § 111(a)(1) and (b) after he threw an item at police officers, assaulted multiple police officers using a fire extinguisher, stole a police officer's helmet and wore it for the rest of the riot, kicked-in a door to gain entrance to another locked Senate conference room, and rifled through belongings in the Senate).

In addition to Isreal's age on January 6, another mitigating factor that warrants significant consideration is that he has demonstrated substantial remorse for his behavior. Isreal knows that he is going to have to serve a term of imprisonment, and he is prepared for that; however, any sentence longer than 12 months and one day would not serve the purposes of sentencing. Instead, a short term of incarceration followed by a longer term of supervised release with the special

condition that he participate in community service opportunities would be more appropriate in this case given Isreal's age, lack of criminal history, his limited but serious conduct in this case, and his behavior while on pretrial release. Importantly, the Hart County Jail and the WJCR 90.1 FM Radio Station have offered to have Isreal participate in 500 hours of community service as a part of his sentence in this case. *See* Exhibit 3, Community Service Opportunities, 1-3.With Hart County Jail, Isreal would serve his 500 hours doing roadside trash pick-up. *Id.* at 1. And with the radio station, Isreal would continue to volunteer every week passing out food to hundreds of families in need. *Id.* at 2.

In addition to serving 1,000 hours of community service while on supervision, Isreal could start working again and begin to provide for his family. For the past year, Isreal has been on strict conditions of pretrial release that have prevented him from leaving his farm, and therefore, from working. This has already created a substantial financial burden not only him, but on his entire family. Isreal already has an offer of employment from New Dawn Solar as a Solar Installation Forman in Elizabethtown, KY. *See* Exhibit 4, Employment Offer. The owner of New Dawn Solar, Jacob Bruce, is Isreal's family friend and he worked for Mr. Bruce without pay years ago. Mr. Bruce has been impressed by Isreal's work ethic, honesty, and compassion, and would be happy to have him be a part of his team.

Mr. Bruce is not the only community member who has noticed Isreal's character. Sarah Gehant met Isreal while standing in line at a farm supply store in 2018 when he was 17 years old. *See* Exhibit 5, Character Letters, at 1. She needed help with her farm's upkeep and asked Isreal if he needed a job; he declined to be paid for his work but by the next day, he was at her farm fixing broken items and by the next week, he showed-up with 600 bales of hay and brought his brother to help. *Id.* She commented how "Is[real] is different. He works hard, doesn't use drugs,

and always says 'Yes, Mame.'" *Id.* Ms. Gehant emphasized that Isreal "has been an integral part of the running of [her] farm ever since" and "would hire him in an instant if given the opportunity." *Id.*

While Isreal has been confined to his farm on pretrial release, he has built and sold eight sheds to generate some income for his family to pay for basic necessities. Even those customers have noticed Isreal's good character in such a short amount of time. Jennifer McNett purchased a shed from Isreal and when she came to his farm to pick-up the shed, Isreal refused to accept any tip for helping her loading the shed off the property and instead saying that she should "bless someone else with it" even though he was clearly struggling financially. *Id.* at 2. Ms. McNett stated that during these brief interactions, "it is rare to find someone, especially as young as he is to be as respectful as Isreal has been to us." *Id.* Additionally, Charles William Easto III purchased two sheds from Isreal. *Id.* at 2-3 (including pictures). Isreal represented to him that "he had to build them at his house because he had certain restrictions imposed by the courts and he was just trying to make a living." *Id.* at 2. Mr. Easto could see that Isreal and his wife "are in financial difficulties" and that they are "going without many comforts to provide for his wife's future alone." *Id.* He also commented on Isreal's "hardworking, dedicated and highly skilled" attitude, which is a benefit to their community.

And lastly, Isreal has worked tirelessly to make sure his wife is taken care of while he is serving his period of incarceration in this case. While on pretrial release, Isreal built their entire family home with materials from the farm. As reflected in the PSR, Isreal's primary house was in "significant disrepair" and was minimally constructed, including just having one bedroom with multiple beds and a makeshift bathroom and kitchen. *See* PSR at ¶ 94. During the past year, Isreal has completed his construction and within the past few weeks, he has listed the property to

rent on Airbnb to generate some income.[13] This way, Isreal's wife, Hannah, has a way to have a

source of income while he is incarcerated. Isreal built the entire home himself:



While Isreal and Hannah are renting the property to vacationers to experience a quieter

and simpler life in Kentucky in their beautiful new home, they have been living in a small tin

shack near the property so that they can afford the basic necessities:

---

[13] *See* listing at
https://www.airbnb.com/rooms/1116792166692468030?adults=2&children=0&enable_m3_priv
ate_room=true&infants=0&pets=0&check_in=2024-04-10&check_out=2024-04-
15&source_impression_id=p3_1712712535_jFnoVYrwoCgKuA8h&previous_page_section_na
me=1000&federated_search_id=18d1603d-0d96-49de-a452-411764d90c86 (last visited Apr. 11,
2024).



