**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:22-cr-404 (JEB)** |
| **ISREAL EASTERDAY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Isreal Easterday to 151 months of imprisonment, three years of supervised release, $2,000 in restitution, and the mandatory $630 special assessment. The government's recommended custodial sentence lies at the bottom of the applicable Sentencing Guidelines range.

## I.    INTRODUCTION

Defendant Isreal Easterday—an unemployed 23 year-old who briefly served as a missionary and worked in construction—used pepper spray to assault and injure two police officers during the January 6, 2021 attack on the United States Capitol, a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

On January 6, 2021, at approximately 2:00 p.m., Easterday was part of the mob that first breached the police line on the East side of the Capitol. Carrying a flagpole waving the Confederate battle flag, Easterday entered the restricted area, pushed his way through the mob, and climbed up to the top landing outside the Capitol's East Rotunda Doors. There, he acquired a can of pepper spray and used it to assault U.S. Capitol Police ("USCP") Officer Joshua Pollitt, who was guarding the East Rotunda Doors, by spraying the chemical irritant directly into Officer Pollitt's face from just an arm's length away. Officer Pollitt collapsed moments after Easterday sprayed him, and experienced excruciating pain and partial blindness for hours. After this attack, Easterday acquired a second can of pepper spray from another rioter and used it to assault a different group of USCP officers guarding the East Rotunda Doors, striking USCP Officer Miguel Acevedo, and causing him to experience excruciating pain and partial blindness for hours, just like Officer Pollitt. A few minutes later, when rioters already inside the building forced the East Rotunda Doors open, Easterday took advantage of the opening to enter the Capitol himself and forcibly pulled several other rioters into the building. Once inside, Easterday roamed through the building for approximately 13 minutes. The next day, in an effort to hide evidence of his guilt, Easterday wiped photographs, posts, and communications from his Facebook account.

Easterday proceeded to trial, where the jury convicted him on all counts, including the charges of assaulting Officers Pollitt and Acevedo with dangerous or deadly weapons, in violation of 18 U.S.C. § 111(b) (Counts 2 and 3). The government's recommended sentence of 151 months

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

of incarceration reflects the gravity of Easterday's conduct; his conviction on 9 counts, including six felonies, five of which involved violence; his destruction of evidence; and his lack of remorse.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the affidavit ("Statement of Facts") filed in support of the original Complaint in this case, ECF No. 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars. The government also refers the Court to the government's Response in Opposition to Defendant's Motion for Judgment of Acquittal and, in the Alternative, for a New Trial as to Counts Two, Three, Four, Five, and Six, ECF No. 98, for a summary of the trial evidence.

### B.      Easterday's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

On January 6, 2021, having traveled from his home in Bonnieville, Kentucky to Washington, D.C., Easterday dressed in blue jeans, a black leather jacket, and a black "I <heart> Trump" beanie and attended the "Stop the Steal" rally near the Washington Monument. At some point that morning, Easterday climbed a tree in the area and proudly displayed the Confederate battle flag that he had brought with him. *See* GEX 401.



*GEX 401: Photograph of Easterday displaying his Confederate battle flag near the Ellipse*

Around the time the rally concluded, Easterday marched with others to the restricted Capitol grounds, which he entered on the east side. There, Easterday encountered bicycle rack barricades bearing "Area Closed" signs and a small number of police officers blocking rioters like Easterday from accessing the East Plaza, where the Vice President's motorcade was staged. At approximately 2:00 p.m., however, the Secret Service relocated the Vice President's motorcade in response to the escalating threat presented by the rioters, particularly those who had broken through police lines on the West Front and were bearing down on the Capitol building itself. Almost immediately afterward, hundreds of rioters on the East Front, including Easterday, broke through the barricades and stormed the East Plaza, concentrating on the central stairs leading to the East Rotunda Doors. Easterday, waving his Confederate battle flag high, pushed his way through the mob and ascended those central stairs, positioning himself directly in front of the East Rotunda Doors, the central access to the Capitol building on the East side. *See* GEX 414.