Isreal's conduct in this case was serious, and such conduct clearly warrants a term of imprisonment. But he also deserves another shot at his future. He has the family, the community, the prospects, and the talent in place to succeed once he is released from incarceration. Twelve months and one day, coupled with sentence of supervised release, would be sufficient but not greater than necessary to serve the purposes of sentence.

### C. A sentence of 12 months and one day would avoid unwarranted sentencing disparities.

Given Isreal's personal characteristics and his specific conduct on January 6, a sentence of 12 months and one day would avoid unwarranted sentencing disparities while still promoting respect for the law. Isreal was 19 years old on January 6, he did not plan for violence on that day, his assaultive conduct was limited to under a minute, and he has expressed tremendous remorse for his behavior. Any sentence over 12 months and a day does not achieve the goals of sentencing, especially in comparison to other January 6 defendants who engaged in preplanned and more egregious assaultive conduct but received significantly downward variant sentences below the advisory sentencing guidelines in this case.

For example, in *United States v. Brian Mock*, 1:21-cr-00444 (JEB), Mock was convicted of 11 counts following a bench trial, including four assaults under 18 U.S.C. § 111(a); the Court dismissed the "dangerous weapon" enhancements on the defense's Rule 29 motion. Although the government requested a sentence of 109 months and calculated an advisory guidelines range of 91-121 months, the Court imposed a downward variant sentence of 33 months. Unlike Isreal's case, the trial evidence demonstrated that Mock planned for violence on January 6 and that he targeted violence against law enforcement on that day. He further did not show any remorse for his behavior, including during his testimony at trial and even his post-trial conduct.

Mock was 44 years old at the time of January 6 and had expressed his intent to engage in violence on that date. He "repeatedly" expressed on social media, text messages, and conversations with family that "a violent mass uprising was needed to keep these 'tyrants' and 'Socialists' from taking power" and called for a "total rebellion" of armed citizens against the government. *See* Gov. Pos. (Dkt. No. 112) 2-4. He recruited others to travel to D.C. with him and even went as far as to tell his oldest son that "he might die there." *Id.* at 5. At the U.S. Capitol, Mock helped other rioters move police barricades and committed four separate assaults against police officers. *Id.* at 2, 5-6. He pushed one officer to the ground and then kicked/attempted to kick him; he threw a broken flagpole "like a spear" at another; he pushed a third officer in the back "causing him to stumble forward"; and he shoved a fourth officer "off his feet and onto the ground." *Id.* at 6-9. He proceeded to steal two police officer shields and passed them to other rioters. *Id.* at 10. Instead of demonstrating remorse, Mock bragged to his friends about his behavior, including that he "[g]ot sprayed directly 3 times, took a flash bang and took down at least 6 cops." *Id.* at 11-12. He then proceeded to trial, where he represented himself for the second half of trial, testified, and repeated falsehoods and mischaracterizations, including that he

"hurled the flagpole at the officers to 'g[e]t it out of my hand'" and that he shoved an officer in

an act of "self-defense.". *Id.* at 2-3, 12-14. Even *after* trial, Mock provided an extensive

interview to *The New York Times* where he continued to justify his actions on January 6, refused

to accept responsibility, and advanced more excuses for his criminal behavior. *Id.* at 14-15.