*GEX 414: Screenshot from CCTV footage of the East Front*

At the time, the East Rotunda Doors were locked and the rioters were temporarily stymied. As the rioters attempted to gain entry to the Capitol building through those locked doors, a small group of USCP officers, including Officers Pollitt and Acevedo, gathered on the landing. Vastly outnumbered, the officers were nevertheless determined to block the rioters from opening the East Rotunda Doors, entering the Capitol building, and further threatening and obstructing the assembled politicians and their staff members, and by extension the democratic process. Easterday pushed and maneuvered until he was directly in front of the East Rotunda Doors. *See* GEX 404.



*GEX 404 at 3:15: Screenshot of Easterday (yellow arrow, holding flagpole bearing Confederate flag)*

### *Assault #1 – Officer Pollitt*

At some point, Easterday acquired a cannister of pepper spray from another rioter. Video footage shows that as soon as Easterday acquired it, he shook it up, raised his hand, pointed it directly at the nearest police officer—Officer Pollitt—and blasted the spray into Officer Pollitt's unprotected face from a mere arm's length away. *See* GEX 404-405.



*GEX 405 at 5:15: Screenshot of Easterday (right) spraying Officer Pollitt (left) (both outlined in white) with pepper spray*

Easterday emptied as much of cannister's contents into Officer Pollitt's face as he could; as soon as the spray strength dissipated to the point where it could not do as much damage, Easterday tossed the cannister into the nearby crowd.

At the time Easterday assaulted him, Officer Pollitt was in the midst of trying to hold off an overwhelming number of rioters who had overrun the police barricades and lines and who were attempting to access the Capitol building through the East Rotunda Doors. 10/24/23 Trial Tr. 83-86, 99-102. Easterday's attack caused Officer Pollitt to experience pain rating "a solid eight, nine on the pain scale. . . . I would imagine if you got battery acid thrown on your face, it's that kind of burning feeling. It's not a pepper burn." *Id*. at 96:13-16. The pain from the spray lasted for hours. *Id*. at 96-98.

Officer Pollitt also experienced partial blindness, which lasted for several hours as well, as a result of Easterday's assault: "My eyes immediately clamped shut. He got me mostly in the left eye. But instinctively, both eyes just slammed shut. I wasn't able to see. I really had to fight to get my right eye open so that I could see and was able to defend myself. But my left eye didn't open again for a few hours." *Id*. at 97:8-12. Indeed, "[i]t was a good while before that pain wasn't really kind of ringing in my head." *Id.* at 98:14-15.

Easterday's assault dramatically reduced Officer Pollitt's ability to see, hear, and function. Moments later, while Officer Pollitt was attempting to aid another officer, Officer Pollitt found himself trapped in a corner near the East Rotunda Doors, surrounded by violent rioters, separated from his fellow officers and being crushed against the wall ("got myself in a pretty bad position, ended up being crushed against the door"). *Id.* at 99-101, 102:1-5. It was a highly dangerous position for any officer, particularly one whose ability to defend himself was impaired, thanks to Easterday's attack. It got worse. Officer Pollitt soon lost consciousness and collapsed into the mob of rioters, temporarily at their mercy. Officer Pollitt said he was "out for a couple minutes. I ended up falling down to the ground. I couldn't see. A rioter tried to take my baton from me. I had to fight my way back up." *Id.* at 85:15-20. Because Officer Pollitt "couldn't see" anything after being sprayed by Easterday, he was terrified that a rioter would be able to grab his gun and use against him or his fellow officers. *Id.* at 85-86. Luckily, no rioter stole Officer Pollitt's gun or further assaulted him while he was unconscious. Once Officer Pollitt regained consciousness, he was terrified by how vulnerable he had been. The intense pain and vision loss continued for hours.

### *Assault #2: Officer Acevedo*

Immediately after his attack on Officer Pollitt, Easterday turned and weaved his way through the crowd, away from Officer Pollitt, to a position near one of the columns just north of

the East Rotunda Doors. *See* GEX 406. While he was standing there, an unknown rioter handed

Easterday a second cannister of pepper spray. *See* GEX 408.



*GEX 408 at 00:27: Screenshot of Easterday receiving the second cannister of pepper spray*

Easterday examined the cannister briefly and then looked up, smirking, in the direction of

a group of officers, which included Officer Acevedo, standing in front of the East Rotunda Doors.