Even when looking at similarly situated defendants who used pepper spray and were

convicted under 18 U.S.C. § 111, each of those cases resulted in a lower sentence than even the

low-end of Isreal's advisory guidelines range but involved more egregious conduct than Isreal's

case. Importantly, although each case involved the use of pepper spray, the dangerous weapon

and bodily injury enhancements under § 2A2.2 applied differently, if at all; meaning, just

because pepper spray was used, that does not mean that both of those enhancements

automatically apply.  The following are cases involving defendants convicted of § 111 that used

pepper spray:

- *United States v. Barry Ramey*, 1:22-cr-00184 (DLF). Ramey was convicted of various counts, including two counts of assault in violation of 18 U.S.C § 111(a) after a bench trial and had a guidelines range of 108-135 months. Ramey was an active member of the Proud Boys and on January 6, he was marching with fellow members while wearing military gear, including army boots, armored motorcycle gloves, and some type of body armor under his jacket. *See* Gov. Pos. (Dkt. No. 60) 4. At some point, he also wore a large gas mask. *Id.* at 9. At the Senate Stairs at the West Front, Ramey sprayed one officer directly in the eyes, and then a second officer seconds later. *Id.* at 9-10. These assaults contributed to the collapse of the line at the base of the Northwest Stairs. *Id.* at 11. After these assaults, Ramey remained at the U.S. Capitol for several hours, until about 5:20 PM that day. *Id.* at 12-13. Prior to his arrest, Ramey attempted to intimidate an FBI case agent on at least two occasions. *Id.* at 18-19. The Court imposed a downward variant sentence of 60 months.

- *United States v. Ricky Willden*, 1:21-cr-00423 (RC). Willden pleaded guilty to one count of assault in violation of 18 U.S.C. § 111(a)(1) based on pepper spraying six police officers and had a guidelines range of 24-30 months.[14] Willden was a member of the

---

[14] The parties agreed that USSG § 2A2.2 applied, but the government did not seek the dangerous weapon enhancement or bodily injury enhancement under the guidelines. *See* SOF (Dkt. No. 28) at 3. Additionally, the government conceded in their position, "the assaulted officers did not report *any lasting injuries as a result of being sprayed . . . .*" Gov. Pos. (Dkt. No. 38) at 22.

Proud Boys, he wore goggles to the riot (which he pulled over his eyes before he deployed the chemical irritant), sprayed officers with pepper spray and then threw the cannister at them, and then entered the U.S. Capitol for about 15 minutes before leaving. *See generally* Gov. Pos. (Dkt. No. 38) 1-20. After January 6, Willden celebrated the events on January 6 by posting on Facebook that "I think they got the message from everyone of all ages" and "FYI the cop who started this shit by mazing me and hitting my nuts playing stupid games, hope you enjoyed my special prize." *Id.* at 2, 20-21. At the time of sentencing, Willden had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal substances while on release. The Court imposed a low-end guideline sentence of 24 months.

- *United States v. James Phillip Mault*, 1:21-cr-00657 (BAH) and *United States v. Cody Mattice*, 1:21-cr-000657 (BAH). Mault and Mattice pleaded guilty to one count of assault in violation of 18 U.S.C. § 111(a)(1) based on pepper spraying officers and both had a guidelines range of 37-46 months.[15] They planned for violence, engaged in violence, and celebrated their violence. Mattice and Mault texted each other prior to January 6, including that Mault had bought "[s]ome pepper spray and a legal baton" and Mattice had a "nice ass high powered firemans fire extinguisher" that they could use during the riot. *See United States v. Mattice*, Gov. Pos (Dkt. No. 60) 9. The day before riot, Mault sent a text message to others suggesting that they bring long sleeves, gloves, a baton, pepper spray, "asskicking boots," a helmet, and eye protection. *Id.* On January 6, Mattice recorded various videos leading up to the riot; for example, he recorded a video stating that "We're all getting ready to go march on Capitol Hill. We're gonna go fuck some shit up. It's about to be nuts." *Id.* at 10. At the West Plaza, Mattice pulled down a segment of the metal barricades that stood in front of a police line, and Mault grabbed it with both hands and pulled it away from the police and onto the ground. *Id.* at 12-13. At the Lower West Terrace Tunnel, Mault and Mattice body-surfed across the crowd, hung from the arch of the tunnel, and pepper sprayed officers. *Id.* at 17-21. They were at the U.S. Capitol for more than four hours. During and after the rally, they gloated about their conduct to friends and family. *Id.* at 15-17, 21-22. And during a custodial interview with FBI agents, they lied about their involvement. *Id.* at 24-25. The Court imposed a sentence of 44 months in both cases.