*See id.*



*GEX 408 at 00:37: Screenshot of Easterday smirking as he looks in the direction of the USCP*
*officers while holding the second cannister of pepper spray*

Easterday maneuvered closer to the officers, raised his hand as high as he could, and

indiscriminately unleashed a blast of the pepper spray into the group of officers. Easterday hit

Officer Acevedo in the face, causing him intense, searing pain and loss of vision that lasted for

hours. *See id.*



*GEX 408 at 00:54: Easterday (outlined in white) indiscriminately deploying the second pepper spray cannister into the group of officers*

Officer Acevedo likened the sensation to "if anybody's gotten some sort of something hot, any substances in their hand, just imagine that maybe a hundred, 200 times on your sensitive eyes." *Id.* at 139:5-7. Officer Acevedo said that the pain he felt registered a "ten out of ten" on the pain scale. *Id.* at 139:8-11. He "couldn't see anything" "for a few hours" and, like Officer Pollitt, he was afraid that a rioter would take his gun due to his vulnerability. *Id.* at 139-140.

### Entry into the Capitol Building

Shortly thereafter, at approximately 2:39 p.m., rioters already inside the Capitol building managed to force open the East Rotunda Doors from the inside, allowing Easterday and hundreds of others in the mob to stream into the building. Not satisfied with only entering himself, Easterday stood just inside the door and grabbed the shirts and jackets of other rioters, yanking them inside, determined to build the mob's numbers. *See* GEX 305.



*GEX 305 at 2:39:48 p.m.: Screenshot of Easterday (outlined in yellow) pulling other rioters into the Capitol building*

After pulling several rioters inside, Easterday left the area and roamed the Capitol building, proceeding up the central stairs, to the Rotunda, and then to the hallways outside of the Senate chamber. As he did so, he appeared to use his cell phone to photograph and/or film his actions and those of other rioters, *see* GEX 307 at 2:40:40 p.m., and to engage in video calls with unknown others, *see* GEX 309 at 2:41:03-21.



*GEX 307 at 2:40:40 p.m.: Screenshot of Easterday (outlined in yellow) using his cell phone to photograph and/or film rioters on the Gallery Stairs*



*GEX 309 at 2:41:15 p.m.: Screenshot of Easterday (outlined in yellow) appearing to use his cell phone to photograph, film, and/or engage in a video call in a Capitol corridor*

After spending approximately thirteen minutes inside the Capitol building, Easterday exited the building through the East Rotunda Doors.

### Destruction of Evidence

Evidence introduced at trial shows that on January 7, 2021, Easterday destroyed evidence.

12

Specifically, the day after the riot, when news outlets were widely reporting that rioters were being investigated and arrested, Easterday deleted photographs and communications from his Facebook account.

Easterday's Facebook account records reveal that on the afternoon of January 7, 2021, Easterday deactivated his Facebook Account. *See* GEX 505. Just seven minutes later, he reactivated it. *Id.* The next day, Easterday uploaded a photograph and appeared to resume normal activity on the account.

In April 2022, the lead FBI investigator, Special Agent Andrew Martin, served Meta Platforms, Inc. (formerly Facebook) with a letter requesting preservation of Easterday's Facebook account, followed by a search warrant. 10/25/23 Trial Tr. at 62-64. The warrant required Meta to provide the government with among other things, all photographs, videos, posts, and communications Easterday connected with Easterday's Facebook account between November 3, 2020, and the date of execution of the search warrant, which was some time after December 1, 2022, the date the warrant was signed. *See* 22-sc-3077, ECF Nos. 1-2. Despite the fact that the *transactional records* for Easterday's Facebook account showed that Easterday was a regular Facebook user during the time period searched, often engaging in private communications and sending attachments to others, the *content* of Easterday's Facebook account was basically empty; it did not contain *any actual photographs, posts, or private communications. See id.* at 64-69. Special Agent Martin testified that the absence of such photographs or communications in Easterday's account data, when the transactional records show that such things should be there, particularly the attachments to Easterday's messages, indicates that Easterday likely deleted or removed them. *See id.* at 69:16.

Easterday also told the U.S. Probation Office that he does not have any social media accounts, *see* PSR ¶ 95, which is false. Special Agent Martin discovered that Easterday has Facebook and Instagram accounts, *see* 10/25/23 Trial Tr. at 62-69, and the government subsequently found that Easterday maintains a Snapchat account as well.