- *United States v. Aiden Henry Bilyard*, 1:22-cr-00034 (RBW). Bilyard pleaded guilty to one count of assault in violation of 18 U.S.C. § 111(a)(1), (b) based on pepper spraying officers and had a guidelines range of 46-57 months.[16] On January 6, Bilyard, who was 18 years old at the time, was at the U.S. Capitol for several hours – from about 2 to 4:30 PM. *See* Gov. Pos (Dkt. No. 50). At the Lower West Terrace, he deployed "Home Defense Pepper Gel" against a line of police officers. *See id.* at 3-6. He then proceeded to strike a glass window of the U.S. Capitol with a baseball bat until it shattered. *Id.* at 6-

---

[15] The parties agreed that § 2A2.2 applied, but the government did not seek the bodily injury enhancement under the guidelines. *See, e.g.*, *United States v. Mattice*, 1:21-cr-00657 (BAH), Plea Agreement (Dkt. No. 43) 2-3.

[16] The parties agreed that § 2A2.2 applied, but the government did not seek the bodily injury enhancement under the guidelines. *See* Plea Agreement (Dkt. No. 38) 2-3.

13.He was the first rioter to crawl through the window and his actions led to Senate Terrace Mezzanine's Room 2 in the U.S. Capitol being breached and encouraged other rioters to crawl through the window *Id.* Other rioters took items from that room that could be used as weapons, including table legs and lamps. *Id.* at 15. After January 6, Bilyard lied to FBI agents during an interview about his conduct that day by stating he did only "lawful" activities while at the U.S. Capitol. *Id.* at 16-17. The Court imposed a downward variant sentence of 40 months.

- *United States v. Mitchell Todd Gardner*, 1:21-cr-00622 (APM). Gardner pleaded guilty to several counts, including one count of assault in violation of 18 U.S.C. § 111(a)(1), (b) and had a guidelines range of 46-57 months.[17] On January 6, Gardner was at the Lower West Terrace Tunnel, and repeatedly chanted "pull the police out," "pull the cops out," and "grab their hands and pull them out." *See* Gov. Pos. (Dkt. No. 57) 16-18. Gardner sprayed an MPD's MK-46 OC spray canister at police officers until it was empty. *Id.* at 18-20. After deploying the OC spray, Gardner used the emptied OC canister to break a window to enter the U.S. Capitol, encouraged and helped other rioters through that broken window, and then helped take the other half of the window out to allow more rioters to enter. *Id.* at 24-30. Once inside, Gardner handed a broken piece of furniture (a leg from a table with a metal nail sticking out of it) to another rioter, that was later used to assault an officer. *Id.* at 29. Before he left, Gardner and other collectively pushed against the police. *Id.* at 35. The Court imposed a sentence of 55 months.

- *United States v. Christian Matthew Manley,* 1:21-cr-00691 (TSC). Manley pleaded guilty to one count of assault in violation of 18 U.S.C. § 111(a) and (b) based on pepper spraying officers and had a guidelines range of 51-63 months.[18] On January 6, Manley arrived at the Lower West Terrace with two cans of bear deterrent/pepper spray, a collapsible police baton, and handcuffs. *See* Gov. Pos. (Dkt. No. 45) 12. He then sprayed the bear deterrent/pepper spray at the officers defending the tunnel until the canister was empty and threw it at them. *Id.* at 13-14. He then assisted in passing stolen police shields away from the officers and to other rioters. *Id.* at 14. Manley then moved inside the tunnel and sprayed officers a second time with bear deterrent/pepper spray, emptied the spray, and threw the canister at them. *Id.* at 14-15. He remained in the tunnel, took a pipe from another rioter and thew it at the officers, and pushed the officers further inside the tunnel. *Id.* at 15-16. During a post-arrest interview in October 2021, Manley lied about his actions on January 6. *Id.* at 17-18.  The Court imposed a sentence of 50 months.

- *United States v. Daniel Ray Caldwell*, 1:21-cr-00181 (CKK). Caldwell pleaded guilty to one count of assault under 18 U.S.C. § 111(a)(1) and (b) based on pepper spraying

---

[17] The parties agreed that § 2A2.2 applied, but the government did not seek the bodily injury enhancement under the guidelines. *See* Plea Agreement (Dkt. No. 48) 3-4. The government sought a two-level upward departure, which brought his guidelines up to 57-71 months. *See* Gov. Pos. (Dkt. No. 57) 44-45.