### III.    THE CHARGES AND TRIAL VERDICT

On August 16, 2023, a federal grand jury returned a superseding indictment charging Easterday with 9 counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Counts 2 and 3); Entering or Remaining in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count 4); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count 5); Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count 6); Disorderly Conduct in a Capitol Building or Ground, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 7); Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 8); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 9).

On October 26, 2023, after a four day-long trial, a jury convicted Easterday on all counts.

### IV.    STATUTORY PENALTIES

Easterday now faces sentencing on each of the counts listed above. The maximum terms of incarceration for each count are detailed in the chart below.

| Count | Statute | Maximum Term of Imprisonment |
|:---:|:---|:---:|
| 1 | 18 U.S.C. § 231(a)(3) | 5 years |
| 2 | 18 U.S.C. § 111(a)(1) and (b) | 20 years |
| 3 | 18 U.S.C. § 111(a)(1) and (b) | 20 years |
| 4 | 18 U.S.C. § 1752(a)(1) and (b)(1)(A) | 10 years |
| 5 | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) | 10 years |
| 6 | 18 U.S.C. § 1752(a)(4) and (b)(1)(A) | 10 years |
| 7 | 40 U.S.C. § 5104(e)(2)(D) | 6 months |
| 8 | 40 U.S.C. § 5104(e)(2)(F) | 6 months |
| 9 | 40 U.S.C. § 5104(e)(2)(G) | 6 months |

For each of the felony counts, *i.e.* Counts 1-6, the Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per count.

On the three Class B misdemeanor counts, *i.e.* Counts 7-9, Easterday faces up to six months of imprisonment or up to five years of probation, a fine of up to $5,000, and a mandatory special assessment of $10.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the guideline analysis in the Presentence Investigation Report ("PSR") except in two respects.

First, Probation has incorrectly applied the grouping rules. *See* PSR ¶¶ 47-51. Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group, but Probation has interpreted "closely related" too expansively. Pursuant to USSG § 3D1.2, the offenses of conviction should generate three groups, not two:

> a)   Group One consists of Count 1 (Civil Disorder), Count 2 (Assault on Officer Pollitt), and Count 6 (Engaging in Physical Violence in a Restricted Building or

Ground). These three offenses group because they all involve the same victim—Officer Pollitt—and the assault against Officer Pollitt (Count 2) embodies conduct that is treated as a specific offense characteristic in the guidelines for Counts 1 and 6, so Count 2 groups with them.[2] The offense level for this group is 29.

b) Group Two consists solely of Count 3 (Assault on Officer Acevedo). Count 3 does not group with any other count because Officer Acevedo is a distinct victim, *see* USSG § 3D1.2(a-b), and the conduct against him is not "treated as a specific offense characteristic in, or other adjustment to," the Guidelines for any other count, USSG § 3D1.2(c). The highest offense level for this group is 29.

c) Group Three consists of Count 4 (Entering and Remaining in a Restricted Building or Ground) and Count 5 (Disorderly or Disruptive Behavior in a Restricted Building or Ground). Contrary to Probation's analysis, *see* PSR ¶¶ 48-49, these offenses should not be included in Group One because these offenses involve a different victim—Congress—and Easterday's infiltration of the restricted U.S. Capitol grounds, his entry into the U.S. Capitol building, and the 13 minutes he spent roaming inside of it were not "part of a common scheme or plan" with his assaults against Officers Pollitt and Acevedo. *See* U.S.S.G. § 3D1.2(a-c). As such, these offenses should form a third separate group. The highest offense level for this group is 27.

Properly applying the grouping rules results in a total of three units, not the two units calculated by Probation. *See* PSR ¶ 69.

Second, Easterday should also receive a two-level enhancement, pursuant to U.S.S.G. § 3C1.1 (Obstructing or Impeding the Administration of Justice) because when he deleted the photographs and communications on his Facebook account on January 7, 2021, *see* GEX 505, 10/25/23 Trial Tr. at 62-69, he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1.