[18] The parties agreed that § 2A2.2 applied, but the government did not seek the bodily injury enhancement under the guidelines. *See* Plea Agreement (Dkt. No. 38) 2-3.

officers and had a guidelines range of 63-78 months.[19] Caldwell prepared for violence on January 6. He brought bear spray, glasses that could shield him from pepper spray, and a Baofeng handheld two-way radio. *See* Gov. Pos. (Dkt. No. 61) 2. Caldwell was present "on the front lines of the main assault for almost the duration of the confrontation" at the Lower West Terrace. *Id.* at 8. At various points, he had confrontations with police officers. *Id.* at 8-14. He then sprayed a gaseous chemical irritant at a line of officers. *Id.* at 14-15. Once Caldwell left the U.S. Capitol and was back at his hotel, he gave an interview where he "reveled in those crimes" and admitted that he sprayed "like 15 of them" with pepper spray. *Id.* at 19. The Court imposed a sentence of 68 months.

- *United States v. Julian E. Khater*, 1:21-cr-222-01 (TFH). Khater pleaded guilty to two counts of assault in violation of 18 U.S.C. § 111(a)(1) and (b) and had a guidelines range of 78-97 months.[20] On January 6, Khater arrived at the U.S. Capitol with two containers of bear spray and two containers of hand-held pepper spray. *See* Gov. Pos. (Dkt. No. 97) 11. At the Lower West Terrace, Khater sprayed pepper spray at three officers at close range that lasted about half a minute. *Id.* at 14-15. The Court imposed a sentence of 80 months.

- *United States v. Lucas Denney*, 1:22-cr-00070 (RDM). Denney pleaded guilty to assault under § 111(b), without a plea agreement. On January 6, he deployed pepper spray at officers and then assaulted them with a pole, brandished a baton, pushed a riot shield into officers, and then swung at an officer. Denney was associated with the Proud Boys and Three Percenters and before January 6, he recruited people to engage in his militate event for January 6 because he thought it would be violent. He further sought people who would be willing to engage in violence to join him and solicited donations to pay for protective gear and pepper spray. On January 6, he wore full battle attire and repeatedly confronted police officers. After the attack, he lied to FBI agents about his involvement and deleted information from a social media account. The Court imposed a sentence of 52 months.

Other assault cases not involving pepper spray are also informative when determining an appropriate sentence. Even in those cases involving more egregious conduct that Isreal's behavior, the Court still imposed a lower sentence than the low-end of the advisory guidelines range in this case:

- *United States v. Sargent*, 1:21-cr-00258 (TFH). Sargent pleaded guilty to assault under § 111(a) and civil disorder under § 231, among other charges, after striking one officer and attempting to strike another officer but instead making contact with another protester. On January 6, he recorded the scene on social media while boasting, "we got a clash of police going on . . . Shit's getting fucking rowdy out here now. We got flash bangs." He

---

[19] The parties agreed that § 2A2.2 applied. *See* Plea Agreement (Dkt. No. 56) 2-3.

[20] The parties agreed that § 2A2.2 applied. *See* Plea Agreement (Dkt. No. 79) 2-3.

also bragged that he "duffed an officer in the face." After his arrest, Sargent lied to the FBI about his actions. The Court imposed a sentence of 14 months.

- *United States v. Leffingwell*, 1:21-cr-5 (ABJ). Leffingwell pleaded guilty to assault under § 111(a) after striking two officers in the head. Leffingwell was 52 years old when he committed the offense conduct. On January 6, when police officers tried to push back Leffingwell and the other gathering crowd at the Senate Wing of the U.S. Capitol, he punched one officer in the head two times and then another officer one time. He then tried to flee the scene. The Court imposed a sentence of 6 months.

- *United States v. Philip Young*, 1:21-cr-00617 (DLF). Young pleaded guilty to all charges, including assault under § 111(a), without a plea agreement. Early on in the U.S. Capitol breach, Young rushed up the stairs, grabbed and lifted a barricade and pushed it into two police officers. After being forced down the stairs, he pushed the barricade forward against the officers a second time. The Court imposed a sentence of 8 months.

- *United States v. Devlyn Thompson*, 1:21-cr-461 (RCL). Thompson pleaded guilty to assault under § 111(b) after assaulting officers to fight one on one, passing around riot shields to rioters and encouraging them to use the shields as weapons, and assaulting a police officer with a metal police baton. He was "among the first of the rioters to arrive on the inaugural stage and he was one of the last to leave." The Court imposed a sentence of 46 months.