The PSR correctly declines to apply the new guideline, U.S.S.G. § 4C1.1, which was added

---

[2] While this same logic could apply to Count 3 (Assault on Officer Acevedo), Comment 5 to § 3D1.2 states that where there are several counts, each of which could be treated as an aggravated factor for another count, only one count representing this factor is to be grouped. Thus, since Count 2 (Assault on Officer Pollitt) is already in this group, Count 3 should not be added to it.

in the 2023 amendments to the Sentencing Guidelines. Section 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case, however, because Easterday personally engaged in violence or credible threats of violence against people or property, as assessed under a totality of the circumstances, and because Easterday possessed a dangerous weapon, as broadly defined in U.S.S.G. § 1B1.1, cmt. n1. Indeed, the jury already reached these determinations in convicting Easterday of two violations of 18 U.S.C. § 111(a)(1) and (b) (Counts 2-3), as well as three other violent felonies (*see* Counts 4-6) and one violation of 18 U.S.C. § 231(a)(3) (Civil Disorder) (Count 1), all based on the evidence presented at trial that Easterday sprayed a chemical irritant into the faces of USCP Officers Pollitt and Acevedo, injuring them both.

Section 4C1.1 is inapplicable for a second reason as well: Easterday possessed a dangerous weapon as broadly defined in 1B1.1 cmt. n.1, namely the two bottles of pepper spray. Again, the jury has already reached this conclusion. In finding Easterday guilty of Counts 3-6, the jury determined that he possessed a dangerous or deadly weapon in the course of committing those offenses. As such, section 4C1.1 does not apply to Easterday.

If the Court agrees that the offenses of conviction generate three groups rather than two, Easterday's total adjusted offense level would become 32. If the Court also agrees that the two-level enhancement for obstruction is appropriate, Easterday's total adjusted offense level would become 34. The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 79. Accordingly, based on the government's calculation, Easterday' Guidelines imprisonment range is 151-188 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offenses

As shown in Section II(B) of this memorandum, Easterday's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Easterday—who was proudly carrying and waving a Confederate battle flag, an established symbol of racism and insurrection—was part of the mob that overwhelmed police officers on the east side of the Capitol. He then assaulted and injured two police officers using dangerous or deadly weapons—specifically, pepper sprays. Easterday's smirk before deploying the second cannister, having observed the effects of his first spray against Officer Pollitt, demonstrates both his callousness towards other human beings and the enjoyment he received from engaging in violence. Unlike the vast majority of rioters who entered the building, Easterday took the time to forcibly pull several other rioters inside, demonstrating that his conduct was intentional and his goal was to have as many rioters as possible enter the Capitol. The nature and circumstances of Easterday's offenses were of the utmost seriousness, and they fully support the government's recommended sentence of 151 months of incarceration.

### B.  The History and Characteristics of the Defendant

Easterday is currently unemployed and supported by his family. *See* PSR ¶¶ 105-106. For a few months at a time, Easterday has held various construction jobs, but in total he has worked for less than a year of his life.  *See id.* ¶¶ 105-11. At the time he was arrested in this case, he was

in the midst of serving as a missionary in the Caribbean, which he had been doing for approximately nine months. *See id.* ¶ 107.

Easterday has no criminal history, but he has used marijuana regularly for years and appears to drink alcohol excessively, which he acknowledges. *See id.* ¶¶ 77-83, 100. Other than his marijuana usage and underage drinking, Easterday appears to have led a law-abiding life, although he lied to Probation about having social media accounts.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Easterday's criminal conduct on January 6 was the epitome of disrespect for the law. As Judge Berman Jackson stated at sentencing in *United States v. Cronin*, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *Cronin*, Tr. 06/09/23 at 20. Here, Easterday attacked and injured two police officers simply because they *were* police officers enforcing the law and standing in his way. Moreover, he did so after proudly carrying and waving the Confederate battle flag, itself a symbol of treason, defiance of the law, and insurrection.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a substantial term of incarceration.

In the wake of the riot at the Capitol, Easterday did not contact the police or the FBI and turn himself in, as some rioters did, or otherwise express remorse. Instead, he deleted evidence in an attempt to avoid responsibility. In fact, he has never expressed remorse for his conduct on January 6. As such, the Court cannot be confident that Easterday would not engage in the exact same behavior in the future if he thought it was justified, if he thought—again—that it was a necessary and righteous response to government action with which he disagreed. With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Easterday in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr.

at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

According to the government's records, courts in this district have sentenced at least 11 defendants who—like Easterday—were convicted of violations of 18 U.S.C. § 111(b) for using chemical irritant sprays to assault police officers on January 6.[6] Of those convictions, only three (other than Easterday's) were the result of guilty trial verdicts:  *United States v. Peter Schwartz*, 21-cr-178-APM (sentenced to 170 months of incarceration); *United States v. Christopher Worrell*, 21-cr-292-RCL (sentenced to 120 months of incarceration); and *United States v. Sean McHugh*, 21-cr-453-JDB (sentenced to 78 months of incarceration). Although the other defendant discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide the most suitable comparisons to the relevant sentencing considerations in this case.