- *United States v. Robert Palmer*, 1:21-cr-328 (TSC). Palmer pleaded guilty to assault under § 111(b) after assaulting officers by throwing a wooden plank like a spear, spraying officers with a fire extinguisher which he then threw at them, and then attacked them again with a piece of scaffolding and a second fire extinguisher and a traffic cone. He was not remorseful of his conduct but instead posted false narratives about January 6 on his fundraising site. The Court imposed a sentence of 63 months.

- *United States v. Kevin Douglas Creek*, 1:21-cr-00645 (DLF). Creek pleaded guilty to assault under § 111(a) based on pushing through the police barricade and grabbing an officer, driving him back forcefully several feet, striking him in the face shield, and shoving a different officer to the ground and kicking him. Creek also picked up a ratchet strap – a thick heavy strap with heavy metal buckles – and threw it at the officers. He also brought mace and a knife to the U.S. Capitol. The Court imposed a sentence of 27 months.

- *United States v. Alan Byerly*, 1:21-cr-257 (RDM).  Byerly pleaded guilty to assault under § 111(b) after he assaulted several officers with a taser and striking another person under § 1113 for assaulting a reporter. He engaged in three separate assaults: he activated a stun gun on one police officer and when it was taken by officers, he physically struck them and pushed against them; he grabbed an officer's baton and assaulted a group of officers using an enormous all metal Trump billboard with sharp edges that was capable of splitting someone's head open as a battering ram; and assaulted a member of the press, dragging him up and down the staircase. The Court imposed a sentence of 34 months.

- *United States v. Mark Mazza*, 1:21-cr-736 (JEB). Mazza pleaded guilty to assault under § 111(b) and carrying a pistol without a license after he brought two loaded firearms with him to the U.S. Capitol. While armed with one firearm, he apparently lost the other one in the crowd and it was subsequently recovered from another rioter who assaulted an officer, he pushed against officers in the tunnel, berated and assaulted officers with a stolen police baton, and remained armed on the U.S. Capitol for several hours. After he left the area, he engaged in numerous acts of obstruction, including filing a false police report about how he lost his gun, filing off the serial number of the stolen police baton, and providing false information to the U.S. Capitol police. The Court imposed a sentence of 60 months.

- *United States v. Nicholas Languerand*, 1:21-cr-353 (JDB).  Languerand pleaded guilty to assault under § 111(b) after assaulting officers by throwing a piece of wood, a heavy black speaker, multiple sticks, and a large traffic cone and also using a riot shield against officers. He showed no remorse for his conduct and bragged about and offered justifications for his violent behavior. Languerand had prior assaultive and threatening conduct and when he was arrested, he had an extensive arsenal, writings deeply critical and menacing of the FBI, photos of the Proud Boys, three percenters, and Nazi iconography. The Court imposed a sentence of 44 months.

These cases in both the pepper spray and assault context demonstrate that a sentence at the low-end of the guidelines range and even the variance suggested by U.S. Probation are far greater than necessary in this case. Although Isreal committed serious misconduct on January 6, his case is so factually different from other January 6 defendants given his young age, the lack of any evidence demonstrating violent rhetoric – or really, any rhetoric – leading up to and after January 6, and his remorse after the incident.  Isreal made a terrible decision in the heat of the moment during the January 6 riot, and he has already suffered significant adverse consequences from his behavior. He will continue to do so when he self-reports to a BOP facility. But a sentence of 12 months and one day would be a sufficient under these unique circumstances to satisfy the purposes of sentencing.

## IV.     CONCLUSION

For the foregoing reasons, Isreal respectfully requests that the Court sentence him to 12 months and one day, followed by a significant period of supervised release. As U.S. Probation

found, Isreal has maintained perfect compliance with his conditions of release, and he will continue to do so when he is on supervised release. Isreal further requests the Court to allow him to self-surrender and to report to a BOP facility in Kentucky near his home and his family.

<div style="margin-left: 3em;">

Respectfully submitted,

Isreal Easterday

By:    /s/ Geremy C. Kamens
Geremy C. Kamens
Federal Public Defender
Office of the Federal Public Defender (Alexandria)
1650 King St, Suite 500
Alexandria, VA 22314
T: 703-600-0848
F: 703-600-0880
Geremy_Kamens@fd.org

Brittany M. Davidson
Assistant Federal Public Defender
Office of the Federal Public Defender (Alexandria)
1650 King St, Suite 500
Alexandria, VA 22314
T: 703-600-0817
F: 703-600-0880
Brittany_Davidson@fd.org

</div>