The case of *United States v. Julian Khater*, 21-cr-22 (TFH), provides the closest match to Easterday, albeit an imperfect one. In *Khater*, Judge Hogan sentenced the defendant to 80 months

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[6] Some of these defendants were also convicted of other felonies, including 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding), and/or had substantial criminal histories, which affected their Guidelines ranges.

of incarceration, which was within Khater's Guidelines range of 78 to 97 months, for less serious conduct and fewer counts of conviction than are at issue here. Once on the West Front of the Capitol, Khater observed the raging violence occurring against police officers and he willingly and voluntarily joined that attack. In retaliation for the officers' efforts at crowd control, Khater retrieved a can of pepper spray from his bag, aimed it towards officers who were distracted by a group effort to remove a barricade, and sprayed at least three police officers for approximately 30 seconds before a USCP lieutenant responded by spraying Khater with chemical irritant. As a result of Khater's spray, the three officers were forced to retreat from the police line to seek aid. One of the officers spent approximately 20 minutes decontaminating his face by pouring water over his eyes.[7] Another officer harmed by Khater temporarily lost her ability to see and required assistance from another officer to escape to safety. Khater pleaded guilty, via plea agreement, to two counts of assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(b). Although Khater's conduct and criminal history was similar to Easterday's, Khater's Guidelines range of imprisonment was 78-97 months, much lower than Easterday's, because Khater (1) received a three-level downward departure for acceptance of responsibility, pursuant to USSG § 3E1.1; (2) did not destroy evidence; and (3) did not plead guilty to any 18 U.S.C. § 1752 offenses victimizing Congress, and thus did not receive an additional level

---

[7] As the Court is likely aware, this officer was Officer Sicknick who died on January 7 after suffering two strokes after the riot. Although the defendant's chemical irritant spray was not the direct cause of Officer Sicknick's death, the Office of the Chief Medical Examiner for the District of Columbia concluded that "all that transpired [on January 6] played a role in [Officer Sicknick's] condition." 21-cr-222 (TFH), ECF No. 97 at 19. This fact underscores the seriousness of the conduct committed by Easterday and others who carelessly assaulted police officers throughout the course of the riot.

under the grouping rules, USSG § 3D1.1(a-d). Ultimately Judge Hogan sentenced Khater to 80 months' incarceration, 24 months' supervised release, a $10,000 fine, and $2,000 in restitution.

A stiffer sentence is warranted here because Easterday's conduct was worse than Khater's. While they both used pepper spray to assault multiple officers and qualified for Criminal History Category I, Easterday's sprays caused more serious injuries. Additionally, Khater only deployed chemical irritant spray once, hitting multiple officers, while Easterday sprayed officers *twice*, a few minutes apart. Indeed, after having had the opportunity to witness the severe impact of his assault on Officer Pollitt, Easterday *smirked* when he received a second spray cannister and immediately sprayed it indiscriminately at the group of officers that included Officer Acevedo. Moreover, Easterday engaged in further criminal conduct that Khater did not: he yanked other rioters into the Capitol building, exacerbating that crisis, and destroyed evidence. Finally, Khater pleaded guilty, accepted responsibility, and expressed remorse, whereas Easterday did none of those things. Easterday thus deserves a longer sentence than Khater received.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Easterday was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019)

(quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Easterday to pay $2,000 in restitution for his convictions on Counts 1-9. This amount fairly reflects Easterday's role in the offenses and the

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 151 months of imprisonment, three years of supervised release, $2,000 in restitution, and the mandatory $630 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel, Capitol Siege Section
Assistant United States Attorney
Florida Bar. No. 1026025
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
michael.gordon3@usdoj.gov
(813) 274-6000

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

BENJAMIN J. SMITH
Assistant United States Attorney
New York Bar No. 5220637
U.S. Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Benjamin.smith4@usdoj.gov